**EXHIBIT LIST TO RELATORS JOHN KING AND JANE DOE'S RESPONSE TO DEFENDANTS SOLVAY AMERICA AND SOLVAY NORTH AMERICA'S MOTION TO DISMISS**

| Exhibit No. | Description |
|---|---|
| 1 | Defendants' Solvay Pharmaceuticals, Inc. and Solvay America, Inc. Corporate Disclosure Statement (Docket No. 23) filed in Case No. 2:05-CV-234; *Carolyn Volpini v. Wyeth Pharmaceuticals, Inc., et al.;* U.S. District Court, District of Vermont |
| 2 | *122261 Fondren, LLC v. Riverbank Realty CP, LLC,* No. H-9-4074, 2010 WL 1741071, at *1 (S.D. Tex. Apr. 29, 2010) |
| 3 | *Leisure Hospitality, Inc. v. Hunt Properties, Inc.,* No. 09-CV-272-GKF-PJC, 2010 WL 4824495, at *4-5 (N.D. Okla. Nov. 22, 2010) |
| 4 | *Akins v. Brewster Place,* No. 09-4153-JAR, 2010 WL 750254, at *1 (D. Kan. Mar. 2, 2010) |
| 5 | *Yount v. Research Specialists, Inc.,* No. 07-1218, 2008 WL 4470189, at *1-2 (E.D. La. Sept. 30, 2008) |
| 6 | *Heraeus Electro-Nite Co. v. Midwest Instrument Co., Inc.,* No. 06-355, 2006 WL 3004877, at *2 (E.D. Pa. Oct. 18, 2006) |
| 7 | *Berrios-Bones v. Nexidis, LLC,* No. 2:07CV193DAK, 2007 WL 3231549, at *9 (D. Utah Oct. 30, 2007) |
| 8 | *Meier v. Provima, Inv.,* No. 8:06-cv-336-T-24, 2006 WL 3876371, at *2 (M.D. Fla. May 11, 2006) |
| 9 | *FTC v. Citigroup, Inc.,* No. 1:01-CV-606-JTC, 2001 WL 1763439, at *4 (N.D. Ga. Dec. 27, 2001) |
| 10 | *Commercial Metals Co.* No. 3:09-CV-0808-B, 2009 WL 3853704, at *6 (N.D. Tex. Nov. 17, 2009) |
| 11 | *Breckenridge Enterprises, Inc. v. Avio Alternatives, LLC,* No.3:08-CV-1782-M, 2009 WL 1936147 (N.D. Tex. Jan. 22, 2009) |
| 12 | *Neal v. Lanier Professional Svcs.,* No. 3-00-CV-53-G, 2001 WL 1335860 (N.D. Tex. Oct. 24, 2001) |

Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2005 NOV 18 AM 8 16

CLERK

BY _____
DEPUTY CLERK

CAROLYN VOLPINI,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          CASE NO. 2:05-CV-234
                                    )
WYETH PHARMACEUTICALS, INC.,        )
et al.,                             )
                                    )
            Defendants.             )

## DEFENDANTS' SOLVAY PHARMACEUTICALS, INC. AND SOLVAY AMERICA, INC. CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed.R.Civ.P. 7.1 and Local Rule 5.2, Defendants Solvay Pharmaceuticals, Inc. and Solvay America, Inc. disclose the following:

1.    Solvay Pharmaceuticals, Inc. is wholly owned (100%) by Solvay America, Inc.

2.    Solvay America, Inc. is wholly owned (100%) by Solvay S.A., a Belgian business entity whose shares are publicly traded in Europe.

Dated at Burlington, Vermont this 17th day of November, 2005.

DINSE, KNAPP & McANDREW, P.C.

By: _____
     John D. Monahan, Jr.

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

{B0108174.1 11982-0003}

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

CAROLYN VOLPINI,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        CASE NO.  2:05-CV-234
                                    )
WYETH PHARMACEUTICALS, INC.,        )
*et al.*,                           )
                                    )
                Defendants.         )

## CERTIFICATE OF SERVICE

I, John D. Monahan, Jr., Esq., hereby certify that I have served Defendants Solvay

Pharmaceuticals, Inc. and Solvay America, Inc.'s Corporate Disclosure Statement on counsel

of record herein by mailing copies thereof, postage prepaid to:

D. Michael Noonan, Esq.
Shaheen & Gordon, P.A.
P.O. Box 977
Dover, NH  03821-0977

Dated at Burlington, Vermont this 17th day of November, 2005.

DINSE, KNAPP & McANDREW, P.C.

By: _John D. Monahan, Jr., Esq._

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

{B0108177.1 11982-0003}

Exhibit 2



Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)
**(Cite as: 2010 WL 1741071 (S.D.Tex.))**

**c**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
122261 FONDREN, LLC, Plaintiff,
v.
RIVERBANK REALTY GP, LLC, Allen Gross,
and GFI Management Services, Inc., Defendants.

Civil Action No. H-09-4074.
April 29, 2010.

West KeySummary**Corporations 101** 349

101 Corporations
    101X Officers and Agents
        101X(D) Liability for Corporate Debts and
Acts
            101k349 k. Insolvency or dissolution of
corporation. Most Cited Cases
        An insolvent corporation's creditor sufficiently
stated a claim for breach of duty of loyalty against a
director of the corporation. The creditor alleged that
the director violated his duty of loyalty by remitting
payments to management services company while
the corporation's property deteriorated in the after-
math of a hurricane. The creditor also alleged that
the director, in failing to fulfill the corporation's ob-
ligation to pay the mortgage on the property, be-
nefited personally from the rental payments to the
management company in which he owned an in-
terest.

An insolvent corporation's creditor sufficiently
stated a claim for breach of duty of loyalty against a
director of the corporation. The creditor alleged that
the director violated his duty of loyalty by remitting
payments to management services company while
the corporation's property deteriorated in the after-
math of a hurricane. The creditor also alleged that
the director, in failing to fulfill the corporation's ob-
ligation to pay the mortgage on the property, be-
nefited personally from the rental payments to the
management company in which he owned an in-
terest.

Darryl Wade Anderson, Fulbright & Jaworski,
Houston, TX, for Plaintiff.

Daniel K. Hedges, Jimmie D. Aycock, Jr., Thomas
Andrew Woolley, III, Porter & Hedges, Houston,
TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**
GRAY H. MILLER, District Judge.
    *1 Before the court is defendants' motion to
dismiss pursuant to Federal Rule of Civil Procedure
12(b)(6). Dkt. 11. After considering defendants'
motion, plaintiff's response, defendants' reply, and
the applicable law, the motion is DENIED.

**I. BACKGROUND**
    Plaintiff 12261 Fondren, LLC ("12261 Fon-
dren"), sues both in its individual capacity and de-
rivatively on behalf of Riverbank Realty, LP. Dkt. 1
at 1.122261 Fondren alleges that Riverbank Realty,
GP, LLC, Allen Gross, and GFI Management Ser-
vices, Inc. ("GFI"), breached contractual and fidu-
ciary duties. Dkt. 1 at 1. The following facts are al-
leged by 122261 Fondren in its complaint: Gross
served as guarantor on a commercial real estate
loan amounting to $8,600,000.00, and a 320-unit
apartment complex in Houston, Texas, secured that
loan. Dkt. 1 at 1-2. As a result, Riverbank Realty,
LP, was indebted on a promissory note, dated
March 7, 2006. Dkt. 1 at 4. Gross and Riverbank
Realty, LP, defaulted on this loan. Dkt. 1 at 2, 6.
Due to these defaults, the noteholder accelerated
the maturity date and demanded payment of the bal-
ance on May 29, 2009. Dkt. 1 at 7. After accelera-
tion, the parties agreed to the designation of a
court-appointed receiver on July 10, 2009, and the
property was sold at public auction on December 1,
2009. Dkt. 1 at 8.

    122261 Fondren contends that Gross and Ri-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)
(Cite as: 2010 WL 1741071 (S.D.Tex.))

verbank Realty, LP, failed to perform contractual duties under the guarantee. Dkt. 1 at 2, 6. 122261 Fondren also claims that Gross and Riverbank Realty GP, LLC, breached fiduciary duties to Riverbank Realty, LP. Dkt. 20-22. Specifically, 122261 Fondren maintains that defendants violated their duty of care by failing to pay rental amounts and other revenues to the noteholder and allowing the property to waste following Hurricane Ike. Dkt. 1 at 20. 122261 Fondren also asserts defendants violated their duty of loyalty by remitting payments to GFI while the property deteriorated. Dkt. 1 at 21. In addition, 122261 Fondren pleads that GFI both aided and abetted and conspired with Gross and Riverbank Realty GP to commit breaches of fiduciary duties. Dkt. 1 at 22-23. Defendants now move for 12(b)(6) partial dismissal for failure to state a claim upon which relief can be granted on the issues of derivative cause of action, breach of fiduciary duties of loyalty and care, aiding and abetting, conspiracy, and alter ego. Dkts. 10, 11.

## II. STANDARD OF REVIEW

Rule 12(b)(6) provides that a party may move to dismiss an action for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, a court must accept the plaintiff's allegations as true and draw all reasonable inferences in its favor. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The court may not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts. *See Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999) (citing *St. Paul Ins. Co. of Bellaire, Texas v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir.1991)); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81

L.Ed.2d 59 (1984); *see also Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bonner v. Henderson,* 147 F.3d 457, 459 (5th Cir.1998) (quoting *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994) (citation omitted)). Dismissal can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *See Frith v. Guardian Life Ins. Co. of Am.,* 9 F.Supp.2d 734, 737-38 (S.D.Tex.1998).

*2 Motions to dismiss for failure to state a claim are viewed with disfavor and rarely granted. *Doss v. S. Cent. Bell Tel. Co.,* 834 F.2d 421, 424 (5th Cir.1987) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982)). The function of a complaint under the Federal Rules is to give the defendant fair notice of plaintiff's claim and the grounds upon which plaintiff relies. *Id.* (citing *Conley,* 355 U.S. at 47). When presented with a Rule 12(b)(6) motion to dismiss, the district court must examine the complaint to determine if the allegations provide for relief on any possible theory. *Id.*

## III. ANALYSIS
### A. 122261 Fondren's Derivative Cause of Action

In evaluating a diversity suit, federal courts apply the choice-of-law rules of the forum state. *Caton v. Leach Corp.,* 896 F.2d 939, 942 (5th Cir.1990). Both Riverbank Realty, L.P. and Riverbank Realty GP, LLC, are Delaware corporations. Dkts. 1 at 3, 11 at 7. Texas applies the "internal affairs doctrine," wherein the "internal affairs of the foreign corporation, 'including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares,' are governed by the laws of the jurisdiction of incorporation." *Hollis v. Hill,* 232 F.3d 460, 465 (5th Cir.2000) (quoting Tex. Bus. Corp. Act Ann. art. 8.02(A) (Vernon 1980)). Hence, Delaware law controls regarding the derivative nature of the suit.

122261 Fondren asserts derivative causes of action against defendants, suing in its creditor capacity as a beneficiary during Riverbank Realty, LP's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)
**(Cite as: 2010 WL 1741071 (S.D.Tex.))**

insolvency. Dkt. 1 at 2. Defendants claim that 122261 Fondren has "attempted to cast its claims as derivative in nature," but that they are essentially direct claims. Dkt. 11 at 10-11. The court disagrees. In the seminal *Gheewalla* case, the Delaware Supreme Court addressed the ability of creditors to bring direct and derivative breach of fiduciary duty actions against insolvent debtor corporations as beneficiaries in place of shareholders. *North American Catholic Education Programming Foundation, Inc. v. Gheewalla,* 930 A.2d 82, 101-02 (Del.2007). The court held that, while no direct claims for breaches of fiduciary duty may be asserted under Delaware law by creditors against insolvent corporations or corporations operating in the zone of insolvency, creditors could properly assert derivative actions on behalf of the insolvent entity. *Id.*__ Here, 122261 Fondren has put forward derivative claims for breaches of fiduciary duty as creditors on behalf of an insolvent corporation. Dkt. 1 at 2. This is precisely the situation endorsed by the Delaware Supreme Court in *Gheewalla,* 930 A.2d at 103 ("Creditors may ... protect their interest by bringing derivative claims on behalf of the insolvent corporation....").

Defendants cite *Torch Liquidating Trust v. Stockstill* as a similar complaint necessitating dismissal, but that case is clearly distinguishable. In *Torch,* the plaintiff amended its complaint following the Delaware Supreme Court's decision in *Gheewalla,* "replac[ing] nearly all of its prior references to 'creditors' with new references to 'creditors and shareholders' and sought damages on behalf of creditors and shareholders." *Torch Liquidating Trust v. Stockstill,* 561 F.3d 377, 382 (5th Cir.2009). In affirming the district court's dismissal, the court noted that the complaint failed to allege any "actual, quantifiable damages suffered by [plaintiff]." *Id.* at 390. No such circumstances exist in this case. Here, 122261 Fondren proffers a derivative action for alleged breaches of fiduciary duty as creditors on behalf of an insolvent corporation, rather than initially seeking direct damages and then altering the claim at a later date. Dkt. 1 at 2.

Further, 122261 Fondren has set forth specific monetary damages in the amount of $6,900,000.00 with regards to both breaches of fiduciary duty of care and loyalty. Dkt. 1 at 20, 22. Therefore, 122261 Fondren has sufficiently pled derivative claims.

**B. 122261 Fondren's Breach of Loyalty Claim**

*3 In its capacity as creditor on behalf of an insolvent entity, 122261 Fondren alleges breach of the fiduciary duty of loyalty, contending that defendants failed to properly pay moneys owed under the guaranty agreement to the noteholder and allowed the property to waste following Hurricane Ike. Dkt. 1, 20-22. Under the "internal affairs doctrine," matters relating to the internal workings of corporations and the duties of directors and shareholders are governed by laws of the state of incorporation. *Hollis v. Hill,* 232 F.3d 460, 465 (5th Cir.2000). Here, creditors of the insolvent corporation take on the beneficiary status normally reserved for shareholders and assert derivative claims on behalf of the corporation. *Gheewalla,* 930 A.2d at 102. These claims of breaches of fiduciary duty are therefore governed by Delaware law.

Defendants claim that the payments to GFI were lawfully owed, and that as a result 122261 Fondren has failed to state a claim. Dkt. 11, 22-23. The court again disagrees. The duty of loyalty demands that the best interests of the corporation and its beneficiaries takes precedence over that of the individual director. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993). Corporate decisions involving either a direct or indirect interest on the part of a particular director may implicate the duty of loyalty. *In re ALH Holdings,* 675 F.Supp.2d 462, 482 (D.Del.2009). "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone* ex rel. *AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del.2006) (internal footnote omitted). 122261 Fondren asserts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)
**(Cite as: 2010 WL 1741071 (S.D.Tex.))**

that defendants were contractually obligated to pay all rents on the property to the noteholder. Dkt. 1 at 21. 122261 Fondren contends that Gross, in failing to fulfill this obligation, benefitted personally from rental payments to GFI, a situation "involv[ing] ... a director appearing on both sides of a transaction [and] ... receiving a personal benefit from a transaction not received by the shareholders generally." *Id.* at 362.122261 Fondren, as creditor to the insolvent Riverbank Realty, LP, would be directly impacted as a beneficiary in the place of shareholders due to this breach. *Gheewalla,* 930 A.2d at 101-02. 122261 Fondren has therefore properly stated a claim for breach of duty of loyalty.

### C. 122261 Fondren's Breach of Care Claim

In its capacity as creditor on behalf of an insolvent entity, 122261 Fondren also maintains breach of fiduciary duty of care, averring that defendants allowed the property to waste and violated contractual obligations requiring all rents and revenues to be paid to the noteholder. Dkt. 1 at 20. Defendants urge that 122261 Fondren has failed to state a claim because 122261 Fondren failed to detail the decision-making process ordinarily protected under the business judgment rule, and that 122261 Fondren has an alternate direct claim for waste on the guaranty agreement. Dkt. 11 at 17-20. The court again disagrees. Directors of corporations, in properly fulfilling their duty of care, must consider all available information that is "reasonably available," and that process is "actionable only if grossly negligent". *Brehm v. Eisner,* 746 A.2d 244, 259 (Del.2000). Although defendants submit that 122261 Fondren has neglected to describe the alleged business decision "process" in this instance, 122261 Fondren correctly points out that the complaint stresses that improper payments under the guaranty agreement caused the specified damages. Dkt. 1 at 20. Violation of this contractual obligation would constitute an unlawful act and vitiate the fiduciary duty. *In re Walt Disney Co. Derivative Litig.,* 905 A.2d 27, 67 (Del.2006) ("A failure to act in good faith may be shown ... where [a] fiduciary acts with intent to vi-

olate applicable positive law."). Further, a plaintiff in this type of derivative suit must only present particular facts that raise a reasonable doubt that the alleged corporate action resulted from ordinary business judgment. *Brehm,* 746 A.2d at 254-55 (Del.2000). 122261 Fondren has pled sufficiently in this regard, alleging self-interested acts that led to waste of the property, which in turn harmed the creditors as beneficiaries of the insolvent corporation. Dkt. 1 at 20. Defendants' other grounds for dismissal-that 122261 Fondren has a direct claim for waste under the guaranty agreement-also fails to withstand scrutiny. 122261 Fondren's direct claims under the contract do not impugn those claims asserted derivatively by the creditor as a beneficiary on behalf of the insolvent corporation, as they are distinct and separate. *See Kramer v. Western Pacific Industries, Inc.,* 546 A.2d 348, 351 (Del.1988) (distinguishing between derivative actions by beneficiary shareholders brought on behalf of corporations and direct actions brought by beneficiary shareholders due to independent causes of action). 122261 Fondren has therefore properly asserted a claim for breach of duty of care.

### D. 122261 Fondren's Claims of Aiding and Abetting, Conspiracy, and Alter Ego

*4 Defendants premise their 12(b)(6) motions to dismiss 122261 Fondren's claims of aiding and abetting and conspiracy on the lack of a "viable claim for breach of fiduciary duty." Dkt. 11 at 23. As 122261 Fondren has properly pled claims for breach of the fiduciary duties of loyalty and care, defendants' motions to dismiss the claims of aiding and abetting and conspiracy are denied.

122261 Fondren has also sufficiently pled an alter ego claim. The parties agree that New York law controls for the alter ego claim. Dkts. 11 at 19, 13 at 23. In order to demonstrate an alter ego under New York law, it must be shown that the owner exercised total domination of the corporation with regards to the implicated transaction and that the owner utilized this domination to commit alleged wrongs resulting in injury. *Morris v. N.Y. State*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)
**(Cite as: 2010 WL 1741071 (S.D.Tex.))**

*Dep't of Taxation and Finance,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160-1161 (N.Y.1993). "[P]iercing the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners." *Id.* at 1160. 122261, 603 N.Y.S.2d 807, 623 N.E.2d 1157 Fondren alleges Gross is the "chief executive officer, chairman, secretary, chief financial officer, president, and director of GFI," and that Gross neglected contractually obligated payments while continuing to funnel money to GFI. Dkt. 1 at 17, 19-20. This demonstrates both domination and subsequent injury due to this domination. 122261 Fondren has pled sufficiently regarding its alter ego claim. *See Thompson-CSF, S.A. v. American Arbitration Ass'n* 64 F.3d 773, 777-78 (2d Cir.1995) ("Veil piercing determinations are fact specific and differ with the circumstances of each case.") (internal quotations and brackets omitted).

## V. CONCLUSION

Defendants' motion for partial dismissal as to the derivative cause of action, fiduciary duties of care and loyalty, aiding and abetting, conspiracy, and alter ego claims is DENIED.

It is So ORDERED.

S.D.Tex.,2010.
122261 Fondren, LLC v. Riverbank Realty GP, LLC
Not Reported in F.Supp.2d, 2010 WL 1741071 (S.D.Tex.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 3

Westlaw.

Slip Copy, 2010 WL 4824495 (N.D.Okla.)
**(Cite as: 2010 WL 4824495 (N.D.Okla.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Oklahoma.
LEISURE HOSPITALITY, INC., Plaintiff,
v.
HUNT PROPERTIES, INC.; SFM GP, LLC; and
SF Crossing Investors, LTD now SF Crossing Investors, L.P., Defendants.

No. 09-CV-272-GKF-PJC.
Nov. 22, 2010.

Courtney L. Bru, Steven K. Metcalf, William Hayden Spitler, IV, Doerner Saunders Daniel & Anderson, Tulsa, OK, for Plaintiff.

Christopher S. Thrutchley, Jon M. Payne, Keith A. Wilkes, Newton O'Connor Turner & Ketchum PC, Tulsa, OK, for Defendants.

## *OPINION AND ORDER*
GREGORY K. FRIZZELL, District Judge.
*1 This matter comes before the court on defendants' Motion to Dismiss Plaintiff's First Amended Complaint. [Doc. No.77]. For the reasons set forth below, the motion is denied.

### I. Background/Procedural History
This suit arises from the sale by defendant SF Crossing Investors, Ltd. ("Crossing") of land in the Smith Farm Marketplace in Owasso to plaintiff Leisure Hospitality, Inc. ("LHI"). Plaintiff sued defendants in Tulsa County District Court, alleging they negligently failed to convey the property free of encumbrances that would prevent or impair Leisure from constructing the hotel the parties contemplated would be built and operated by Leisure on the property. [Doc. No. 2-1, Petition, ¶ 16]. Defendants removed the case to federal court based on diversity jurisdiction and subsequently filed a Motion for Summary Judgment, arguing plaintiff's negligence claim was barred, as a matter of law, by the parol evidence rule. [Doc. No. 20]. The court granted defendants' Motion for Summary Judgment, but gave plaintiff leave to file an Amended Complaint. [Doc. No. 56].

### II. Allegations of First Amended Complaint
The First Amended Complaint alleges, in pertinent part, that LHI is in the business of building and operating hotel properties in Oklahoma. [Doc. No. 58, ¶ 1]; that Hunt Properties, Inc. ("Hunt") is in the business of owning, operating, managing, marketing and developing commercial real estate in the southwest region of the United States, including Oklahoma, and was the manager of SFM GP, L.L.C ("SFM") [*Id.,* ¶ 2]; that SFM was the general partner of SF Crossing Investors, Ltd. Now SF Crossing Investors, L.P. ("Crossing"); and that Crossing was in the business of owning, operating, managing, marketing and developing commercial real estate in the southwest region of the United States, including Oklahoma. [*Id.,* ¶ 4]. LHI alleges that Jim Shindler is an agent of all defendants. [*Id.,* ¶ 8], and that Shindler contacted the president of LHI, Robert Patel, in September 2005 about purchasing a portion of the Smith Farm Shopping Cener property located in Owasso (the "Property"). [*Id.*]. LHI alleges at all material times Shindler was a Vice President with Hunt, Hunt was represented to be the manager for SFM and SFM was represented to be the general partner for Crossing. [*Id.*]. LHI asserts that in October 2005, Patel provided Hunt, and specifically Shindler at Shindler's request, with site plans and architectural drawings depicting the proposed hotel, and advised Shindler that LHI's purchase of the Property was not only dependent on LHI's ability to develop the Property to include the Proposed Hotel, but also that LHI intended to develop or sell a portion of the Property for use as a restaurant. [*Id.,* ¶ 9].

The First Amended Complaint alleges that in November 2005, Schindler advised Patel he did not foresee any problem with development of the Property in the manner LHI intended but before the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4824495 (N.D.Okla.)
**(Cite as: 2010 WL 4824495 (N.D.Okla.))**

parties could enter into a purchase and sale agreement, defendants would need to get the consent of Target Corporation, the anchor tenant of the Smith Farm Shopping Center, and other owners with an interest in the shopping center, and that he did not foresee any difficulties obtaining the approval of Target and the other owners with respect to LHI's development of the proposed hotel on the property. [*Id.*, ¶ 10]. Plaintiff alleges that in early December 2005, Shindler advised Patel that defendants had received the approvals and consents necessary to permit LHI's development of the proposed hotel, that LHI and defendants could move forward with entering into a purchase and sale agreement and that defendants would begin drafting the agreement. Plaintiff alleges that at no time did Shindler advise Patel or LHI that the defendants did not have or could not obtain approval of the other owners with respect to LHI's development of the proposed hotel. [*Id.*, ¶ 12].

**\*2** Plaintiff alleges that, acting in reliance on the promises and representations of Shindler and the defendants that the consents and approvals necessary to permit LHI to develop the proposed hotel on the property had been or would shortly thereafter be obtained, on January 25, 2006, LHI entered into a purchase and sale agreement with defendants to purchase the property. [*Id.*, ¶ 13]. It asserts that although the Agreement specifically contemplates and defendants understood the property would be used to construct a four-story Hampton Inn Hotel, at the time the Agreement was executed, the property remained subject to certain covenants, easements and restrictions contained in a Declaration of Easements, Covenants and Restrictions ("EC & Rs") that had been filed of record on October 27, 2004, and which specifically prohibited the Property from being sued for hotel purposes. [*Id.*, ¶ 14]. Plaintiff contends that during the course of negotiating the Agreement, LHI made clear to Shindler and defendants and defendants understood that LHI's purchase of the Property was predicated on the Property being susceptible to development of the proposed hotel. [*Id.*, ¶ 15]. It alleges that, in entering into the Agreement, it acted in reliance on and induced by representations and promises made by Shindler and Defendants that the consents and approvals of Target and others with an interest in the Smith Farm Shopping Center had been or would be obtained before closing. [*Id.*]. Plaintiff alleges that both before and after entering into the Agreement, Shindler and defendants undertook to carry out promises and representations that had been make to LHI that they would obtain the necessary consents and approvals. [*Id.*, ¶ 16]. Without consulting, conferring with or notifying LHI, defendants undertook to amend the EC & Rs so as to permit the Proposed Hotel to be developed on the Property. An amendment prepared by Shindler and/or Hunt and/or SFM and/or Crossing was executed by all requisite property owners as of May 17, 2006 (the "Second Amendment") and was filed of record in the land records of Tulsa County, Oklahoma, on June 8, 2006. [*Id.*, ¶ 17].

The First Amended Complaint alleges that before the closing of the sale of the Property on June 8, 2006, it believed that pursuant to the promises and representations of and the duty assumed by the defendants, there were no restrictions against LHI's development of the property as a four story Hampton Inn Hotel and that defendants had complied with the promises and representations made and the duty assumed toward LHI by alleviating any restrictions or prohibitions with respect to such development that may have existed at the time LHI notified defendants of its intention to develop the Property to include the proposed hotel. [*Id.*, ¶ 18]. Further, plaintiff alleges defendants did not advise LHI that they had not complied with the promises and representations, that they had no such obligation to do so, or that they did not have any intention of doing so. [*Id.*].

**\*3** Plaintiff alleges "Shindler and Defendants intended to and did intentionally deceive LHI by representing to LHI that they would and could obtain the necessary approvals from affected property owners to permit construction of the Proposed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4824495 (N.D.Okla.)
(Cite as: 2010 WL 4824495 (N.D.Okla.))

Hotel when they had no intention of so doing. Instead, Defendants never intended to fulfill their promises to LHI, but instead intended only to lull LHI into believing Defendants would obtain the necessary consents and approvals to permit construction of the Proposed Hotel so as to induce LHI to enter into the Agreement so that once the Agreement was executed Defendants could renege on those promises and representations and ignore the duty they assumed in reliance on language in the Agreement they believed would shield them from liability on the basis that, as they have now admitted, LHI was itself required to obtain the necessary consents and approvals from affected property owners so as to permit development of the Proposed Hotel on the Property, that LHI had no right to rely on Defendants to do so, and, in fact, Defendants had no obligation to fulfill such promises and representations." [*Id.*, ¶ 20]. Plaintiff further alleges: "After LHI entered into the Agreement and up to and through closing of the property sale transaction, Defendants went so far as to conduct a series of activities designed to give the appearance they were fulfilling the promises and representations they made to LHI and the duty they assumed toward LHI to obtain the necessary consents and approvals of affected property owners to allow development of the Proposed Hotel on the Property, including communicating with affected property owners, drafting the Second Amendment, securing signatures on the Second Amendment, and filing the Second Amendment of record one minute before filing the deed conveying the subject parcels to LHI." [*Id.*, ¶ 21].

Plaintiff alleges Shindler and Defendants made promises and representations to LHI with the intent that LHI would rely on them and enter into the Agreement, trusting that defendants would fulfill their promises and representations and the duty they assumed toward LHI. [*Id.*, ¶ 22]. Plaintiff alleges "Defendants achieved the purpose of their fraudulent activities by inducing LHI to enter into the Agreement in reliance on the truthfulness of the promises and representations made and the duties assumed by Defendants that they would obtain the

consents and approvals necessary to permit LHI to develop the Property to include the Proposed Hotel, all to the detriment of LHI." [*Id.*].

Plaintiff seeks actual and punitive damages. [*Id.*, ¶¶ 23-24].

## III. Analysis

Defendants contend the First Amended Complaint fails to meet the pleadings requirements of either Fed.R.Civ.P. 9(b) or Rule 8(a)(2), and should therefore be dismissed pursuant Rule 12(b)(6).

### A. Rule 9(b) Pleading Requirements

Fed.R.Civ.P. 9(b) provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

**\*4** Rule 9(b)'s purpose "is to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based." *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir.2000) (internal quotations and citations omitted). The Tenth Circuit "requires a complaint alleging fraud to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Id.* (internal quotations and citations omitted). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud, and [she] must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702, 726-27 (10th Cir.2005). Rule 9(b)'s particularity requirement, however, is not absolute or limitless; a plaintiff need not go so far as to give the defendant a 'pretrial memorandum containing all the evidentiary support for plaintiff's case." *Schrag v. Dinges,* 788 F.Supp. 1543, 1550 (D.Kan.1992) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4824495 (N.D.Okla.)
**(Cite as: 2010 WL 4824495 (N.D.Okla.))**

In reviewing a motion to dismiss pursuant to Rule 9(b), the court must confine its analysis to the text of the complaint, accepting as true all well-pleaded facts as distinguished from conclusory allegations. *Id.* at 726. Those facts must be viewed in the light most favorable to the non-moving party. *Id.*

The First Amended Complaint states who, on behalf of defendants, made the alleged misrepresentations (Shindler); who received specific alleged misrepresentations (Patel and LHI); when the alleged misrepresentations were made (in September, October, November and December of 2005, January 26, 2006, and in the period of time between execution of the agreement on January 26, 2006, and the closing on June 8, 2006); where the alleged misrepresentations were made and/or what type of communication medium contained the alleged misrepresentations (in Tulsa County during communications between Patel and Shindler). The First Amended Complaint also alleges the specific misrepresentations (that defendants could and would obtains consents and approvals from other property owners of Smith Farm Crossing for LHI to build the proposed hotel) and the consequences of those misrepresentations (that LHI entered into the agreement in reliance on the statements and suffered losses when defendants could not or did not obtain all consents and approvals needed). Thus, the First Amended Complaint gives defendants "fair notice" of plaintiff's claim.

**B. *Twombly* Standard**
Defendants also contend the First Amended Complaint fails to meet the pleading requirements of Federal Rule of Civil Procedure 8(a)(2), which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The United States Supreme Court clarified this standard in *Bell Atlantic Corp. v. Twombly,* ruling that to withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." 550 U.S. 544, 570, 127 S.Ct. 1955,

167 L.Ed.2d 929 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted). On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

*\*5 Under the *Twombly* standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008), quoting *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (emphasis in original). "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Robbins,* 519 F.3d at 1247, citing *Twombly,* 127 S.Ct. at 1965 (internal quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Although the new *Twombly* standard is "less than pellucid," the Tenth Circuit Court of Appeals has interpreted it as a middle ground between "heightened fact pleading," which is expressly rejected, and complaints that are no more than "labels and conclusions," which courts should not allow. *Robbins,* 519 F.3d at 1247, citing *Twombly,* 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief. *Robbins,* 519 F.3d at 1247. "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248. The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4824495 (N.D.Okla.)
**(Cite as: 2010 WL 4824495 (N.D.Okla.))**

the need to include sufficient factual allegations, depends on context .... [and] the type of case." *Id.* (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir.2008)). A simple negligence action may require significantly less allegations to state a claim under Rule 8 than a case alleging antitrust violations (as in *Twombly)* or constitutional violations (as in *Robbins* ). *Id.*

The court, having found that the First Amended Complaint meets the heightened pleading standards of Rule 9(b), also concludes that it also meets the requirements of Rule 8(a)(2) as explained in *Twombly.* The First Amended Complaint sets forth sufficient allegations to give defendants fair notice of its claim of fraud. Although it remains to be seen, through discovery and motion practice, whether LHI can actually *prove* its claims, the allegations are plausible on their face.

### III. Conclusion

For the reasons set forth above, defendants' Motion to Dismiss [Doc. No. 77] is denied.

N.D.Okla.,2010.
Leisure Hospitality, Inc. v. Hunt Properties, Inc.
Slip Copy, 2010 WL 4824495 (N.D.Okla.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 4

Westlaw.

Slip Copy, 2010 WL 750254 (D.Kan.)
(Cite as: 2010 WL 750254 (D.Kan.))

c
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
D. Kansas.
Foy F. AKINS, Plaintiff,
v.
BREWSTER PLACE, Defendant.

No. 09-4153-JAR.
March 2, 2010.

Foy F. Akins, Topeka, KS, pro se.

James P. Nordstrom, Vincent M. Cox, Fisher, Patterson, Sayler & Smith, LLP, Topeka, KS, for Defendant.

## *MEMORANDUM AND ORDER OF DISMISSAL*
JULIE A. ROBINSON, District Judge.

**\*1** This matter comes before the Court on defendant Brewster Place's Motion to Dismiss (Doc. 8).[FN1] Plaintiff, proceeding *pro se,* filed this action pursuant to Title VII of the Civil Rights Act of 1964. He was granted leave to file *in forma pauperis.* He has not responded to defendant's motion to dismiss and the time for doing so has expired.[FN2]

> FN1. Defendant inexplicably filed two motions to dismiss that appear to be identical (Docs.8, 11). The Court considers the earlier motion, so it finds the later motion moot.

> FN2. *See* D. Kan. R. 6.1(d)(2) (requiring a response to a dispositive motion to be filed within 23 days). Defendant filed its summary judgment motion on January 22, 2010. The response was therefore due on February 15, 2010. *See id.;* Fed.R.Civ.P. 6.

### Background
Plaintiff filed a *pro se* form Complaint for employment discrimination cases. He marked an "x" next to certain boxes on the form, but did not write out any factual allegations in the spaces provided to do so. He marked under Item 8, "Nature of the Case," an "x" next to "termination of my employment" and "terms and conditions of my employment differ from those of similar employees." Under Item 9, "I believe that I was discriminated against because of (check all that apply)," plaintiff marked "x's" next to "my gender" and "male." Item 10 on the form Complaint specifically directs plaintiff to state the essential facts of the case. This section is blank. Likewise, plaintiff did not mark an "x" next to any of the options listed under "Request for Relief."

### Standard
To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." [FN3] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." [FN4] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," [FN5] but requires more than "a sheer possibility." [FN6]

> FN3. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007).

> FN4. *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (emphasis in the original).

> FN5. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).

> FN6. *Id.*

The plausibility standard enunciated in *Bell At-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 750254 (D.Kan.)
**(Cite as: 2010 WL 750254 (D.Kan.))**

*lantic Corp. v. Twombly* seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.' " [FN7] *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[FN8]

> FN7. *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008) (quoting *Twombly,* 550 U.S. at 555).

> FN8. *Id.* (citing *Twombly,* 550 U.S. at 556).

The Supreme Court recently explained the analysis as a two-step process. For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " [FN9] Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[FN10] Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." [FN11] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [FN12]

> FN9. *Ashcroft,* --- U.S. ----, 129 S.Ct. at 1949-50.

> FN10. *Id.* at 1950.

> FN11. *Id.*

> FN12. *Id.* at 1949.

**Discussion**

**\*2** Plaintiff has not responded to defendant's motion to dismiss, leaving defendant's motion un-

contested. If a "respondent fails to file a response within the time required ... the motion will be considered and decided as an uncontested motion and ordinarily will be granted without further notice." [FN13] As a result of plaintiff's failure to respond, the Court grants defendant's motion.

> FN13. D. Kan. R. 7.4.

The Court also grants defendant's motion to dismiss because plaintiff fails to state a claim upon which relief can be granted. Plaintiff alleges absolutely no factual basis for his Title VII claim. Accordingly, this Court is unable to conclude that plaintiff's claim is plausible on its face. Also, Rule 8(a)(3) requires a Complaint to set forth "a demand for the relief sought, which may include relief in the alternative or different types of relief." Plaintiff made no attempt to set forth a claim for relief in his Complaint.

Defendant further claims in the motion to dismiss that plaintiff's former employer is "The Congregational Home," not Brewster Place; therefore, dismissal is warranted under Rules 12(b)(5) and 12(b)(7). The Court agrees that if The Congregational Home is plaintiff's former employer, this Complaint should also be dismissed for failure to join an indispensable party and for insufficient service of process.

**IT IS THEREFORE ORDERED BY THE COURT** that Brewster Place's Motion to Dismiss (Doc. 8) is granted. The Court, therefore, finds Brewster Place's later-filed motion to dismiss (Doc. 11) moot.

D.Kan.,2010.
Akins v. Brewster Place
Slip Copy, 2010 WL 750254 (D.Kan.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 5



Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)
(Cite as: 2008 WL 4470189 (E.D.La.))

**c**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Louisiana.
Chris YOUNT
v.
RESEARCH SPECIALISTS, INC., Joseph Genovese, and ABC Insurance Company.

Civil Action No. 07-1218.
Sept. 30, 2008.

L. Clayton Burgess, Lauren Ledet, L. Clayton Burgess, Attorney at Law, Lafayette, LA, for Plaintiff.

J. Douglas Sunseri, Svetlana V. Crouch, Nicaud, Sunseri & Fradella, LLC, Metairie, LA, Brian J. Branch, Edward J. Womac, Jr., & Associates, LLC, Dawn Danna Marullo, Duncan, Courington & Rydberg, LLC, New Orleans, LA, for Defendant.

### ORDER AND REASONS
KURT D. ENGELHARDT, District Judge.
\*1 Presently before the Court are Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) or, in the alternative, Motion for Summary Judgment (Rec.Doc.26). The Court rules on these motions as stated herein.

### I. Background
In this action, Plaintiff contends that his former employer, Defendant Research Specialists, Inc., and its president and sole shareholder, Defendant Joseph Genovese, improperly accessed, forwarded, and/or deleted certain of his personal electronic mail ("email") messages. In connection with these allegations, Plaintiff has asserted claims against Defendants under 18 U.S.C. §§ 2511 and 2520 and Louisiana tort law-namely, claims for invasion of privacy, conversion, and spoliation of evidence.

Plaintiff has voluntarily dismissed the claim that he initially asserted under La. R.S. 23:967, which is Louisiana's whistleblower statute. Both defendants in turn seek dismissal of all of the remaining claims.[FN1] Defendant Genovese additionally argues that, even if Defendant Research Specialists, Inc., has legal liability for any of these claims, he, given his status as a shareholder and officer of that corporate entity, should not be held personally liable to Plaintiff.

> FN1. The Court previously heard argument on a Rule 12(b)(6) motion to dismiss filed by Defendants (Rec.Doc. 20). At the hearing, the Court ordered that the motion be granted without prejudice to Plaintiff's right to file an amended complaint. Following the filing of Plaintiff's Second Supplemental and Amended Complaint (Rec.Doc. 21), Defendants filed the instant alternative motions.

### II. Law and Analysis

#### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

#### 1. Legal Standards

As recently discussed by the undersigned, albeit in more detail, in *Bishop v. Shell Oil Co.*, No. 07-2832, 2008 WL 2079944, \* 1-2 (E.D.La.5/16/08) (Engelhardt, J), compliance with Rule 8 of the Federal Rules of Civil Procedure requires that the complaint provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema*, 534 U.S. 506, 511, 122 S.Ct. 992, 998 (2002) (internal citations omitted); *see also Christopher v. Harbury*, 536 U.S. 403, 416, 122 S.Ct. 2179, 2187 (2002) (the elements of the plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant").

Although a complaint does not need " *detailed*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)
**(Cite as: 2008 WL 4470189 (E.D.La.))**

factual allegations, ... more than labels and conclusions, are necessary, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal citations and quotations omitted) (emphasis added); *see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Thus, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' " *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) *(quoting Twombly,* 127 S.Ct. at 1974)). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 127 S.Ct. at 1965.FN2 The degree of required specificity, however, depends on context, *i.e.,* the type of claim at issue. *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008).

> FN2. The Third Circuit Court of Appeals recently described *Twombly* as "seek[ing] to find a middle ground between 'heightened fact pleading,' which is expressly rejected [relative to Rule 8] ... and allowing complaints that are not more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.' " *Robbins,* 519 F.3d at 1247 (quoting *Twombly,* 127 S.Ct. at 1965, 1974).

**\*2** On the other hand, Rule 9 of the Federal Rules of Civil Procedure establishes certain special pleading requirements. With allegations of fraud or mistake, Rule 9(b) requires that parties "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

In evaluating motions to dismiss filed under Rule 12(b)(6), the Court "must accept all well-pleaded facts as true, and ... view them in the light most favorable to the plaintiff." *Campbell v. Wells*

*Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279 (1986). If sufficient notice of the basis of the plaintiff's claim is provided, "dismissal will not be affirmed if the allegations [made] support relief on any possible theory" of recovery. *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 261 (5th Cir.1999) (internal citations omitted). Moreover, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir.2001). Finally, to the extent the complaint's allegations are simply vague or ambiguous, a motion for more definite statement, pursuant to Rule 12(e), is appropriate. *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 998.

### 2. Analysis

Relative to Plaintiff's claims under 18 U.S.C. §§ 2511 and 2520, the Court finds that he, despite being allowed to file a second supplemental and amending complaint (Rec.Doc.21), still has not adequately pled that an "interception" of any of his email messages, as that term is used for purposes of § 2511, has occurred. *See, e.g., Steve Jackson Games, Inc. v. United States Secret Serv .,* 36 F.3d 457, 460-63 (5th Cir.1994) (interception of electronic communications requires simultaneous transmission and acquisition; it does not include stored electronic communications). Accordingly, Plaintiff's claims asserted under 18 U.S.C. §§ 2511 and 2520 are dismissed with prejudice.

With respect to Plaintiff's claims of invasion of privacy and conversion, the Court declines to dismiss these claims at this time. Proper resolution of Plaintiffs' claims regarding Defendants' handling of emails transmitted to/from Plaintiff's personal email account while he was at work and during working hours requires consideration of Research Specialists' employment manual, and perhaps other written policies and procedures. The Court is not in a position, however, to do this in connection with a Rule 12(b)(6) motion. Further, Plaintiff's second supplemental and amended complaint alleges that Defend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)
(Cite as: 2008 WL 4470189 (E.D.La.))

ants also used Plaintiff's password to access personal email messages that Plaintiff transmitted or received from his own computer while at home where he certainly has a greater expectation of privacy. Accordingly, on the showing made, the Court cannot determine that, as a matter of law, Plaintiff has no chance of recovery on these claims.

Plaintiff's allegations relative to his spoliation of evidence claim,[FN3] however, are not sufficiently pled so as to provide the notice, as set forth above, that is required by Rule 8. Thus, if he wishes to proceed on this claim, he must, within ten (10) business days from the date this Order is entered, rectify these deficiencies in accordance with these pleading requirements. This will be Plaintiff's last opportunity to amend so as to sufficiently plead these claims. Importantly, if filed, this amendment is to supersede the original, first, and second supplemental and amended complaints in that it should include all of the allegations from the earlier versions of the complaint on which Plaintiff continues to rely, as well as Plaintiff's additional amending and supplemental allegations. If no amendment is timely filed with respect to this claims, it will be dismissed with prejudice.

> FN3. *See, e.g., Longwell v. Jefferson Parish Hosp. Serv. Dist. No. 1,* 970 So.2d 1100, 1104-05 (La. Ct.App. 5 Cir. 10/16/07) (discussing elements of claim), *writ denied,* 973 So.2d 756 (La.2008); *Jackson v. Home Depot, Inc.,* 906 So.2d 721, 728 (La. Ct.App. 1 Cir. 6/10/05) (same).

*3 Turning to the issue of Defendant Genovese's alleged personal liability, the Court finds that Plaintiff's allegations relative to piercing the corporate veil-on the basis of alter ego liability and fraud-are not sufficiently pled. The alter ego allegations are unacceptably conclusory. Although Plaintiff's opposition memorandum suggests knowledge of additional facts arguably relevant to this assertion, they are not included in his pleadings. Further, with respect to fraud, which must be pled

with particularity, Plaintiff's second supplemental and amending complaint simply suggests that Defendants caused him to participate in their fraud versus *third parties.* Even if this is so, these allegations do not support a finding of liability in Plaintiff's favor on the basis of fraud as it has been pled in this action. To the extent that Plaintiff can and wants to rectify these deficiencies, he may amend them as directed with the spoliation of evidence claim. If no amendment is timely filed, however, any claims contingent on these allegations will be dismissed with prejudice.

Notwithstanding the foregoing, however, the Court declines to find that Plaintiff's claims pose no viable threat of personal liability to Mr. Genovese. Specifically, with respect to Plaintiff's invasion of privacy and conversion claims, the Court, on the showing made, is not convinced, at least at this juncture, that Mr. Genovese, as a matter of law, owed no independent, personal duty (that is, in addition to any duty owed on behalf of Research Specialists) to refrain from the conduct that Plaintiff's allegations attribute to him. This is particularly so with respect to Plaintiff's assertions that Defendants used Plaintiff's password to access personal email messages that he transmitted or received from his personal email account using his home computer.

**B. *Motion for Summary Judgment***

**1. *Legal Standards***

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)
**(Cite as: 2008 WL 4470189 (E.D.La.))**

outcome of the suit under the governing law ." *Id.*

If the dispositive issue is one on which the non-moving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir.1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2553; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir.2001).

*\*4* When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence

to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir.2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence ." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir.2002).

**2.** *Analysis*
Defendants' motion is submitted, in the alternative, as a motion for summary judgment. At this time, the Court denies this alternative request without prejudice to Defendants' right to seek summary judgment once Plaintiff has had the opportunity to make the amendments discussed above. Further, the motion presently before the Court (Rec.Doc.26) refers to supporting documentation that is not attached as an exhibit(s) to this motion. Nor does the motion's supporting memoranda clearly incorporate by reference documents that already may have been filed in the record of this proceeding. Additionally, Defendant's memoranda do not contain appropriate citations to the relevant page, paragraph, or section numbers of pertinent supporting documentation. Under these circumstances, the Court would have to speculate regarding supporting evidence, which the Court will not do. Finally, although the Court does not fully understand the reason for the delay, the parties appar-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)
(Cite as: 2008 WL 4470189 (E.D.La.))

ently have been and still are engaging in discovery arguably necessary for a proper summary judgment resolution. Indeed, the Court has been apprised that Mr. Genovese is scheduled to be deposed on the first or second day of October.

### III. *Conclusion*

*5 As stated herein, **IT IS ORDERED** that Defendants' motion to dismiss (Rec.Doc. No. 26) is **GRANTED IN PART and DENIED IN PART. IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Rec.Doc. No. 26) is **DENIED WITHOUT PREJUDICE** to their right to re-file it as ordered herein.

**IT IS FURTHER ORDERED** that:

(1) Any *amendments required by this Order and Reasons, if made,* must be completed within *ten (10) business days* from the date that the Order and Reasons are entered into the record. This will be Plaintiff's last opportunity to amend so as to sufficiently plead the affected claims. Importantly, if filed, this amendment is to supersede the original, first, and second supplemental and amended complaints in that it should include all of the allegations from the earlier versions of the complaint on which Plaintiff continues to rely, as well as Plaintiff's additional amending and supplemental allegations. If no amendment is timely filed with respect to the affected claims, they will be dismissed with preju- dice.

(2) Unless otherwise ordered, Defendants are to raise any further pleading, evidentiary, or legal deficiencies applicable to Plaintiff's claim that may be addressed by motion practice in a properly supported *motion for summary judgment* that is to be filed no later than *Friday, October 24, 2008,* and set for hearing no later than *Wednesday, November 19, 2008.* To the extent that Plaintiff might believe summary judgment in his favor is warranted, he is to follow the same filing and hearing schedule. The parties' submissions are to properly cite and have attached all supporting documentation.

(3) Unless otherwise ordered, any additional discovery necessary for proper submission and opposition of the above-referenced motion(s) for summary judgment is to be *completed* on or before *Wednesday, November 5, 2008.* If any discovery disputes arise during the course of this discovery, despite the parties' and counsel's diligent and good faith efforts, the affected party(ies) *must* promptly seek the assistance of the assigned magistrate judge. Any party failing to comply with these instructions will not be heard to complain that he or it did not have adequate opportunity to conduct discovery necessary to present or oppose a motion for summary judgment.

E.D.La.,2008.
Yount v. Research Specialists, Inc.
Not Reported in F.Supp.2d, 2008 WL 4470189 (E.D.La.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 6

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
**(Cite as: 2006 WL 3004877 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
HERAEUS ELECTRO-NITE CO.
v.
MIDWEST INSTRUMENT COMPANY, INC.

Civil Action No. 06-355.
Oct. 18, 2006.

Jason A. Snyderman, R. Brendan Fee, Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, for Heraeus Electro-Nite Co.

Dean F. Murtagh, William C. Stubits, German Gallagher & Murtagh PC, Philadelphia, PA, James F. Boyle, Boyle Fredrickson Newholm Stein & Gratz SC, Milwaukee, WI, William J. Schramm, Bloomfield Hills, MI, for Midwest Instrument Company, Inc.

### MEMORANDUM

PADOVA, J.

*1 On January 26, 2006, Plaintiff Heraeus Electro-Nite Co., ("HEN") brought this suit alleging patent infringement against Midwest Instrument Company, Inc. ("Minco"). Minco filed its amended answer and counterclaim on August 30, 2006, asking that the Court declare that the patent at issue, No. 4,964,736 ("the '736 Patent") is invalid, inter alia, due to inequitable conduct before the Patent and Trademark Office ("PTO"). Presently before the Court is a motion by HEN to dismiss the counterclaim pursuant to Fed.R.Civ.P. 12(b)(6). Also before the Court are two motions by Minco to compel discovery. For the reasons that follow, the motions to compel will be denied and the motion to dismiss the counterclaim will be granted in part, with leave to file an amended pleading to cure the defect we perceive.

HEN's complaint alleges that the '736 Patent describes a temperature measuring device for use in molten metals. (Complaint ¶ 6.) Minco has allegedly infringed the patent by selling its own product that incorporates the claimed features of the '736 Patent, including molten metal immersion probes. (Complaint ¶ 10.) Minco denies that it has infringed the patent (Amended Answer and Counterclaim at ¶ 14) and asserts that the patent is unenforceable because of HEN's inequitable conduct before the PTO. More specifically, it contends that Plaintiff failed to disclose in the prosecution of its application certain prior art references, including its own commercial practices, and art cited in a corresponding Japanese patent application during the pendency of the U.S. application. (Id. at ¶ 20.) [FN1] Minco asserts that, as part of HEN's attempt to patent the invention in Japan, the Japanese examiner rejected the application on the basis of the prior art reference, and, therefore, HEN must have recognized the materiality of the Japanese prior art to the U.S. application. (Id.) It asserts that the U.S. patent is invalid because HEN breached its duty of candor with respect to the U.S. examiner by not disclosing the prior art, and by failing to correct specific statements that turned out to be untrue. (Id.) [FN2]

FN1. Minco asserts that:

Heraeus expressly and repeatedly stated to the PTO examiner that none of the referenced prior art would suggest to a person of skill in the art to adopt a taper design of the sort disclosed in the '736 patent. However, while the application resulting in the '736 patent was still pending before [the PTO], the Japanese patent examiner in the corresponding Japanese application cited, among other references, Japanese Utility Model Application No. SHO 56-65460 as disclosing a probe for measuring the oxygen content in molten metal having a tapered refractory sheath that narrows toward the tip of the probe on which a temperature-sens-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
(Cite as: 2006 WL 3004877 (E.D.Pa.))

Page 2

ing element and oxygen sensing cell are mounted.

(Amended Answer and Counterclaims at ¶ 20.)

FN2. Minco also asserts counterclaims based on anticipation by prior art, obviousness, failure to provide a full, clear, concise and exact written description of the invention, failure to set forth best mode, and failure to distinctly claim the subject matter of the patent. (Amended Answer and Counterclaim at ¶ 11.)

Minco also asserts inequitable conduct in HEN's prosecution of a reexamination application, during which it (1) again failed to inform the PTO of the same prior art; and (2) failed to inform the PTO that it had (a) asserted a claim of infringement against its competitor Leeds & Northrup ("L & N") and (b) L & N also responded to the claim by asserting HEN's inequitable conduct in failing to cite the Japanese prior art in the original application. ( *Id.* at 22.)

Minco's Motions to Compel.

Because Minco asserts that the absent discovery has a direct bearing on the dispositive motion, we address the discovery issues first. Minco asserts that it sought discovery related to its patent defenses, including foreign patent documents, from HEN, but that the plaintiff has failed to provide the discovery on the ground that it does not control the third parties that allegedly have the information. The third parties are Heraeus Electro-Nite International N.V. of Belgium ("HEN Belgium"), and Heraeus Holding GmbH ("HH"), a privately held German company. Minco asserts that HH is the parent entity of HEN and HEN Belgium, that HEN Belgium or HH control the related companies' worldwide patent filings, direct all patent litigation, and that they likely had knowledge of the Japanese prior art, and the claim of L & N.

*2 In response to Minco's interrogatories, HEN

responded that it objected thereto "to the extent that they seek information and documents that belong solely to third parties that are not within Plaintiff's possession, custody, or control." (HEN's Response at General Objection 7.) HEN also objected to Minco's definition of what entities were included within the scope of the discovery request to the extent that it imposed "an obligation on Plaintiff to obtain information and/or documents that are in the possession, custody or control of entities or person other than the U.S. company Heraeus Electro-Nite Co." (HEN's Response at General Objection 12.) FN3 Minco's counsel asserts that he made a good faith effort to obtain the discovery by requesting that HEN waive its objections, but that HEN has refused. (Certification of William Schramm.) Minco makes no assertion that it attempted to get the information directly from HEN Belgium or HH through third party discovery under Fed.R.Civ.P. 34(c) and 45.

FN3. We note that, nonetheless, in its own requests for production of documents, HEN included the following definition:

"Plaintiff" and "Electro-Nite" shall mean Heraeus Electro-Nite Co., and its predecessors, parents, subsidiaries, ... and each person acting on its or their behalf or under its or their control.

(Boyle Declaration Exhibit A.)

In *Gerling Intern. Ins. Co. v. C.I.R.,* 839 F.2d 131, 140-41 (3d Cir.1988), the Third Circuit set out the test for when a party to the litigation can be held accountable for failing to produce discovery in the possession of a non-party. The test focuses on the relationship between the two entities. In the absence of control by the litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce the discovery, *id.,* and the location of the documents, whether within the territorial jurisdiction of the court or not, is irrelevant. *Marc Rich & Co., A.G. v. United States,* 707 F.2d 663, 667 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
**(Cite as: 2006 WL 3004877 (E.D.Pa.))**

Cir.1983). Where the litigating corporation is the parent of the corporation possessing the records, courts have found the requisite control where "a subsidiary corporation acts as a direct instrumentality of and in direct cooperation with its parent corporation, and where the properties and affairs of the two [were] ... inextricably confused as to a particular transaction," *Gerling* at 140 (quoting *Acme Precision Products, Inc. v. American Alloys Corp.,* 422 F.2d 1395,1398 (8th Cir.1970)). The requisite control may also be found where the parent had the power to elect a majority of the board of directors of the subsidiary. *Gerling* at 140 (citing *In re Uranium Antitrust Litig.,* 480 F.Supp. 1138, 1152 (N.D.Ill.1979).

Where the litigating corporation is the subsidiary and the parent possesses the records, control has been found to exist where the "alter ego" doctrine warranted piercing the corporate veil. *Gerling* at 140, (citing *In re Uranium Antitrust Litig.* at 1152-53 litigating subsidiary held responsible for documents possessed by Canadian parent where evidence established that the two "operated as a single functional unit in all aspects of their uranium business" and "have shared an interlocking structure of corporate directors, officers, and executive and administrative personnel who have managed the uranium-related activities of both corporations" and *Advance Labor Service, Inc. v. Hartford Accident & Indem. Co.,* 60 F.R.D. 632, 634 (D.C.Ill.1973) veil-piercing where two corporations had identical stockholders and directors). Control has also been found where the subsidiary was an agent of the parent in the transaction giving rise to the suit and in litigating the suit on the parent's behalf. *Gerling* at 140-41 (citing *Afros S.P.A. v. Krauss-Maffei Corp.* 113 F.R.D. 127 (D.Del.1986) litigating subsidiary held to have the requisite control over documents held by the parent where the subsidiary was the exclusive seller of its parent's products in the United States). Thus, where the agent-subsidiary "can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the

courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party." *Gerling* at 141. Where sister corporations are under common control, the same rules as with the cases involving a litigating subsidiary apply. The requisite control has been found only where the sister corporation was found to be the alter ego of the litigating entity, or where the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf. *Id.*

*3 HEN is the subsidiary of HH and the sister of HEN Belgium. Accordingly, for HEN to be responsible to produce documents possessed by these entities, it must be shown to be their alter ego or agent. The exhibits to Minco's motion, while showing that these entities are unquestionably related, fails to show that they are alter egos or agents. According to its web site, HH "unites six companies," in the "Heraeus Group." (See *www.heraeus.com/hh/eng/holding home.nsf,* Motion to Compel, Exhibit 1.) It has numerous subsidiaries throughout the world. (*Id .* at Ex. 3, 4.) HH has a "supervising board of directors," a "board of management," and a "board of its executive board managing companies." The only individual who is listed as a director of HH as well as a HEN subsidiary is Taco Gerbranda, the chief executive officer of HEN Belgium who, presumably because of that position, also serves on the board of executive board managing companies. (*Id.* at Ex. 8.) Beyond this evidence, Minco offers the facts that (1) the HEN and HH websites are linked; (2) that a person wishing to contact HEN through its website is directed to HEN Belgium (*id.* at Ex. 5); (3) a press release that states that the individual responsible for operations in the United States, Canada and Mexico, and another who is responsible for operations in Japan, Taiwan and China, both report to the chairman of HEN Belgium (*id.* at Ex. 6); and (4) a mass-mailed letter announcing that HH was consolidating two companies, HEN and L & N [FN4], into a single unit (*id.* at Ex. 7).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
(Cite as: 2006 WL 3004877 (E.D.Pa.))

FN4. Although it is not entirely clear from the exhibits, we infer that at some point after their patent infringement dispute, L & N was acquired by one of the HEN entit- ies.

Although Minco claims that information in the hands of HEN Belgium or HH is likely to be relevant to issues involved in the counterclaim, it makes no showing that the companies operated as a single functional unit, had identical stockholders and directors, or that HEN used the documents to meet its own business needs. Accordingly, HEN's objections to the discovery requests were proper and the motions to compel production must be denied.

HEN's Motion to Dismiss the Counterclaim.

Inequitable conduct constitutes an equitable defense to a claim of patent infringement. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1255-56 (Fed.Cir.1997); *see also* 35 U.S.C. § 282(1). "Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of 'candor, good faith, and honesty.' " *Warner-Lambert Co. v. Teva Pharms. USA, Inc.,* 418 F.3d 1326, 1342 (Fed.Cir.2005) (quoting *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995)). Inequitable conduct consists of an "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Refac Intern., LTD v. Lotus Dev. Corp.,* 81 F.3d 1576, 1581 (Fed.Cir.1996); *Warner-Lambert Co.* at 1342; *Pharmacia Corp. v. Par Pharm., Inc.,* 417 F.3d 1369,1373 (Fed.Cir.2005). "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins,* 48 F.3d at 1179.[FN5]

FN5. Courts have been cautioned to examine claims of inequitable conduct with care, and the Federal Circuit has been critical of "the habit of charging inequitable conduct in almost every major patent

case," describing it as having "becom[e] an absolute plague ." *Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988). *See also FMC Corp. v. Manitowoc Co., Inc.,* 835 F .2d 1411, 1415 (Fed.Cir.1987) (holding that " '[i]nequitable conduct' is not, or should not be, a magic incantation to be asserted against every patentee").

**\*4** "The inequitable conduct analysis is performed in two steps comprising 'first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be held unenforceable.' " *Ferring B.V. v. Barr Laboratories, Inc.,* 437 F.3d 1181, 1186 (Fed.Cir.2003) (quoting *Dayco Prods., Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1362-63 (Fed.Cir.2003) and *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1366 (Fed.Cir.2001)). "One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins,* 48 F.3d at 1178.

At the pleading stage, many courts have held that claims of inequitable conduct must be pleaded with particularity and are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g. EMC Corp. v. Storage Technology Corp.* 921 F.Supp. 1261, 1263 (D.Del.1996); *Resqnet.com, Inc. v. Lansa, Inc.,* No. 01 CV 3578, 2004 WL 1627170, at \*14 (S.D.N.Y. July 21, 2004) (citing *Agere Sys. Guardian Corp. v. Proxim, Inc.,* 190 F.Supp.2d 726, 733-34 (D.Del.2000); *Rentrop v. Spectranetics Corp.,* No. 04 CV 101, 2004 WL 1243608, at \*1-2 (S.D.N.Y. June 4, 2004)). Although the Federal Circuit has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
(Cite as: 2006 WL 3004877 (E.D.Pa.))

not stated specifically whether it will require pleadings of inequitable conduct to conform to Rule 9(b), it has noted in dicta that inequitable conduct "must be pled with particularity." *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1344 (Fed.Cir.2003). Courts that have held claimants to the strictures of Rule 9(b) have also stated that pleadings that disclose the name of the relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b). *EMC Corp.* 921 F.Supp. at 1263 (D.Del.1996) (disclosure of prior art patent fulfills pleading requirements of 9(b); *Schwarzkopf Tech. Corp. v. Ingersoll Cutting Tool Co.,* 820 F.Supp. 150,154 (D.Del.1992) (same); *Mars Inc. v. JCM American Corp.,* No. 05-3165, 2006 WL 1704469 (D. N.J. June 14, 2006) (collecting cases).

We find that certain of Minco's allegations satisfy the pleading requirements, but others do not. Minco contends that HEN failed to disclose to the U.S. PTO the prior art cited in the Japanese application, which caused that application to be rejected by the Japanese examiner. Because that art caused the rejection of the corresponding patent, we find that Minco has sufficiently pled its materiality to the '736 patent. Minco alleges that HEN expressly and repeatedly stated to the PTO examiner that none of the referenced prior art would suggest to a person of skill in the art to adopt a taper design of the sort disclosed in the '736 patent, while at the same time it allegedly had knowledge that the Japanese patent examiner in the corresponding Japanese application cited, among other references, Japanese Utility Model Application N. SHO 56-65460 as disclosing a probe for measuring the oxygen content in molten metal having a tapered refractory sheath that narrows toward the tip of the probe on which a temperature-sensing element and oxygen sensing cell are mounted. As Minco has disclosed the name of the relevant prior art and disclosed the acts of the alleged fraud, it has fulfilled the requirements of Rule 9(b) vis-a-vis the assertion of inequitable conduct based on the failure to disclose prior art references to the PTO. For the same reason, Minco has also sufficiently pled that HEN intended to deceive the PTO by failing to disclose the prior Japanese art because HEN had knowledge that that art allegedly caused the Japanese examiner to reject the corresponding application.

*5 In regards to the claim of inequitable conduct in HEN's prosecution of the reexamination application, Minco alleges that HEN (1) again failed to inform the PTO of the same prior art; and (2) failed to inform the PTO that L & N had asserted inequitable conduct in HEN's failure to cite the Japanese prior art in the original application, in response to an earlier infringement allegation. The "same prior art" allegation, vis-a-vis the reexamination application, sufficiently pleads materiality, intent to deceive, and the requirements of Rule 9(b) for the reasons just stated in regard to the original application. We find the derivative inequitable conduct claim involving the L & N allegation is also material since it too asserted HEN's inequitable conduct in regard to the '736 patent arising from the failure to cite the Japanese prior art.[FN6] In addition, Minco sufficiently alleges HEN's intent to deceive the PTO in regards to the L & N allegation since it asserts that L & N's allegation of inequitable conduct arose from the same set of circumstances as its own claim.

> FN6. HEN argues that the L & N charge cannot form the basis of a claim for inequitable conduct because such a claim can *only* arise if an assertion of infringement results in litigation that is not disclosed to the PTO. Memorandum of Law in Support of HEN's Motion to Dismiss Counterclaims at 10. We reject this argument. First, inequitable conduct before the PTO is a defense to an infringement claim. It would not be reasonable for a second party challenging patentability on inequitable conduct grounds to have to depend on the patent holder bringing an actual infringement suit against the first party that challenged patentability, before the patent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
(Cite as: 2006 WL 3004877 (E.D.Pa.))

holder's inequitable conduct of hiding the first claim before the PTO can become material.

Second, under the patent regulations, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose [ ] all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a) (emphasis added). HEN's argument fails to address why knowledge of an allegation of inequitable conduct that, while material, has not resulted in actual litigation, fails to qualify as "all information."

Third, the cases HEN cites for its proposition that only actual litigation can form the basis of an inequitable conduct claim do not support it. In *Critikon, Inc. v. Becton Dickinson Vascular Access,* 120 F.3d 1253 (Fed.Cir.1997), the Federal Circuit held that Becton Dickinson's argument-that the district court's failure to find intent was contrary to the weight of the evidence-was correct because the prior art patent was material to patentability and Critikon should have disclosed it to the PTO. The Court then added:

"But, more importantly, during the reissue proceedings, Critikon should have disclosed that the [patent in suit] was concurrently involved in the present litigation and that claims of invalidity and inequitable conduct were asserted against the patent. Failure to disclose the [prior art] patent and the fact that the [patent in suit] was in litigation was done with an intent to mislead or deceive and rises to the level of inequitable conduct."

*Id.* at 1255. Nothing in the Federal Circuit's discussion *limits* the basis for claims of inequitable conduct to claims actually in litigation. Rather, under 37 C.F.R. § 1.56(a) and the law of the Federal Circuit, it is the materiality of the conduct before the PTO, not whether that conduct led to litigation, that forms the basis of an inequitable conduct defense. *Accord ICU Medical, Inc. v. B. Braun Medical, Inc.,* No. 01-3202, 2005 WL 588341 at * 13 (N.D.Cal. Mar. 15, 2005) (court's holding that the existence of ongoing litigation was material to the prosecution of the patent in suit did not specifically limit the basis for inequitable conduct defense to actual ongoing litigation); *Nisus Corp. v. Perma-Chink Sys., Inc.,* 421 F.Supp.2d 1084, 1104 (E.D.Tenn.2006) (finding that related litigation was per se material did not specifically limit the basis for inequitable conduct defense to the failure to disclose actual related litigation).

However, Minco's alternate assertion of inequitable conduct, based on HEN's "own commercial practices" is insufficient. While one may assume this is a reference to either HEN's or its related companies' foreign patent prosecutions, the counterclaim does not so state this as an averment. There is simply no basis to place HEN on notice of the precise misconduct alleged by this term because the invocation of HEN's "commercial practices" as a basis for inequitable conduct before the PTO is simply too vague, and does not specifically inform HEN of its acts of alleged fraud. Accordingly, the affirmative defense of inequitable conduct based on HEN's own commercial practices will be dismissed with leave to file an amended counterclaim to cure the defect.[FN7]

FN7. Minco has also filed a motion in the alternative for leave to amend its counterclaim. We shall grant this motion and per-

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
(Cite as: 2006 WL 3004877 (E.D.Pa.))

mit Minco to file an amendment, if it is able to do so within the confines of Fed.R.Civ.P. 11, to attempt to state with adequate specificity the commercial practices upon which it bases its assertion of inequitable conduct.

Finally, Minco's amended counterclaims allege that the '736 patent is additionally unenforceable due to HEN's "inequitable conduct in failing to disclose the best mode of practicing the invention as contemplated by the inventor." (Amended Answer and Counterclaims at ¶ 22). As a consequence of the intentional concealment of best mode, Minco contends, the patent was fraudulently procured, rendering all of the claims of the patent unenforceable. (*Id.*)

HEN argues that this inequitable conduct claim also must be dismissed because it is little more than a legal conclusion, unaccompanied by any specific allegation regarding what Minco believes the best mode was or what representations HEN allegedly made to the PTO that concealed the best mode of practicing the invention. (Memorandum of Law in Support of HEN's Motion to Dismiss at 8-9.) In response, Minco argues that the '736 patent is directed to a probe especially designed for measuring the oxygen content of molten steel, and several of its claims expressly recite an "electro-chemical cell" oxygen sensor. However, Minco continues, the only explanation of what an oxygen sensor is is that it is a "solid electrolyte." (Complaint Exhibit 1, col. 1, line 51; col. 2, line 37.) Minco argues the patent is totally devoid of any discussion of what a "solid electrolyte" or "solid electro-chemical cell" is, which Minco believes, was a conscious effort on HEN's part to not disclose the details of the oxygen cell to the patent examiner. (Minco's Response to HEN's Motion to Dismiss at 10.) [FN8]

FN8. Additionally, Minco asserts a direct claim of invalidity based on the '736 patent's failure to set forth the best mode contemplated by the inventor of carrying out the invention. (*Id.* at ¶ 11(d)) Both parties

in their moving papers focus upon the best mode issue as an additional specie of inequitable conduct, rather than the separate affirmative defense pled in the amended counterclaims. Accordingly, we focus our discussion on the alleged failure to disclose, rather than whether Minco has pled the elements of a best mode defense.

*6 We find the best mode theory of inequitable conduct, as pled, also fails to satisfy Rule 9(b). First, none of the assertions contained in Minco's Response concerning solid electrolytes are pled in the amended counterclaims. Even if they were, they would be insufficient to satisfy an inequitable conduct claim based on best mode because the allegations do not specifically inform HEN of its acts of alleged inequitable conduct. The best mode defense has two prongs: first, whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention; second, if the inventor possessed a best mode, whether the written description disclosed the best mode such that one reasonably skilled in the art could practice it. *See Chemcast Corp. v. Arco Indus. Corp.,* 913 F.2d 923, 927-28 (Fed.Cir.1990). Minco fails to make any specific allegation that HEN possessed a best mode which was undisclosed, how it misrepresented that best mode, and what representations HEN allegedly made to the PTO that concealed the actual best mode. As with its "commercial practices" claim, we shall permit Minco to file another amended counterclaim to cure these defects.

An appropriate order follows.

***ORDER***
**AND NOW,** this 18th day of October, 2006, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion to Dismiss Defendant's Counterclaims for Inequitable Conduct (Docket Entry # 25) is **GRANTED** insofar as it seeks dismissal of the inequitable conduct counterclaim based upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)
**(Cite as: 2006 WL 3004877 (E.D.Pa.))**

(a) Plaintiff's "own commercial practices;" and

(b) Plaintiff's failure to disclose best mode.

These claims are **DISMISSED** without prejudice. The motion is **DENIED** in all other respects.

2. Defendant's Motion to Amend/Correct its Amended Answer and Counterclaim (Docket Entry # 37) is **GRANTED.** Defendant shall file its second amended answer and counterclaim within twenty days.

3. Defendant's Motion to Compel (Docket Entry 26) is **DENIED.**

4. Defendant's Motion to Compel (Docket Entry 27) is **DENIED.**

5. Defendant's Supplemental Motion to Compel (Docket Entry 34) is **DENIED.**

6. Defendant's Motion for Leave to File Reply (Docket Entry 41) is **GRANTED.**

7. Plaintiff's Motion for Leave to File Reply (Docket Entry 43) is **GRANTED.**

E.D.Pa.,2006.
Heraeus Electro-Nite Co.v. Midwest Instrument Co., Inc.
Not Reported in F.Supp.2d, 2006 WL 3004877 (E.D.Pa.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 7



Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Utah,
Central Division.
Santiago BERRIOS-BONES, et al., Plaintiff,
v.
NEXIDIS, LLC, et al., Defendants.

No. 2:07CV193DAK.
Oct. 30, 2007.

Justin D. Heideman, Patrick J. Ascione, Ascione Heideman & McKay LLC, Provo, UT, for Plaintiff.

Burton Miller, Salt Lake City, UT, pro se.

Blake S. Atkin, Joseph H. Pugsley, William O. Kimball, Jr., Atkin Law Offices, Bountiful, UT, Thomas E. Lowe, Taylor Adams Lowe & Hutchinson, Gerry B. Holman, Dunn & Dunn, Steven G. Loosle, Kevin C. Timken, Kruse Landa Maycock & Ricks, Christine T. Greenwood, Magleby & Greenwood PC, Joel T. Zenger, Ryan K. Done, Miller Guymon PC, Salt Lake City, UT, Stephen O. Taylor, Walstad Law Group, Provo, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER
DALE A. KIMBALL, United States District Judge.

*1 This matter is before the court on Defendants Walker Design Services, La Colonia, Rockwell Estates, James Walker, and Mitch Vice's ("Walker Defendants") Motion to Dismiss Plaintiff's Complaint, the Walker Defendants' Motion to Dismiss Jared Schneider and Jason Jensen's Cross-Claim, and the Walker Defendants' Motion to Dismiss Defendant Legacy Land Title's Cross-Claim. The court held a hearing on the motions on September 20, 2007. At the hearing, Plaintiff was represented by Justin Heideman, the Walker Defendants were represented by Blake Atkin and William Kimball, Defendants Jared Schneider and Jason Jensen were

represented by Steven Loosle, and Defendant Legacy Land Title was represented by Gerry Holman. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties. The court has further considered the arguments made by counsel at the hearing and the law and facts relevant to the motions. Now being fully advised, the court enters the following Memorandum Decision and Order.

## BACKGROUND
Because the court must accept all well pled facts as true at the motion to dismiss stage, the court takes the facts from Plaintiff's Complaint. Plaintiffs allege that Defendants have perpetrated an extensive investment and real estate fraud scheme. In fact, the Complaint in this case contains one hundred and fifty one pages of factual allegations.

Plaintiffs allege that Defendants represented themselves as providers of real estate investment education tools and real estate investment opportunities. Defendants sold Plaintiffs memberships in a "Buyer Partner Program" ("BPP"), which was represented as having been developed by an experienced private venture group and/or real estate developers. Defendants solicited Plaintiffs to invest by representing that they had developed an "exclusive proprietary process" and that Plaintiffs would have a rare opportunity to partner a multi-billion dollar investor group. Defendants repeatedly claimed that the opportunity was a "low-risk" way for the Plaintiffs to "significantly increase their net value."

From June 2004 through December 2004, Defendants solicited investments from Plaintiffs through Nexidis, LLC, to invest in the BPP whereby Plaintiffs were promised a low risk opportunity to use their good credit and financial stability to obtain a stable return through investment in real estate. Through telephone solicitation, email, and a "Welcoming Packet," the Defendants represented

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

that by paying a membership fee, Plaintiffs would be presented with the opportunity to invest in real estate that had been pre-screened and pre-selected by an experienced joint-venture management group. Plaintiffs were further assured that the Plaintiffs need not do anything to advance the investment, but that the management group would arrange for everything, including securing the financing on all projects and ensuring that all debt payments were made on the properties by setting up escrow accounts through which all payments would be made. Plaintiffs were only required to pay an initial membership fee of at least $5000 and, in return, they were promised that they would receive a "commission fee" from each project they invested in that would be based upon the total loan obtained on the individual properties the Plaintiffs invested in.

*2 Upon payment of the membership fee, Nexidis required most, if not all, of Plaintiffs to sign a General Agreement ("GA") with Global Financial Services ("GFS"). The GA set forth the terms of the investment. Plaintiffs were told that they were required to sign the GA before they could receive priority to receive investment opportunities.

Plaintiffs allege that Defendants' representations made through the Welcoming Packet and other means were patently false and the BPP and the investments made through the Program were in fact high risk and had a high potential to negatively impact Plaintiffs' credit. By personally signing on the loan documents for the properties presented through the investment scheme, Plaintiffs were taking on the sole responsibility for the re-payment of the loan terms without clear title or the ability to sell the property.

Plaintiffs further allege that the assurance that the investment was stable and low risk because Defendants would make one hundred percent of the loan payments from an escrow account was also false and without any real guarantee. Plaintiffs assert that Defendants retained the real benefit from the loans and the investment by diverting funds

from the loans for improper purposes through closely related companies and means while shifting the majority of the risk of the scheme to the Plaintiffs.

Beginning in early 2005, Plaintiffs were solicited to invest in the Rockwell Estates Development in Draper, Utah and/or the La Colonia Development in Coachella, California. While the investment opportunity was initially presented and made through Nexidis, in May 2006 it was announced that Walker Design Services ("WDS"), the alleged developer of the projects, had taken over the projects. WDS later attempted to distance itself from Nexidis and represented that WDS had nothing to do with Nexidis. Plaintiffs allege that these representations were false because James Walker controlled both companies and both were simply alter egos of James Walker.

In addition, Plaintiffs claim that in order to entice them to invest in his projects, Defendant Walker made repeated representations to Plaintiffs that he had pledged his personal funds to ensure that loan payments would be made and provided personal financial statements to Plaintiffs to that effect.

For each project presented to the Plaintiffs by Nexidis and/or WDS, Plaintiffs were required to sign a Joint Venture Agreement ("JVG Agreement") or a General Partner Agreement ("GA"). Under these agreements, Defendants were granted equitable title to the properties and Plaintiffs agreed that Defendants would have sole discretion over the terms of the purchase, finance, and sale of the properties. Initially, GFS was identified as the company that would work with the developers of the projects and assign Plaintiffs to a qualifying project. However, by the time the Plaintiffs were presented with JVG Agreements on the Rockwell and La Colonia projects, these agreements were entered into between the Plaintiffs and Rockwell Estates, and La Colonia.

*3 In both the Rockwell and La Colonia projects, loans were secured in the Plaintiffs' names

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

to cover the purchase price of the lots. Defendants failed to disclose to Plaintiffs the fact that WDS and/or related individuals and companies were the owners of the properties and that the purchase price of the properties Plaintiffs purchased were inflated, which resulted in a significant profit to WDS and/or other owners. With the exception of only a few Plaintiffs, the Plaintiffs were not provided with fully executed closing documents and/or settlement statements for the property sales. Furthermore, the Plaintiffs who invested in the Rockwell project were required to execute deeds transferring actual title back to Rockwell, another company managed and owned by James Walker.

In addition, construction loans were obtained on all of the lots in the Rockwell project and many of the lots in the La Colonia project, ostensibly for the construction or improvement of residences on the real property. Plaintiffs were presented with and instructed to sign on all property closings, financing, and loan draw documents as presented by Defendants. Defendants did not provide Plaintiffs with fully executed copies of the documents they were required to sign. When presented with questions regarding the terms of the loans or the representations made in the loan documents, Defendants assured Plaintiffs that the banks were on board, implying that the banks had full knowledge and approved of the terms. Plaintiffs allege that Walker and Mitchell Vice were improperly and illegally making draws from the construction loans on the Rockwell and La Colonia projects and using the funds for their own personal purposes.

The Defendants repeatedly made false representations regarding the status of the projects, including false representations that foundations had been poured and other false reports regarding the status of construction. As Plaintiffs started to receive notices demanding payments on loans, they were informed by Defendants that Defendants were seeking refinancing and/or purchasers for the projects. The promised refinancing never occurred, and the properties are now in default. The banks

have begun to take action directly against Plaintiffs for recovery of the loan amounts.

Based on these factual allegations, Plaintiffs assert causes of action for violations of Section 10(b) of the Securities Act and Rule 10b-5, violations of Section 12(1) of the Securities Act, Section 12(2) of the Securities Act, violations of Section 61-1-1 of the Utah Uniform Securities Act, violations of Section 61-1-22(1)(a) of the Utah Uniform Securities Act, fraudulent misrepresentation, breach of contract, breach of covenant of good faith and fair dealing, quiet title, waste, and negligence.

In their motion to dismiss, the Walker Defendants assert that Defendants Jared Schneider, Simon Juhlin, Jason Jensen, and Christopher Reyes were or are members or officers of Nexidis and were the parties who involved Plaintiffs in the real estate transactions that form the basis of this action. On November 18, 2005, Investifications LLC bought a list from Nexidis of the people who had been involved in real estate transactions with Nexidis. The Walker Defendants claim that the membership fees were not transferred to Investifications. Plaintiffs dispute these facts because they are not based on any allegations in the Complaint or any evidence in the record. Defendants did not submit affidavits or declarations to support these additional facts.

*Walker Defendants' Motion to Dismiss Plaintiffs' Complaint*
**A. Claims under Securities Laws**
    **\*4** The Walker Defendants argue that the first five causes of action can only survive if Plaintiffs can prove the existence of a security. The first cause of action alleges a violation of Section 10(b) of the Securities Act and securities fraud under Rule 10b-5. 15 U.S.C. § 78j(b); 17 C.F.R. § 204.10b-5. The second cause of action alleges a violation of Section 12(1) of the Securities Act, requiring a registration statement in connection with the sale of a security. 15 U.S.C. § 77l(a)(1). The third cause of action alleges a violation of Section 12(2) of the Securities Act based on the offer or sale of a security "by means of a prospectus or oral

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
(Cite as: 2007 WL 3231549 (D.Utah))

communication" which contains misleading information or material omissions. *Id.* § 771(a)(2). The fourth cause of action alleges a violation of the Utah Uniform Securities Act, which forbids fraud "in connection with the offer, sale, or purchase of any security," Utah Code Ann. § 61-1-1. The fifth cause of action alleges a violation of Utah Code Annotated Section 61-1-22(1)(a), which allows the complainant to sue, at law or equity, any person selling a security in violation of Section 61-1-7. Section 61-1-7 makes it illegal to sale any unregistered security.

The Supreme Court has interpreted Congress' purpose "in enacting the securities laws ... to regulate investments, in whatever form they are made and by whatever name they are called." *Reeves v. Ernst & Young,* 494 U.S. 56, 61 (1990). There is purposefully a broad definition of security. A security is defined to include "any note, stock, treasury stock, security future, bond, debenture ... investment contract ... [or any] instrument commonly known as a 'security.' " *S.E.C. v. Edwards,* 540 U.S. 389, 392 (2004)."

Defendants argue that these real estate transactions are not "securities." The Complaint calls the deals "investment contracts," but the Walker Defendants contend that the transactions in this case do not meet the *Howey* test used to determine if an investment is a security. The three-pronged *Howey* test to determine if an investment is a security is: "whether the scheme involves (1) an investment of money in (2) a common enterprise with (3) profits to come solely from the efforts of others." *S.E.C. v.. W.J. Howey Co.,* 328 U.S. 293 (1946).

The *Howey* test has been interpreted by the Supreme Court to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Edwards,* 540 U.S. at 393. As the Court explained in *Edwards,* Congress' inclusion of "investment contract" in the statutory definition of "security" reflected the commonly held

"blue sky" or state law definition, which defined an investment contract as "a contract or scheme for the placing of capital or lying out of money in a way intended to secure income or profit from its employment." *Id.* at 394.

**\*5** However, the determination of whether Plaintiffs were sold investment contracts pursuant to the federal securities laws is a question of fact that is rarely appropriate for a motion to dismiss. What constitutes an "investment contract" is a question of fact, and not a question of law to be determined on a motion to dismiss. *Crowley v. Montgomery Ward & Co.,* 570 F.2d 875, 877 (10th Cir.1975). The Tenth Circuit has denied several motions to dismiss security claims when "the plaintiffs reasonably allege the existence of investment intent and common enterprise and where nothing in the complaint precludes the finding of a security." *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1040 (10th Cir.1980).

**(1) Investment of Money**
Under the first prong of the *Howey* test, Plaintiffs have alleged facts sufficient to show that they invested money in a security. In order to "invest money," investors must choose to give up specific consideration, meaning they gave up "some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 559-60 (1979). In this case, Plaintiffs paid thousands of dollars to participate in the BPP. The BPP was the method by which the Plaintiffs entered into the investment, and the JVG Agreements with Defendants were the vehicle by which the scheme was carried out and by which the investments were made in particular properties or projects. Furthermore, the loan proceeds, which the Plaintiffs are bound to repay also constitute consideration for the JVG Agreements. Defendants make no argument that Plaintiffs have not met this prong of the *Howey* test. Thus, this element is satisfied.

**(2) Common Enterprise**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

Under the second prong, Plaintiffs contend that they have pled sufficient facts to show a common enterprise. If a "transaction is in reality an investment ... then it creates a common enterprise and gives rise to a security falling within the ambit of the 1933 and 1934 Securities Acts." *McGill v. American Land & Exploration Co.,* 776 F.2d 923, 925 (10th Cir.1985). To determine whether or not a common enterprise exists, courts have examined the "economic reality of the transaction involved." *Bradford,* 670 F.Supp. at 931. The determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit. If it was, the economic reality requirement is often fulfilled and there is strong indicia that the investment is a security. *Id.*

Plaintiffs in this case argue that they did not invest in a program or in joint venture agreements that were purely commercial in nature; instead, the BPP and JVG Agreements were entered into with the expectation of profit and not just a return based on capital appreciation. Thus, the economic reality of Plaintiffs' investments gives rise to a "common enterprise" within the meaning of the *Howey* test.

*\*6 Defendants contend that the Rockwell Estate Transaction between Plaintiffs and Walker Design did not involve a security because Plaintiffs did not invest in a common enterprise with Walker Design, but with Nexidis. Defendants claim that although Walker Design was the developer of the Rockwell Estates, Walker Design has no involvement in the purported securities scheme relating to Rockwell Estates. No agreement was signed between Walker Design and Plaintiffs and no membership fees were paid to Walker Design. Plaintiffs paid membership fees directly to Nexidis.

Although the Walker Defendants argue that no common enterprise exists because Plaintiffs' first contact was through Nexidis and Nexidis received the payment from Plaintiffs, Plaintiffs assert that the Defendant with which the initial contact was made is irrelevant for determining the existence of a common enterprise or for the determination of

whether the investment constitutes a security. In order to be held jointly and severally liable, the law only requires proof of a primary violation of securities law and the Defendants' knowledge of the primary violation of securities law as well as substantial assistance by Defendants in achieving the primary securities violation. *DBLKM Inc. v. Resolution Trust Corp.,* 969 F.2d 905, 908 (10th Cir.1992).

In addition, Plaintiffs allege that they were introduced to Walker Design by Nexidis and were represented as a certified partner of Nexidis. Walker Design was also represented to Plaintiffs by Walker Design employees as the parent company of Nexidis. After Walker Design took complete control of the BPP, Walker Design and its employees almost exclusively communicated with Plaintiffs to detail the ongoing relationship, carried out the investment scheme in substantially the same manner as Nexidis, and expressly reiterated and ratified the representations and promises originally made by Nexidis. Thus, the Complaint alleges that the Walker Defendants knew and participated with Nexidis in the carrying out of the BPP and were an essential part of the Nexidis enterprise, subsequently exercising control over the enterprise.

Even if this court were to determine that the relationship between Nexidis and the Walker Defendants is relevant to the inquiry of common enterprise, the court concludes that Defendants are not entitled to dismissal of this claim as a matter of law because there are disputed facts as to the relationship and level of substantial assistance between the Walker Defendants and Nexidis.

**(3) Profits**
Under the third prong of the *Howey* test, buyers must invest money in a common venture with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Foundation v. Forman,* 421 U.S. 837, 852 (1975). The Supreme Court has defined profits to be "either capital appreciation resulting from the development of the initial invest-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
(Cite as: 2007 WL 3231549 (D.Utah))

ment ... or a participation in earnings resulting from the use of investors' funds." *Id.* Payment of interest does not constitute "profit," even with its attendant consequence of tax deductibility. *Forman* at 852.

**\*7** The Walker Defendants contend that the transaction fails the third prong of the *Howey* analysis because the Plaintiffs were paid 1% interest on their loan, regardless of the success or failure of the enterprise. The 1% was paid in the beginning, with no waiting to determine whether or not the project would be successful.

The *Edwards* Court explained that the *Forman* case supports the "commonsense understanding that profits in the *Howey* test as simply financial returns on investments." *Edwards,* 540 U.S. at 394. The term "profits," thus, refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Id.* The *Edwards* Court determined that there was no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of determining "profits" under the *Howey* test. *Id.* The Court held that an investment scheme that promised a fixed return rate can be an investment contract and, thus, a security. *Id.* at 397.

Plaintiffs expected to receive profits from the approximately $5,000 they each invested in the Nexidis BPP. Furthermore, Plaintiffs' investment allowed them to participate in the BPP, for which they would receive a "commission fee" every time their credit history was used to secure a real property loan. This commission fee constitutes the profit that Plaintiffs expected. As in Edwards, the return that Plaintiffs received constitutes a profit within the meaning of the Howey test, and the scheme constitutes an investment scheme.

Furthermore, Plaintiffs' Complaint alleges that the commission fees came solely from the entrepreneurial efforts of the Walker Defendants. In order for an investment contract to exist, profits must come from the "entrepreneurial or managerial efforts of others ." *Edwards,* 540 U.S. at 394. This

court has recognized that because the Tenth Circuit has adopted an economic reality test to determine whether or not individuals had an expectation of profit, the entire transaction should be examined flexibly. *Bradford,* 670 F.Supp. at 931.

The Walker Defendants focus primarily on the argument that Plaintiffs' legal title of the properties in La Colonia gave them control over the investment and that legal title is enough to eliminate any entrepreneurial or managerial efforts by Defendants. Plaintiffs, however, depended entirely on Walker and Vice for access to critical information about the ventures. Plaintiffs also lacked any power under the JVG Agreements to decide even the most basic decisions regarding the property, including the terms of the loan agreements they signed off on. Under the JVG Agreements, Plaintiffs had bare legal title to the property but Defendants reserved equitable title.

Furthermore, in regard to the Rockwell Estate properties, the Plaintiffs do not have legal title to the property. Under the terms of the JVG Agreements, Rockwell and La Colonia "reserved an unrestricted right to cause the transfer of the legal title of the properties held by Plaintiffs." The JVG Agreements further restricted Plaintiffs' ability to contact any prospective seller, agent, or representative without express consent by Defendants. Plaintiffs were required to grant Defendants the power to determine who would have possession of the property, negotiate leases, determine rents, etc.

**\*8** The facts alleged in the Complaint indicate that the Plaintiffs made no decisions regarding the development of the property and were not in any way actively involved in the decisions regarding the development of the properties. The Walker Defendants made all of the decisions regarding the price and negotiation of the purchase price for the undeveloped lots, the terms of financing, the companies used to broker the loans, the design and construction schedule for the development of the lots, the draws made on the construction loans, and in fact made payments on the loans. The Defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

had control over the ultimate expectation of profits.

Plaintiffs have adequately alleged that the profits of the investment were from the managerial efforts of others. Because Plaintiffs have established all three elements under the *Howey* test, the court concludes that the Nexidis BPP and the JVG Agreement are securities as defined in federal securities laws.

Furthermore, Defendants argue that the projects in Utah and California did not involve securities because they were typical real estate transactions and real estate deals are not securities because of land's inherent value. Real estate transactions are typically deemed outside the bounds of the Securities and Exchange Acts. "A piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter. For this reason, real estate transactions are not in and of themselves governed by the federal securities laws." *Bender v. Continental Towers Ltd. Partnership,* 632 F.Supp. 497, 501 (S.D.N.Y.1986). If a buyer is not motivated solely by profits, but by a desire to develop the land himself, then securities laws are inapplicable. *Forman,* 421 U.S. at 852-53. Also, importantly, "investments in land solely for the purpose of profits from appreciation on resale cannot be securities." *Gordon v. Terry,* 684 F.2d 736 n. 4 (11th Cir.1982). The Tenth Circuit has declared that a "land purchase contract, simply because the purchaser expects or hopes that the value of the land purchased will increase," does not convert the transaction automatically into a security under the federal securities acts. *McCown v. Heidler,* 527 F.2d 204, 208 (10th Cir.1975).

But courts have consistently held that investments in real property can fall under the federal securities laws. *See Howey,* 328 U.S. at 293. *Howey* involved the sale of tracts of citrus grove acreage. The *Howey* Court held that the land sales contracts, warranty deeds, and service contracts were investment contracts even when the "tangible interest had an intrinsic value independent of the success of the enterprise as a whole." *Id.* at 300-01. Like *Howey,*

Plaintiffs in this case, invested in the BPP and JVG Agreements with the intention to obtain profits from their investments.

Therefore, the court concludes that there is a question of fact with respect to whether investment scheme in this case is a security. As a result it is premature to resolve the issue at the motion to dismiss stage. Accordingly, the Walker Defendants' motion to dismiss is denied.

**B. State Law Claims**

**\*9** The Walker Defendants further contend that each of Plaintiff's state law claims should be dismissed. First, the Walker Defendants argue that the fraudulent misrepresentation claim has not been pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, and should be dismissed. Plaintiffs assert that their fraud allegations meet the specificity requirements of Rule 9(b).

Plaintiffs' Complaint identifies particular defendants with whom they dealt directly, designates the occasions on which affirmative statements were allegedly made to them and by whom, and designates what alleged misstatements were directed to them. The court concludes that the Walker Defendants have adequate notice of the claims against them. Therefore, there is no basis for dismissing the fraudulent misrepresentation claim under Rule 9(b).

Next, the Walker Defendants argue that the breach of contract claim must be dismissed with respect to Defendants James Walker and Mitch Vice because they are not in privity of contract with the Plaintiffs. The Walker Defendants also claim that a quiet title action could only be applicable to Rockwell Estates and should be dismissed against all other defendants. Finally, Defendants assert that Walker Design cannot be liable for waste on Plaintiffs' property because it was not legally in possession of the property. *Oquirrh Assocs. v. First Nat'l Leasing Co.,* 888 P.2d 659, 664 (Utah Ct.App.1994).

On the breach of contract claim, Plaintiffs ar-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

gue that there are disputed material facts as to secondary liability. Plaintiffs allege that La Colonia and Rockwell are the alter egos of Walker and Vice. Also based on their assertions of alter ego, Plaintiffs argue that the quiet title and waste claims should not be dismissed against any of the individual Defendants.

Alter ego is a highly fact intensive issue and inappropriate to resolve at the motion to dismiss stage. Even if it is not specifically pled in the Complaint as a cause of action, the facts allege such an assertion. Accordingly, the court denies the Walker Defendants' motion. The complexities of the relationships between the parties preclude a determination as a matter of law with respect to which parties should remain in the case for given claims. These issues can be resolved through discovery.

### Walker Defendants' Motion to Dismiss Schneider and Jensen's Cross-Claim

The Walker Defendants seek to dismiss the cross-claim asserted against them by Defendants Schneider and Jensen. The cross-claim includes four claims for relief alleging that Walker and/or Walker Design agreed to pay Schneider and Jensen $1.5 million in return for ownership of Nexidis and Walker and/or Walker Design has breached the purchase agreement. The claims allege breach of contract, contractual indemnity, implied indemnity and contribution, and statutory liability pursuant to Utah Code Annotated Section 48-2c-602 and alter ego.

The cross-claim alleges that Walker and/or Walker Design held themselves out as doing business through a Utah company known as Investifications. However, neither Walker nor Walker Design ever actually organized Investifications as a proper legal entity under the laws of the State of Utah. In reality, Investifications is merely a dba or the alter ego of Walker and/or Walker Design.

*10 Using the name Investification, Walker and/or Walker Design entered into a Membership Interest Purchase and Sale Agreement with Schneider and Jensen. Pursuant to the Agreement, Walker and/or Walker Design purchased 100% of the membership interests of a limited liability company known as Nexidis from Schneider and Jensen. Walker and/or Walker Design took control of the operations in early 2005.

The Walker Defendants argue that Schneider and Jensen have not pled that they complied with or performed their duties under the terms of the contract as required to establish a prima facie case of breach of contract. But the allegations in the cross-claim sufficiently infer that Schneider and Jensen performed their contractual obligations. On a motion to dismiss, the allegations must be construed in favor of Schneider and Jensen, and all reasonable inference must be drawn in their favor. The obligation of Schneider and Jensen under the Agreement was simply to transfer control of Nexidis to the Walker Defendants. The cross-claim states that they performed this obligation.

In addition, the Walker Defendants argue that Walker Design was not in privity of contract with Schneider and Jensen. The basis for each of the claims is the Membership Interest Purchase and Sale Agreement. Walker Design is not a party to the Agreement. The cross-claim, however, alleges that the Walker Defendants are liable for all contractual obligations of Investifications based upon the alter ego doctrine and because they failed to organize Investifications as required by Utah law. Under the Utah Revised Limited Liability Company Act, a limited liability company is formed by the signing and filing of articles of organization with the State of Utah. Utah Code Ann. § 48-2c-401. The Act further states that "all persons who assume to act as a company without complying with this chapter are jointly and severally liable for all debts and liabilities so incurred." Utah Code Ann. § 48-2c-602(1).

Moreover, the claim for implied indemnity and contribution does not require privity of contract. Implied indemnity and contribution are equitable doctrines that apply whenever a person is required

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

to discharge in whole or in part a duty that should be discharged by another.

Therefore, the court denies the Walker Defendants' motion. The cross claim adequately alleges that Schneider and Jensen conveyed Nexidis to Investigation, and thus performed under the contract. Also, the alter ego assertions create a question of fact as to whether the parties were in privity of contract, and privity is not necessary for the equitable claims.

### Walker Defendants' Motion to Dismiss Legacy Land Title's Cross-Claim

Plaintiffs' Complaint alleges that Legacy Land Title negligently deeded Plaintiffs' properties to Gilger and missed obvious encumbrances on Plaintiffs' properties. Legacy disputes these allegations. Legacy asserts a cross-claim against all defendants in the case. The Walker Defendants assert that Legacy has not entered into any contracts with the Walker Defendants.

**\*11** Walker Design argues that it cannot answer responsively to Legacy's cross-claim because it does not give enough facts and information to state a legal claim. Rule 9 states that a party that is seeking to allocate fault under Title 78 Chapter 27 of the Utah Code must file "a description of the factual and legal basis on which fault can be allocated. Utah R. Civ. P. 9(I)(1)(A). The Walker Defendants contend that the only thing that can be gathered from the cross-claim is that in some way all of the Defendants are or may be liable to Legacy for all or part of the claims and/or damages asserted by Plaintiffs.

Legacy relies on the Plaintiffs' Complaint to supply the facts and circumstances of Walker Design's liability toward Legacy. Legacy incorporates by reference the allegations against the other co-defendants as part of its cross-claim. Legacy excludes itself from cross-claim allegations by stating that "the facts and circumstances supporting this cross-claim arise out of incidents, occurrences, and actions that are the subject of the Plaintiffs' Com-

plaint, as pled therein, which, with the exception of any and all claims of negligence or liability against Legacy, are specifically incorporated herein by this reference." Thus, the 1,000 paragraphs of the Complaint, minus the limited allegations against Legacy, are incorporated into Legacy's Cross-Claim. The content of those paragraphs are sufficient at this stage of the litigation to sustain a cross-claim in this case.

The purpose for Legacy's cross-claim is merely to preserve an apportionment of fault defense against other co-defendants. In order to preserve such apportionment of fault against other co-defendants, a cross-claim is required. This requirement is explained in *National Service Industries Inc. v. B.W. Norton Manufacturing Co.,* 937 P.2d 551 (Utah Ct.App.1997). In *National Service,* the court explained that "to preserve the right to litigate [supplier's] liability, [seller] must have filed a cross-claim against [supplier] during the underlying tort action against the [plaintiff]. In reaching our conclusion, we recognize that prohibiting subsequent apportionment suits essentially requires joint tortfeasors co-defendants to raise cross-claims against each other in the underlying tort action or else such claims may be lost. As such, cross-claims for apportionment among joint tortfeasor co-defendants are mandatory." *Id.* at 556.

Legacy's cross-claim is merely a procedural necessity required to preserve all defenses of apportionment of fault against other co-defendants in this case. Like the parties in *National Service,* if the Walker Defendants are successful in being dismissed from this case, Legacy is required to have filed a cross-claim in order to attempt to apportion any appropriate fault to the Walker Defendants in subsequent litigation of this case. Accordingly, the cross-claim is not improper, inappropriate, or premature.

The court denies the Walker Defendants' motion. All that Legacy needs to demonstrate is that the other defendants may be at fault as well. The allegations of the complaint demonstrate a factual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)
**(Cite as: 2007 WL 3231549 (D.Utah))**

basis for that allegation. Accordingly, Legacy's claim is properly asserted against the Walker Defendants.

## CONCLUSION

*12 Based on the above reasoning, the Walker Defendants' Motion to Dismiss Plaintiff's Complaint is DENIED, the Walker Defendants' Motion to Dismiss Jared Schneider and Jason Jensen's Cross-Claim is DENIED, and the Walker Defendants' Motion to Dismiss Defendant Legacy Land Title's Cross-Claim is DENIED

D.Utah,2007.
Berrios-Bones v. Nexidis, LLC
Not Reported in F.Supp.2d, 2007 WL 3231549 (D.Utah)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 8



Not Reported in F.Supp.2d, 2006 WL 3876371 (M.D.Fla.)
**(Cite as: 2006 WL 3876371 (M.D.Fla.))**

**c**
Only the Westlaw citation is currently available.

United States District Court, M.D. Florida,
Tampa Division.
Jacqueline MEIER, et al., Plaintiffs,
v.
PROVIMA, INC., et al., Defendants.

No. 8:06-cv-336-T-24 TBM.
May 11, 2006.

Russell Scott Buhite, Fowler White Boggs Banker, P.A., Tampa, FL, for Plaintiffs.

Richard E. Berman, Berman, Kean & Riguera, Ft. Lauderdale, FL, for Defendants.

### ORDER

SUSAN C. BUCKLEW, United States District Judge.
*1 This cause comes before the Court on Defendants Provima, Inc. and Mirabilis, Inc.'s Motion to Dismiss. (Doc. No. 13). Plaintiffs oppose the motion. (Doc. No. 16).

### I. Standard of Review

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. *See Murphy v. Federal Deposit Ins. Corp.,* 208 F.3d 959, 962 (11th Cir.2000)(citing *Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir.1999)). A complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45-46 (1957). The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* at 47. All that is required is "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2). The standard on a 12(b)(6) motion is not whether the plaintiff will ul-

timately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. *See Jackam v. Hospital Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir.1986).

### II. Background

Plaintiffs allege the following in their amended complaint (Doc. No. 3): Defendant Provima, Inc. ("Provima") was an employer, sponsor, and fiduciary of the ERISA welfare benefit plan, Provima, Inc. Health Insurance Plan ("the Plan"), which provided health insurance to its employee participants and their enrolled beneficiaries. (¶ 6). Plaintiffs were at all relevant times individual participants in the Plan. (¶ 1). Provima operated under at least November 14, 2005, at which time, Defendant Mirabilis, Inc. ("Mirabilis") became the successor in interest through merger or acquisition to Provima as the sponsor and fiduciary of the Plan. (¶ 2, 3).

Pursuant to the Plan, Provima and its successor, Mirabilis, were obligated as fiduciaries of the Plan to pay premiums when due and to provide accurate and timely information regarding the Plan to Plan participants. (¶ 8). On October 15, 2004, insurance coverage for the Plan was cancelled for failure to pay premiums. (¶ 9). On December 1, 2004, new insurance coverage became effective, but Defendants did not inform Plan participants about the gap in coverage. (¶ 11). Effective March 1, 2005, the new insurance coverage was cancelled for failure to pay premiums, and Defendants did not inform Plan participants about this cancellation of coverage. (¶ 12).

Due to the cancellations of coverage, Plaintiffs incurred substantial unpaid health insurance expenses that should have been covered under the Plan but were not due to Defendants' failure to pay premiums. (¶ 13). As a result, Plaintiffs filed suit against Defendants [FN1] for breach of fiduciary duty, seeking relief that includes the following: (1) specific performance of the Plan document; and (2)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3876371 (M.D.Fla.)
(Cite as: 2006 WL 3876371 (M.D.Fla.))

injunctive relief preventing Plan funds from being used for Defendants' own personal interest and requiring Defendants to abide by the terms of the Plan regarding the proper administration of the Plan and payment of claims. In response, Provima and Mirabilis move to dismiss the amended complaint.

> FN1. Plaintiffs sued two additional defendants as fiduciaries of the Plan-Robert Lowder (managing director and president of Provima) and Charlotte Lowder (vice president of Provima). These defendants failed to respond to the complaint, and the Clerk entered default against them. (Doc. No. 15).

### III. Motion to Dismiss

*2 Defendants [FN2] set forth several arguments in support of their contention that the amended complaint should be dismissed. Accordingly, the Court will address each argument.

> FN2. All further references to "Defendants" in this Order refer only to Provima and Mirabilis.

### A. Successor Liability

Defendants first argue that Plaintiffs' claim against Mirabilis should be dismissed, because Plaintiffs have not adequately alleged that Mirabilis has successor liability. The Court rejects this argument, as Plaintiffs have satisfied the notice pleading requirements of Federal Rule of Civil Procedure 8(a). See Federal Trade Commission v. Citigroup Inc., 2001 WL 1763439, at *3 (N.D.Ga. Dec. 27, 2001). Furthermore, the Court notes that whether successor liability can be imposed is a fact specific inquiry that should not be resolved on a motion to dismiss. See id. at *4 (citations omitted). Accordingly, the Court denies Defendants' motion on this issue.

### B. Prospective Relief

Next, Defendants argue that Plaintiffs cannot seek prospective relief, since Plaintiffs allege in the amended complaint that the Plan ended on Novem-

ber 14, 2005. Plaintiffs respond that they are entitled to seek prospective relief to enforce all claims that have already been submitted under the Plan and that may be submitted in the future for expenses that were covered by the Plan. Defendants have not cited any case law showing that Plaintiffs are not entitled to such prospective relief, and as such, the Court denies Defendants' motion on this issue.

### C. Injunctive Relief

Next, Defendants argue that Plaintiffs have failed to adequately allege the requisite elements for injunctive relief, namely that Plaintiffs have a substantial likelihood of success on the merits, that Plaintiffs will be irreparably harmed in the absence of an injunction, that the threatened injury to Plaintiffs outweighs any injury to Defendants caused by the injunction, and that the injunction is not contrary to the public interest. The Court rejects this argument as it is premature at this time to determine whether Plaintiffs will be entitled to injunctive relief, and the Court cannot state that it is beyond doubt that Plaintiffs can prove no set of facts that would entitle them to injunctive relief. Accordingly, the Court denies Defendants' motion on this issue.

### D. Breach of Fiduciary Duty

Next, Defendants argue that to the extent that Plaintiffs claim that Defendants breached their fiduciary duty by providing misleading and inaccurate information regarding the Plan to participants and beneficiaries, the claim should be dismissed, because Plaintiffs' allegations are not stated with particularity. Specifically, Defendants argue that Plaintiffs have not alleged who made the misrepresentations, to whom they were made, when they were made, or what the misrepresentations were.

Plaintiffs respond that they have set forth this information in the amended complaint. Specifically, Plaintiffs point out that they have alleged that the defendants named in the amended complaint failed to tell the Plan participants and beneficiaries about the March 1, 2005 cancellation of coverage and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3876371 (M.D.Fla.)
**(Cite as: 2006 WL 3876371 (M.D.Fla.))**

2004 gap in coverage when those incidents oc-
curred. Upon consideration, the Court denies De-
fendants' motion on this issue.

*IV. Conclusion*
 *3 Accordingly, it is ORDERED AND AD-
JUDGED that Defendants Provima, Inc. and
Mirabilis, Inc.'s Motion to Dismiss (Doc. No. 13) is
**DENIED.**

 **DONE AND ORDERED.**

M.D.Fla.,2006.
Meier v. Provima, Inc.
Not Reported in F.Supp.2d, 2006 WL 3876371
(M.D.Fla.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 9



Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529
**(Cite as: 2001 WL 1763439 (N.D.Ga.))**

**H**

United States District Court, N.D. Georgia, Atlanta Division.
FEDERAL TRADE COMMISSION, Plaintiff
v.
CITIGROUP INC., Citifinancial Credit Co., Associates First Capital Corp., and Associates Corp. of North America, Defendants.

No. 1:01-CV-606-JTC.
Dec. 27, 2001.

ORDER

**\*1** This case is before the Court on Defendant's Motion to Dismiss [# 12-1] and Plaintiff's Motion for Rule 16(b) Scheduling Order and to Initiate Discovery [# 16-1].

I. BACKGROUND
CAMP, D.J.

The Federal Trade Commission ("Commission") brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act") to "secure permanent injunctive relief and other equitable relief, including rescission, restitution, reformation, and disgorgement." (Compl.¶ 1). Defendant Associates First Capital Corporation and its wholly owned subsidiary, Defendant Associates Corporation of North America (collectively "the Associates"), offered finance products and services to consumers who are considered to be greater credit risks. (Comp.¶ ¶ 7, 8, 12). However, the Associates allegedly engaged in numerous deceptive acts or practices in order to induce consumers to take out or refinance loans with high interest rates, costs and fees and to purchase high-cost credit insurance. (Compl.¶ 15). According to the Commission, these deceptive practices violated the FTC Act, the Truth in Lending Act ("TILA") and the Fair Credit Reporting Act ("FCRA").

On November 30, 2000 Defendant Citigroup acquired the Associates and merged the domestic consumer finance business of the Associates into the consumer finance business of Defendant CitiFinancial, a wholly owned subsidiary of Citigroup. (Compl.¶ ¶ 5-6). As a result of this acquisition and merger, Plaintiff alleges that Defendants Citigroup and CitiFinancial are "successor corporations to the Associates and are liable for the illegal practices alleged in [the] Complaint." (Compl.¶ 6).

Soon after the Complaint was filed, Defendants jointly moved to dismiss it pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. According to Defendants, the underlying Complaint is deficient for several reasons. First, Defendants contend that the Court lacks jurisdiction over this action because the Complaint fails to allege facts which would permit the Court to grant injunctive relief. Second, Defendants assert that Citigroup and CitiFinancial are not proper parties to the action because they cannot be held liable for the acts committed by the Associates. Finally, Defendants assert that the Complaint fails to allege a violation of either the Truth in Lending Act or the Fair Credit Reporting Act.

II. SUBJECT MATTER JURISDICTION

Section 13(b) of the Federal Trade Commission Act "authorizes the FTC to seek, and the district courts to grant, preliminary and permanent injunctions against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468 (11th Cir.1996); 15 U.S.C. § 53(b). Pursuant to this statute, the Commission may bring suit for injunctive relief when it has reason to believe "that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission." 15 U.S.C. § 53(b)(1). The authority to grant permanent injunctive relief also includes the power to grant any ancillary relief necessary to accomplish complete justice. *Gem Merch.,* 87 F.3d at 468-70.

**\*2** Defendants move to dismiss this case, as-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529
**(Cite as: 2001 WL 1763439 (N.D.Ga.))**

serting that the Court does not have subject matter jurisdiction. According to Defendants, "the Complaint fails to assert the FTC's entitlement to injunctive relief." (Def.'s Mot. to Dismiss at 12). Without a valid claim for such relief, Defendants assert that Section 13(b) of the FTC Act is inapplicable, and the Court lacks jurisdiction to bring this action before the district court.

While Defendant has moved to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendants' motion actually challenges an element of the underlying claim and the sufficiency of the Complaint. "Where the defendant's challenge to the Court's jurisdiction is also a challenge to the existence of a cause of action, the proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of plaintiff's case." *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.1981). In such cases, the defendant is forced to proceed under either Rule 12(b)(6) or Rule 56-both of which provide a greater level of protection to the plaintiff. *Id.*

In this case, Defendants' challenge to the Court's jurisdiction is also a challenge to the existence of a federal cause of action. If the Complaint fails to state a claim for injunctive relief under Section 13(b), there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts. *See Williamson,* 645 F.2d at 416 ("In this case it is clear that the jurisdictional issue reaches the merits of Plaintiff's case: if the joint venture interests and notes are not securities there is not only no federal jurisdiction to hear the case but also no federal cause of action on the stated facts"). Therefore, the Court examines Defendants' "jurisdictional" challenge pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## III. FAILURE TO STATE A CLAIM

The purpose of a Rule 12(b)(6) motion is to determine whether the plaintiff's complaint adequately states a claim for relief. A motion to dismiss concerns only the complaint's legal sufficiency

and is not a procedure for resolving factual questions or for addressing the merits of the case. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (2d ed.1990). Consequently, the Court's inquiry is limited to the contents of the complaint. *GSW, Inc. v. Long County,* 999 F.2d 1508, 1510 (11th Cir.1993).

A motion to dismiss under Rule 12(b)(6) is viewed with disfavor and is rarely granted. Wright & Miller, § 357 at 321. The Supreme Court has determined that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts" which would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). Furthermore, the court should not grant a motion to dismiss merely because the complaint does not state with precision every element of the offense necessary for recovery. In fact, a complaint is sufficient if it contains "allegations from which an inference can be drawn that evidence on these material points will be introduced at trial." 5 Wright & Miller, § 1216 at 154, 156-59. Finally, in considering a motion to dismiss, the complaint's allegations must be accepted as true and construed in the light most favorable to the plaintiff. *See Powell v. United States,* 945 F.2d 374, 375 (11th Cir.1991).

A. Failure to State a Claim for Injunctive Relief

*\*3* Applying the Rule 12(b)(6) standard, Plaintiff has stated a claim upon which injunctive relief can be granted. The Complaint describes systematic and widespread acts of deception by the Associates. While these past wrongs are generally not enough for the grant of an injunction, an injunction may issue if a violation is ongoing or likely to recur. *FTC v. Evans Products Co.,* 775 F.2d 1084, 1087-88 (9th Cir.1985); *FTC v. Minuteman Press,* 53 F.Supp.2d 248, 260 (E.D.N.Y 1998). As one Court of Appeals has observed, "[a]n inference arises from illegal past conduct that future violations may occur. The fact that illegal conduct has ceased does not foreclose injunctive relief." *SEC v. Koracorp Indus., Inc.,* 575 F.2d 692, 698 (9th

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529
**(Cite as: 2001 WL 1763439 (N.D.Ga.))**

Cir.1978), *cert. denied,* 439 U.S. 953 (1978).

Based upon the foregoing, it does not appear "beyond doubt that the plaintiff can prove no set of facts" which would entitle it to relief. *Conley,* 355 U.S. at 45-46, 78 S.Ct. at 102. The Complaint describes systematic and widespread deception by the Associates, Citigroup and CitiFinancial's occupations position them to commit future violations, and the alleged harm to consumers is grave. *See FTC v. Magui Publishers, Inc.,* 1991 WL 90895, at *15 (S.D.Cal. March 28, 1991)(noting that the factors to consider to determine whether there is a "cognizable danger of future violations" include "the degree of scienter, whether the conduct was an isolated incident or recurrent, whether the defendant's current occupations position them to commit future violations, the degree of harm consumers suffered from defendants' unlawful conduct, and defendants' recognition of their own culpability and the sincerity of their assurances (if any) against future violations"). As a result, Defendant's Motion to Dismiss with regard to this issue is DENIED. The Commission has properly stated a claim for injunctive relief under Section 13(b) of the FTC Act.

B. Failure to State a Claim Against Citigroup and CitiFinancial

Defendants assert that Citigroup and CitiFinancial should be dismissed from the case because they can not be held liable for the actions of the Associates. According to Defendants, Citigroup bears no liability for the Associates' acts because it is merely a "parent" corporation. Defendants further assert that the merger of GitiFinancial and the Associates did not create successor liability. However, based upon the allegations found within the Complaint, Plaintiff has stated a sufficient claim against both Citigroup and CitiFinancial.

The Complaint states that (1) Citigroup acquired the Associates on November 30, 2001; (2) Citigroup merged the domestic consumer finance business of the Associates into the consumer finance business of CitiFinancial; (3) Citigroup and CitiFinancial are "successor corporations" to the Associates; and (4) Citigroup and CitiFinancial are "liable for the illegal practices alleged in this Complaint." (Compl.¶ 6). Construing these allegations in the light most favorable to the Commission, it does not appear beyond doubt that the Commission can prove no set of facts which would entitle it to relief. In fact, the allegations in the Complaint comply with the requirements of the Federal Rules of Civil Procedure which only require the Commission to provide a "short and plain statement of the claim" showing that it is entitled to relief. *See* Fed.R.Civ.P. 8(a).

*\*4 Furthermore, because the issues of successorship and the parent-subsidiary relationship are "heavily fact-specific," they should be resolved in a motion for summary judgment. *United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 694 (5th Cir.1985)(determining whether a subsidiary is the alter ego of its parent is a "heavily fact-specific" issue); *P.F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 272 (6th Cir1970)(noting that "[t]he question of successorship is one of fact"). Only after the parties have performed discovery can the Court fully examine the relationship of the companies and the circumstances surrounding the acquisition and merger. *See P.F. Collier,* 427 F.2d at 272 (noting that the following factors should be considered when resolving successorship issues: whether the companies engage in the same business, whether the successor has the capability to continue or resume deceptive practices, whether the companies have in common individuals who have served in similar capacities, whether there is substantial identity of ownership between the companies). As a result, Defendant's Motion to Dismiss Citigroup and CitiFinancial is DENIED. Plaintiff has stated a sufficient claim against each of these parties.

C. Failure to State a Claim Under the Truth in Lending Act

Defendant moves to dismiss Count VIII of the Complaint which alleges a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640 et seq. According to Defendants, the Complaint fails to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529
**(Cite as: 2001 WL 1763439 (N.D.Ga.))**

state a claim for relief under TILA. First, Defendants assert that the Complaint is insufficient because it fails to identify the disclosures that the Associates allegedly failed to provide to consumers. Second, Defendants assert that the Homeowner's Express Loans at issue in this case were unsecured loans which were not subject to the rescission requirements of 12 C.F.R. § 226.23(a)(1). Third, Defendants assert that the advertisements attached to the Complaint fully comply with the TILA requirements. Finally, Defendants assert that the Complaint is insufficient because it fails to allege any facts supporting the allegation that Defendants failed to retain records required by TILA.

The Complaint alleges in detail three different types of conduct prohibited by TILA: loan splitting, failure to make required advertising disclosures clearly and conspicuously, and failure to keep required records. With regard to the loan splitting claims, the Complaint alleges that the Associates improperly "split" real estate-secured home equity loans when it issued Howmeowner's Express Loans-giving the borrower immediate cash, tying him to a home equity loan, and effectively nullifying the TILA three-day rescission period. (Compl.¶ ¶ 22, 60). The Complaint also alleges that the Associates disseminated advertisements promoting home equity loans which failed to clearly and conspicuously disclose loan fees, periodic annual percentage rates, and the fact that the plan included a balloon payment. (Compl.¶ ¶ 20, 21, 60). Construing these allegations in the light most favorable to the Commission, the Complaint sufficiently states a claim for relief under TILA and provides Defendant sufficient notice of the claims. *See* Fed.R.Civ.P. 8(a). Each of the fact-specitic issues raised in Defendants' Motion to Dismiss should be resolved after discovery in a motion for summary judgment. As a result, Defendant's Motion to Dismiss this claim is also DENIED.

D. Failure to State a Claim Under the Fair Credit Reporting Act

**\*5** Finally, Defendants also move to dismiss

Count X of the Complaint in which the Commission asserts violations of the Fair Credit Reporting Act. According to Defendants, the FCRA permits the use of consumer reports to solicit consumers who have not initiated a credit transaction. While it is appropriate for a creditor to obtain a consumer report "in connection with a credit transaction involving the consumer ... and involving the extension of credit to, or review or collection of an account of, the consumer," consumer reports should not be used as a marketing tool. *Trans Unition Corp. v. FTC,* 245 F.3d 809, 813 (D.C.Cir.2001) (citing *Trans Union Corp. v. FTC,* 81 F.2d 228, 233 (D.C.Cir.1996)). Based upon the allegations found in the Complaint, the Associates used the consumer reports for this impermissible purpose. (Compl.¶ 18, 68, 69)("The Associates used or obtained consumer reports for impermissible purposes by: (a) using a consumer report that was originally obtained in connection with a credit transaction involving a consumer to subsequently solicit the consumer to purchase new or additional loan product; and (b) obtaining a new consumer report to solicit a consumer for a credit transaction that the consumer did not initiate."). A consumer's credit related data should be kept private "except under circumstances in which the consumer could be expected to wish otherwise or, by entering into some relationship with a business, could be said to implicitly waive the Act's privacy to help further that relationship." *Trans Union,* 81 F.3d at 234.

Construing the allegations in the light most favorable to the Commission, the Complaint sufficiently states an FCRA claim. As a result, Defendants' Motion to Dismiss with regard to this issue is also DENIED. Each of the issues raised by Defendants should be resolved after discovery in a motion for summary judgment.

IV. CONCLUSION

Based upon the foregoing, Defendants' Motion to Dismiss [# 12-1] is DENIED and Plaintiff's Motion for Scheduling Order and to Initiate Discovery [# 16-1] is GRANTED. The parties are DIRECTED

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529
**(Cite as: 2001 WL 1763439 (N.D.Ga.))**

to appear before the Court for a scheduling conference on Tuesday, January 8, 2002 at 10:30 a.m. in Courtroom 2106, U.S. District Court, 75 Spring Street, S.W., Atlanta, Georgia. The parties are also DIRECTED to file proposed scheduling orders by Monday, January 7, 2002.

N.D.Ga.,2001.
F.T.C. v. Citigroup Inc.
Not Reported in F.Supp.2d, 2001 WL 1763439 (N.D.Ga.), 2002-1 Trade Cases P 73,529

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 10

Westlaw.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

c

United States District Court,
N.D. Texas,
Dallas Division.
COMMERCIAL METALS COMPANY, Plaintiff,
v.
Mark CHAZANOW, Michael Uhrick, Mark
Wayne, and MI 3 Transport, LLC, Defendants.

Civil Action No. 3:09-CV-0808-B.
Nov. 17, 2009.

West KeySummary**Federal Civil Procedure 170A**
€═►636

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(A) Pleadings in General
       170Ak633 Certainty, Definiteness and
Particularity
         170Ak636 k. Fraud, Mistake and Con-
dition of Mind. Most Cited Cases
    Corporations's complaint pleaded facts with
sufficient particularity to support the predicate acts
of mail and wire fraud. The complaint specified the
time period during which the alleged frauds oc-
curred; the location of the misrepresentation; the
contents of the misrepresentations; and what was
obtained through the misrepresentations. The cor-
poration appraised each of the alleged fraudsters of
his role in the alleged scheme by describing the ac-
tions taken by individual alleged fraudster to direct
business to a business which the alleged fraudsters
had an interest in, approve invoices at issue, and
conceal their interests in the business. Fed.Rules
Civ.Proc.Rule 9(b), 28 U.S.C.A.

David R. McAtee, II, Haynes & Boone LLP, Aimee
M. Minick, Peter D. Marketos, Haynes & Boone
LLP, Dallas, TX, for Plaintiff.

Michael K. Hurst, G. Michael Gruber, Melanie
Kemp Okon, Vanessa J. Rush, Gruber Hurst Jo-
hansen & Hail LLP, Robert L. Tobey, C. Randal

Johnston, Johnston Tobey, Dallas, TX, for Defend-
ants.

***MEMORANDUM OPINION AND ORDER***
JANE J. BOYLE, District Judge.
   **\*1** Before the Court are (1) the Motion of De-
fendants Mark Chazanow, Michael Uhrick, and
Mark Wayne ("Individual Defendants") to dismiss
Plaintiff Commercial Metals Company's ("CMC")
RICO and RICO conspiracy claims (doc. 5), and (2)
the Motion of Defendant MI 3 Transport, LLC
("MI") that adopts and incorporates the Motion of
the Individual Defendants and seeks the same re-
lief. (doc. 7). For the reasons that follow, the Court
GRANTS in part and DENIES in part Defendants'
motions to dismiss.

**I.**
**FACTUAL AND PROCEDURAL BACK-**
**GROUND**[FN1]

> FN1. The Court takes its factual account
> from Plaintiff's Original Complaint (doc.
> 1). *Martin K Eby Constr. Co. v. Dallas*
> *Area Rapid Transit,* 369 F.3d 464, 467 (5th
> Cir.2004) (stating that in deciding a motion
> to dismiss, all well-pleaded factual allega-
> tions are taken as true).

   Plaintiff CMC is a public corporation based in
Irving, Texas that "manufactures, recycles, and
markets steel and metal products and related mater-
ials" worldwide. (doc. 1 ¶ 1). The events giving rise
to this dispute followed CMC's 2006 purchase of
Yonack Iron & Metal Co. ("Yonack") and its
wholly owned subsidiary, Metallic Industries, LLC
("Metallic"). (*Id.* at ¶ 2). The Agreement for the
Purchase and Sale of Assets ("APSA"), called for
CMC to acquire substantially all of the assets of
Yonack and Metallic. (*Id.* at ¶¶ 3, 25, 27). The
APSA additionally required Individual Defendants
Chazanow and Uhrick to accept employment with
CMC, and each executed an employment agreement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

along those lines on June 7, 2006. (*Id* at ¶¶ 40-42, 45-46).

While negotiating the APSA, the parties discussed the possibility of including the sale of MI in the transaction. MI, a transportation company partly owned by Yonack and the Individual Defendants, had provided transportation and trucking services to Metallic. (*Id.* at ¶ 32). Opting instead to rely on its own transportation fleet, CMC declined to purchase MI and instructed Yonack and the Individual Defendants to divest their ownership of MI to avoid any conflicts of interest that could result from interest in a potential competitor. (*Id.* at ¶¶ 8, 32). Each informed CMC that he had complied and divested ownership in MI. (*Id.* at ¶ 8).

Each of the Individual Defendants worked for one of the acquired entities prior to the APSA and assumed management positions with CMC afterwards. Prior to the execution of the APSA, Chazanow was president of Metallic. (*Id.* at ¶ 33). On June 7, 2006, simultaneously with the execution of the APSA, Chazanow executed a three year employment agreement and accepted a position as CMC Recycling's Marketing Coordinator for the North Texas Region. (*Id* . at ¶ 4). Uhrick was a Vice President of Yonack prior to the APSA and, also on June 7, 2006, executed an employment agreement with CMC, becoming CMC Recycling's North Texas/South Texas Operations Manager. (*Id.* at ¶ 35). Wayne was an employee at Metallic, working under Chazanow, prior to the execution of the APSA. In November 2006, he signed an employment agreement and joined CMC, where he ultimately became the manager of the American yard for CMC. (*Id.* at ¶¶ 43, 34).

The Individual Defendants' employment agreements with CMC included similar noncompete clauses prohibiting them from competing directly or indirectly with CMC during their employment and for a specified period following employment with CMC. (*Id.* at ¶¶ 30, 41, 43, 45). CMC alleges that instead of divesting their interest in MI as directed, the Individual Defendants either retained their ownership of MI or maintained a beneficial interest and association with MI despite ostensible transfer of ownership to their respective wives. [FN2] (*Id.* at ¶¶ 32-34, 38; doc. 10 p. 13-14). CMC also asserts that it required its employees to annually certify compliance with ethics policies and to disclose any potential conflicts. (*Id.* at ¶¶ 49-52). CMC further alleges that each of the Individual Defendants "failed to disclose his continued involvement with MI to CMC and, in fact, affirmatively represented that neither he nor members of his household had involvement with any 'supplier of ... services' to CMC." (*Id.*).

FN2. It is not clear whether CMC alleges that these purported transfers of ownership was invalid or that the transfers did not occur. Whatever issues CMC has with the transfers, it clearly concluded and alleges that MI was "owned or controlled by" the Individual Defendants. (*See, e.g., id.* at ¶ 67).

\*2 CMC alleges that shortly after joining CMC in 2006, the Individual Defendants "began a scheme to defraud CMC by directing substantial business to MI, the company allegedly owned by their spouses, for their direct benefit." (*Id.* at ¶ 53). Through this scheme, the Individual Defendants allegedly concealed their interest in MI3, used their positions at CMC to employ MI instead of CMC's trucking fleet, and approved MI's fraudulent or overstated invoices. (*Id.* at ¶ 53-55). CMC alleges that the scheme, lasting from June 2006 through February 2009 resulted in payments to MI3 of over $3 million, many of which were made outside the ordinary course of CMC's payment process. (*Id.* at ¶¶ 11, 58). Specifically, CMC alleges that Chazanow "directed the use of MI for all former Yonack customers." (*Id.* at ¶ 55, 72). CMC further contends that "Chazanow and Wayne required and approved the use of MI and directed business to MI over other available trucking services." (*Id.*).

According to CMC, several employees questioned "the excessiveness of the MI charges and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

lack of necessity of certain charges." (*Id.* at ¶ 56). CMC found "disturbing inconsistencies in MI's invoicing," and directed its audit staff to investigate MI's activities. (*Id.* at ¶ 59). CMC's initial audit revealed "that MI grossly overcharged CMC for services, improperly charged CMC for services that were neither necessary nor requested, and charged CMC for services that, in some cases, were never provided." (*Id.* at ¶ 11). CMC then attempted to determine "whether Chazanow, Uhrick, and Wayne actually owned MI and the extend to which the employees had directed CMC's business to MI." (*Id.* at 13). CMC concluded that the Individual Defendants did not divest their ownership as represented, and did not disclose the interests purportedly transferred to their spouses. (*Id.* at ¶ 13-15).

As a result of this scheme, CMC alleges that it made at least 618 payments to MI between June 2006 and December 2008, and that it conducted these transactions "through the mail, e-mail, facsimile, wire transmissions, telephones, and text messages." (*Id.* at ¶¶ 58-60). CMC attached to its complaint invoices and corresponding payments that it contends its audit revealed to be evidence the scheme. (*Id.* at ¶¶ 78, 81-82; Exhibits E through H). CMC terminated Individual Defendants Chanazow and Wayne on January 29, 2009, and in February 2009 informed MI that it would no longer utilize its services. (doc. 6 p. 5).

Plaintiff CMC filed suit on April 30, 2009, claiming that the Individual Defendants, while employed by CMC, engaged in a scheme, through their wholly owned entity (and alleged RICO enterprise), MI 3 Transport, to fraudulently overcharge CMC and to collect money from CMC for services that were not requested or necessary. (doc. 1, p. 1-4; doc. 10, p. 1-3). CMC filed suit asserting claims for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1062(c), alleging the Individual Defendants participated in a RICO enterprise through a pattern of racketeering activity that included mail fraud, wire fraud, and bank fraud. (doc. 1, p. 17-25). CMC also asserts a

claim for RICO conspiracy, as well as claims under a variety of state law causes of action based on the same conduct. (*Id.* at p. 25-38). On June 30, 2009, the Individual Defendants filed their motion to dismiss (doc. 6), which was joined on July 2, 2009 by Defendant MI (doc. 7).

## II.
## LEGAL STANDARD

*3 Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K Eby Constr. Co. V. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004). "A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.' " *TelPhonic Servs., Inc. v. TBS Int'l., Inc.,* 975 F.2d 1134, 1137 (5th Cir.1992) (quoting *Ward v. Hudnell,* 366 F.2d 247, 249 (5th Cir.1966)). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true (even if doubtful in fact)." *Id.* at 555. "[A] plaintiff's obligations to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* If the allegations raise no entitlement to relief, "this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

court." *Cuviller v. Taylor,* 503 F.3d 397, 401 (5th Cir.2007) (quoting *Tombly,* 550 U.S. at 557). The Court will not weigh the evidence or resolve competing factual assertions at the motion to dismiss stage. *See Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (" Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations."). Instead, at this stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *At the Airport, LLC v. Isata, LLC,* 438 F.Supp.2d 55, 60 (E.D.N.Y.2006).

### III.
### ANALYSIS

CMC alleges that Defendants "conducted, participated in, and/or conspired to conduct or participate in, directly or indirectly, the affairs of the MI Enterprise through a pattern of racketeering activity" in violation of the RICO statute, 18 U.S.C. § 1962(c) and (d). (doc. 1 ¶ 66). "Subsection 1962(c) prohibits persons employed by or associated with any enterprise from conducting or participating in the enterprise's affairs through a pattern of racketeering." *Word of Faith World Outreach Center Church, Inc.,* 90 F.3d 118, 121 (5th Cir.1996). "Subsection 1962(d) prohibits a conspiracy to violate 18 U.S.C. § 1962(a), (b), or (c)." *Id.* at 122.

*\*4* To state a plausible RICO claim, CMC must allege facts to show "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *In re Burzynski,* 989 F.2d 733, 741-42 (5th Cir.1993). A RICO "person" may be "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3); *St. Paul Mercury Ins. Co. V. Williamson,* 224 F.3d 425, 439 (5th Cir.2000). A RICO person must be distinct from the RICO enterprise. *Abraham v. Singh,* 480 F.3d 351, 357 (5th Cir.2007). "Racketeering activity" includes certain state and federal offenses enumerated in § 1961(1), including mail, wire, or bank fraud. *H.J. Inc. v. Nw. Bell Tell.*

*Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Word of Faith,* 90 F.3d at 122. To assert a claim based on a "pattern of racketeering activity, CMC must allege "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *Word of Faith,* 90 F.3d at 122 (quoting *H.J. Inc.,* 492 U.S. at 239). An "enterprise" is broadly defined by the Act, and it "can be either a legal entity or an association-in-fact." [FN3] *St. Paul Mercury Ins. Co.,* 224 F.3d at 440.

> FN3. CMC alleges that MI is a RICO enterprise as defined by 18 U.S.C. § 1961(4). (doc 1 ¶ 65). In the alternative, CMC alleges that the Individual Defendants formed an association-in-fact enterprise. ( *Id.* at ¶ 71).

CMC alleged that Defendants Chazanow, Uhrick, and Wayne are RICO persons who engaged in a pattern of racketeering activity grounded in the predicate acts of mail fraud, wire fraud, and bank fraud. (doc. 1, ¶¶ 76-84). Because CMC has adequately plead the first element and sufficiently identified RICO persons, whether CMC's complaint can withstand a 12(b)(6) challenge will depend on the sufficiency of its allegations related to a pattern of racketeering activity and the existence of a RICO enterprise.

*A. Sufficiency of Allegations for Predicate Acts*

CMC RICO claims are grounded in the alleged predicate acts of mail fraud, wire fraud, and bank fraud. Defendants argue that CMC's claims must fail because it has not sufficiently plead facts to support the fraud-based predicate acts that form the foundation for its RICO claims.

Rule 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *Coates v. Heartland Wireless Comms., Inc.,* 26 F.Supp.2d 910, 914 (N.D.Tex.1998). Because " Rule 9(b)'s particularity requirement applies to pleading fraud as a predicate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

act in a RICO claim," CMC must meet the heightened standard of pleading when alleging these fraud-based predicate acts. *Bonton v. Archer Chrysler Plymouth, Inc.,* 889 F.Supp. 995, 1004 (S.D. Tex.1995 (citing *Tel-Phonic Servs. Inc. v. TBS Int'l. Inc.,* 975 F.2d 1134, 1138 (5th Cir.1992) ). "To satisfy Rule 9(b), a plaintiff must at a minimum allege the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.' " *Bonton,* 889 F.Supp. At 1004 (quoting *Tel-Phonic Servs. Inc.,* 975 F.2d at 1139)). Where, as here, multiple defendants are alleged to have contributed to the fraudulent predicate acts, a "plaintiff must 'plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to 'distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.' " *Coates,* 26 F.Supp.2d at 915 (quoting *In re Silicon Graphics, Inc. Secs. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997)).

**\*5** Though this burden requires specificity, a "complainant need not, however, state all facts pertinent to a case to satisfy the requirements of Rule 9(b)." *Mitchell energy Corp. V. Martin,* 616 F.Supp. 924, 927 (S.D.Tex.1985). " Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *United States v. Kanneganti,* 565 F.3d 180, 186 (5th Cir.2009) (quoting *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 178 (5th Cir.1997)). In alleging RICO scheme involving mail or wire fraud, it is not necessary to assert that each defendant personally made fraudulent mailings or wires; rather " Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." *At the Airport,* 438 F.Supp.2d at 61. Where a "plaintiff claims that mail and wire fraud were in furtherance of a larger scheme to defraud ... Rule 9(b) 'only requires the plaintiff to delineate, with adequate par-

ticularity, the specific circumstances constituting the overall fraudulent scheme.' " *Id.*

Here, CMC alleges that the Individual Defendants participated in a scheme by which they used their positions with CMC to direct business to MI and approve fraudulent invoices. (doc. 1 p. 1-4). To satisfy the requirements of Rule 9(b), CMC must both describe the allegedly fraudulent statements with particularity and sufficiently apprise each defendant of his role in the alleged scheme. CMC contends that "[f]rom June 2006 to December 2008, CMC made at least 618 payments to MI for a total of $3,152,835.17. From CMC's initial audit of those payments, (I) CMC was grossly overcharged for the services that MI allegedly performed, (ii) CMC was charged for services that were neither necessary nor requested, and (iii) in several cases, CMC was improperly charged for services that were neither requested nor performed." (doc. 1 ¶ 58). As Exhibit E to its complaint, CMC attached a series of dated invoices, each sent from MI, that it contended to be fraudulent or overstated as described in the body of its complaint. CMC further alleges that, in addition to their actions through MI, each of the Individual Defendants contributed to the fraudulent scheme by directing legitimate business to MI, approving MI's invoices, and concealing their interest in MI. (doc 1 ¶¶ 53-58, 67-68). CMC contends that "Defendants Chazanow, Wayne, and Uhrick operated the MI Enterprise for the purpose of diverting profits and business opportunities from CMC to a company owned or controlled by them." (*Id.* at ¶ 67).

Defendants argue that CMC's averments of mail and wire fraud are not stated with sufficient particularity. They contend that "Plaintiff never identifies any specific misrepresentations contained in any of" the documents attached to the complaint. (doc. 6, p. 10). Defendants further argue that CMC did not sufficiently identify which of the alleged misrepresentations are attributable to each defendant, and that the Individual Defendants are not adequately apprised of their roles in the alleged scheme. (*Id.*).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

**\*6** The Court has reviewed the Complaint and finds that it's averments of mail fraud and wire fraud satisfy Rule 9(b). The Complaint specifies the time period during which the alleged frauds occurred (June 2006-December 2008); the location of the misrepresentations (Dallas, Texas); the contents of the misrepresentations (specific invoices and corresponding payments attached); the responsibility for the misrepresentations (transmitted by MI at the direction of the Individual Defendants and approved by Chazanow and Wayne); and what was obtained through the misrepresentation (payments to MI on invoices that were inflated or that included unnecessary services). CMC also sufficiently apprised each defendant of his role in the alleged scheme. Each of the misrepresentations was allegedly sent by MI, and the Complaint describes the actions taken by the Individual Defendants to direct business to MI, approve the invoices at issue, and conceal their interest in MI. To adequately state a cause of action for the predicates of mail fraud [FN4], the plaintiff need not tie each defendant to each offensive mailing, but "must only present enough evidence to connect the defendant to the fraudulent scheme involving the use of the mails." *Cadle Co.,* 779 F.Supp. at 399. CMC further alleges that, in support of the enterprise, each Individual Defendant made additional misrepresentations about his ownership of or control of MI, both prior to the closing of the APSA and when annually certifying his compliance with CMC's ethics policy. The Complaint pleads facts sufficient to meet the requirements of Rule 9(b) and contains "enough facts to state a claim for relief that is plausible on its face." *Twombly,* 550 U.S. at 570. CMC will have the burden of presenting evidence to support each of the above critical facts alleged in its complaint; however, at this stage, CMC's allegations must be taken as true. Because CMC has properly described the allegedly fraudulent statements and the role of each defendant in the alleged scheme, dismissal of CMC's RICO claims for failure to plead the predicate acts of mail fraud and wire fraud under Rule 12(b)(6) is not appropriate. The Court DENIES Defendants' Motions to Dismiss CMC's complaint on the asserted ground that it insufficiently pleads the predicate acts of mail fraud or wire fraud.

FN4. "The elements necessary to establish violations of the mail and wire fraud statutes are essentially identical; hence, courts apply identical analyses to both the mail and wire fraud statutes." *Cadle Co. V. Schultz,* 779 F.Supp. 392, 399 n. 37 (N.D.Tex.1991) (citing *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)).

CMC additionally alleges that the scheme described above constitutes predicate acts of bank fraud in violation of 18 U.S.C. § 1344. (doc. 1, ¶ 84). To support its bank fraud claims, CMC alleges that "[b]y mailing and transmitting the invoices described in Paragraphs 78 and 81-82 above, Defendants caused CMC to remit checks to Defendants, as described in Paragraph 79 above. By doing so, Defendants knowingly executed a scheme or artifice to obtain monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution." (*Id.*). The predicate acts of bank fraud are thus grounded in allegations that Defendants presented CMC with fraudulent invoices that CMC paid with funds maintained at a financial institution. This allegation fails as a matter of law because "[i] t is the financial institution itself ... that is the victim of the fraud the statute proscribes." *United States. v. Saks,* 964 F.2d 1514, 1518 (5th Cir.1992) (citing *United States v. Blackmon,* 839 F.2d 900, 904-906 (2d Cir.1988)). Here, CMC does not plead facts that indicate a financial institution, as opposed to a client of a financial institution (itself) was defrauded. CMC admits that Defendants "caused CMC to remit checks" and does not allege that the money was fraudulently withdrawn or that any misrepresentations were made to a financial institution. (doc. 1, ¶ 84). Instead, CMC alleges that it remitted checks to pay invoices it contends to be fraudulent. CMC simply has not alleged that the financial institution was the victim of any fraud, or even that any fraudulent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

statement was made to the financial institution. *Compare United States v. Hubbard,* 889 F.2d 277, 280 (D.C.Cir.1989) (bank fraud properly alleged where defendant stole check from bank) *with United States v. Blackmon,* 839 F.2d 900, 904-905 (bank fraud not properly alleged where money was legally withdrawn from bank by a customer who was defrauded). Accordingly, CMC has not stated a claim for the predicate acts of bank fraud, and the Court GRANTS Defendants' Motions in part. All claims dependent upon allegations of bank fraud are DISMISSED.

*B. Pattern of Racketeering Activity*

*7 In addition to sufficient pleading of predicate acts, to satisfy the second RICO element CMC must allege a "pattern" of such acts. *In re Burzynski,* 989 F.2d at 742. " 'Racketeering Activity' consists of two or more predicate offenses, defined by the statute to include acts violating federal wire or mail fraud statutes." *Word of Faith,* 90 F.3d at 122 (quoting 18 U.S.C. § 1961). This two-pronged element "requires the plaintiff to plead both that the predicate acts are related to each other and that they either constitute or threaten long-term criminal activity." *In re Burzynski,* 989 F.2d at 742 (citing *H.J. Inc.,* 492 U.S. at 239). "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J. Inc.,* 492 U.S. at 239 (emphasis in original).

Predicate acts are related where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.; Word of Faith,* 90 F.3d at 122. CMC alleges a series of similar predicate acts of mail and wire fraud regularly conducted through the MI enterprise that, as alleged, are not isolated or sporadic events. Thus, CMC has adequately pleaded that the predicate acts are related.

It is not enough that the alleged predicate acts be related; for a series of related predicate acts to constitute a RICO "pattern of activity," Plaintiff must also allege that the conduct was sufficiently

continuous. "It is 'continuity' that assures a federal cause of action." *In re Burzynski,* 989 F.2d at 742. Continuity may be alleged as "either a closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.' " *Word of Faith,* 90 F.3d at 122 (quoting *H.J. Inc.,* 492 U.S. at 240). A closed period of conduct may be properly pleaded by alleging "a series of related predicates extending over a substantial period of time." *Id* (citing *H.J. Inc.,* 492 U.S. at 241). An open period of conduct requires allegations of "a specific threat of repetition extending indefinitely into the future," or that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* (citing *H.J. Inc.,* 492 U.S. at 242-43).

Defendants challenge CMC's allegations of continuity and contend that on the facts alleged, "[i]t is impossible to ascertain ... when the alleged fraud actually began and ended." (doc. 6, p. 12). CMC argues that its Complaint properly alleges both "closed-ended and open-ended continuity." (doc. 10, p. 12). CMC alleges that the "pattern of racketeering activity began at least as early as June 7, 2006 and continued at least until MI's services were terminated in February 2009." (doc. 1, ¶ 78). In support of this contention, CMC attached invoices dated from October 2006 to October 2008 that it contends "provides at least the minimum time frame" during which the scheme operated. (doc. 10, p. 12). The Fifth Circuit has held that the continuity requirement, though related to fraudulent predicate acts, need not meet heightened pleading requirements. *Abraham,* 480 F.3d at 355-56. That CMC's Complaint does not firmly fix the dates of the alleged conduct is therefore not fatal. While there is no clear line delineating the point when a period of closed-ended conduct reaches a "substantial period of time," CMC's allegations-acts that continued for thirty two months-extend well beyond the periods of weeks or months that have been found to be inadequate. *H.J. Inc.,* 492 U.S. at 242. Further, the alleged acts are not "part and parcel of a single, otherwise lawful transaction" of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

sort alleged in *Word of Faith.* 90 F.3d at 123. Accordingly, the Court finds that CMC alleged continuity sufficient, if proven, to show a pattern of racketeering activity and DENIES Defendants Motions to Dismiss on the asserted ground that the Complaint fails to allege a pattern of racketeering activity.[FN5]

> FN5. CMC also contends that its Complaint supports a finding of open-ended continuity. Open-ended continuity allows a plaintiff to bring a RICO action "before continuity can be established," and is based on the threat of future activity. *H.J. Inc.,* 492 U.S. at 242. Because CMC did not bring this action before sufficient time elapsed to show closed-ended continuity, the Court need not address this alternative.

*C. RICO Enterprise*

**\*8** Defendants contend that CMC has not alleged facts sufficient to show that MI is a RICO enterprise or that the Individual Defendants were employed by or associated with the alleged MI enterprise. (doc. 6, p. 13-16). "Congress gave the term 'enterprise' a very broad meaning." *United States v. Elliott,* 571 F.2d 880, 897 (5th Cir.1978) (quoting *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir.1976)). Under the statute, " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "RICO enterprise can be either a legal entity or an association-in-fact." *St. Paul Mercury ins. Co.,* 224 F.3d at 440. "If the alleged enterprise is an association-in-fact, the plaintiff must show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *Id.* CMC alleges that MI is a "RICO Enterprise," and that the Individual Defendants are "RICO Persons." (doc. 1, ¶¶ 64-65). In the alternative, CMC alleges that the Individual Defendants formed an association-in-fact enterprise. (*Id.* at ¶ 71).

CMC's RICO claims are based upon 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Claims based on this provision require "that the RICO person be distinct from the RICO enterprise." *St. Paul Mercury Ins. Co.,* 224 F.3d at 445. Defendants contend that CMC has not plead facts sufficient to show that the Individual Defendants were "employed by or associated with" the alleged MI Enterprise. (doc. 6, p. 13; doc 13, p. 4).

The proscriptions of the RICO statute have a broad reach; the "RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.1978). Yet while liability does not depend on a defendant's seniority or level of responsibility within the enterprise-he may indeed be a small fish-each defendant must "have some part in directing" the affairs of the enterprise, directly or indirectly. *Reeves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The *Reeves* Court interpreted "the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction," while making clear that the statute does not require "primary responsibility" or "significant control." *Id.*

CMC alleges that the Individual Defendants "were all employed by or associated with the MI Enterprise, and conducted its affairs through a pattern of racketeering activity" that included the acts of mail and wire fraud described above. (doc. 1, ¶¶ 67-69). CMC further argues that the Individual Defendants are "associated with" the MI Enterprise by virtue of their ownership interest in MI. (*Id.;* doc. 10 p. 15). Defendants respond that CMC's allegations of ownership and employment "are patently untrue," and assert that none of the Individual Defendants were ever employed by MI and that each divested his ownership interest. (doc. 6, p. 13).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

**\*9** The Court finds that, taking the facts contained in the Complaint as true, CMC has sufficiently alleged direct or indirect participation on the part of the Individual Defendants in the conduct of the MI Enterprise's affairs. The statute "makes clear that RICO liability is not limited to those with a formal position in the enterprise," and CMC has alleged facts the Individual Defendants had "some part in directing the enterprise's affairs." *Reeves,* 507 U.S. at 179. It is not necessary for the Individual Defendants to have managerial or operational control, or hold any formal position within MI. Rather, it is sufficient to allege, as CMC does, that each participated indirectly in the conduct of MI Enterprise's affairs by directing business to MI and approving invoices sent by MI.

The Court further finds that CMC's alternative pleading that the Individual Defendants formed an association-in-fact enterprise satisfies the pleading requirements. "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* --- U.S. ----, ----, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). Here CMC alleged that the purpose of the Association-in-Fact Enterprise was to direct business opportunities and profits to an entity controlled or owned by the Individual Defendants. The relationships among those associated with the Enterprise-in-Fact need not involve "a hierarchical structure or 'chain of command.' " *Id.* CMC's allegations that the Individual Defendants collaborated regarding the scheme and were related through their common ownership of MI suffices. CMC's allegations that the Association-in-Fact's operation was "continuous" throughout the time frame alleged satisfies the longevity requirement. Thus, the Court DENIES Defendants' Motions to Dismiss on the asserted ground that the Complaint fails to allege a RICO enterprise.

*D. RICO Conspiracy*

Defendant also moves to dismiss CMC's Section 1962(d) claim for RICO conspiracy. A claim for RICO conspiracy must allege "three elements: (1) knowledge by the defendant of the essential nature of the conspiracy; (2) the defendant's objective manifestation of an agreement to participate in the conduct of the affairs of an enterprise, and (3) an overt act, which need not be a crime, in furtherance of the conspiracy." *Bonton,* 889 F.Supp. at 1005 (citing *United States v. Sutherland,* 656 F.2d 1181, 1187 (5th Cir.1981)). Defendants specifically challenge the sufficiency of CMC's pleading of "an agreement to commit the predicate acts." (doc. 6, p. 17). "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Tel Phonic Servs. Inc.,* 975 F.2d at 1140.

**\*10** Defendants argue that CMC did not "allege specific facts underpinning this "agreement," such as which Defendants conspired, when the agreement to conspire took place, or any other specific details regarding the alleged conspiracy." (doc. 6, p. 17). To properly allege agreement, CMC must plead facts that indicate the Individual Defendants, by their "words or actions ... objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Elliott,* 571 F.2d at 903.

CMC alleges that the individual Defendants "collaborated to form and control MI" then "consciously agreed to commit, and ultimately did commit, predicate acts with knowledge that the predicate acts were part of a pattern of racketeering activity." (doc. 1, ¶¶ 90-92). CMC then delineates which acts it contends provide evidence of the completed predicate acts of mail and wire fraud.[FN6] (doc. 1 ¶¶ 94-101). Agreement may be alleged by pointing to words or actions, and CMC's complaint alleges the actions that it contends show the Individual Defendants objectively manifested their

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784
**(Cite as: 2009 WL 3853704 (N.D.Tex.))**

agreement. Accordingly, the Court finds that CMC has pleaded facts sufficient to make relief under Section 1962(d) plausible when taken as true, and dismissal of CMC's conspiracy claim at this stage is inappropriate. The Court DENIES Defendants Motions to Dismiss on the asserted ground that the Complaint fails to sufficiently allege a RICO conspiracy.

> FN6. CMC additionally alleges that predicate acts of bank fraud constitute evidence of agreement to commit the same. Because this Court dismissed CMC''s allegations of bank fraud, the accompanying claim for conspiracy to commit those acts is also dismissed. *See, e.g., Bonton,* 889 F.Supp. at 1005).

### IV. Conclusion

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss. (doc. 5; doc. 7). The following claims are DISMISSED: (1) CMC's RICO claims based on predicate acts of bank fraud; and (2) CMC's RICO conspiracy claim based on agreement to commit predicate acts of bank fraud. Defendants' Motion to Dismiss is DENIED in all other respects.

**SO ORDERED.**

N.D.Tex.,2009.
Commercial Metals Co. v. Chazanow
Slip Copy, 2009 WL 3853704 (N.D.Tex.), RICO Bus.Disp.Guide 11,784

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 11



For Opinion See 2009 WL 1469808

United States District Court, N.D. Texas,
Dallas Division.
BRECKENRIDGE ENTERPRISES, INC., Plaintiff,
v.
AVIO ALTERNATIVES, LLC; et al, Defendants.
No. 3:08-CV-1782-M.
January 22, 2009.

Plaintiff's Surreply to Defendants' Reply Memorandum

Respectfully submitted, Reid & Dennis, P.C., William E. Reid, State Bar No. 16748500, wreid@reiddennis.com, Jacqueline Montejano, State Bar No. 24027402, jmontejano@reiddennis.com, Providence Towers, Suite 255W, 5001 Spring Valley Road, Dallas, Texas 75244-3914, (972) 991-2626 (Telephone), (972) 991-2678 (Facsimile), Attorneys for Plaintiff Breckenridge Enterprises, Inc.

TO THE HONORABLE JUDGE OF SAID COURT:

## I. INTRODUCTION

Plaintiff, Breckenridge Enterprises, Inc., files this Surreply to Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss to address two arguments, which Defendants raised for the first time in their Reply.

## II. ARGUMENT

### A. Plaintiff's Response Was Timely Filed.

Defendants argue that Plaintiff filed its Response Brief four days after the prescribed deadline.[FN1] Contrary to Defendants' assertions, Plaintiff's Response in Opposition to Defendants' Motion to Dismiss was timely filed. Defendants, improperly calculated the response deadline by failing to include additional time provisions articulated in Rule 6 of the Federal Rules of Civil Procedure, to which Plaintiff is entitled and which, cannot be shortened by any Local Rule.

FN1. Defendants' complaint is not only misplaced, it is particularly ironic given Defendants' own request for an enlargement of time in which to file their Motion to Transfer Venue.

1. The Rule.

"Whenever a party must or may act within a prescribed period after service and service is made under Rule 5(b)(2)(C),(D), (E), or (F), three days are added after the period would otherwise expire." Fed. R. Civ. P. 6(d). This rule applies in computing any time period specified in the Federal Rules of Civil Procedure *or in any local rule*, court order, or statute. Fed. R. Civ. P. 6(a) (emphasis added).

Defendants served their Motion to Dismiss by electronic means, pursuant to Rule 5(b)(2)(E) therefore, Rule 6(d)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

was triggered and Plaintiff was entitled to an additional three days to reply. *See* Fed. R. Civ. P. 6(d); *F.D.I.C. v. Neubauer*, 2007 WL 2350892 at *2 n.10 (N.D. Tex. Aug. 17, 2007) (finding Defendant entitled to three additional days beyond prescribed deadline to file Reply Brief to Plaintiff's Response, which was served to Defendant by mail); *AT & T, Inc. v. Flores*, 2008 WL 3003480 at *1 n.6 (W.D. Tex. Aug. 1, 2008) (noting that depending upon the type of service employed, a responding party may have three additional days beyond that provided by the Local Rules).[FN2]

> FN2. Local Rule 5.1(d) similarly recognizes that service by electronic means such as electronic court filing ("ECF") "constitutes service under Fed. R. Civ. P. 5(b)(2)(E) on each party who is a registered user of ECF," which again would trigger the provisions of Fed. R. Civ.P. 6(d). *See* LR 5.1 (d) (N.D.Tex.).

### 2. Applying the Rule and Calculating the Deadline.

In this case, Plaintiff was served electronically on November 21, 2008. Local Rule 7.1 (e) provides twenty days to respond to an opposed motion. Because Plaintiff was served electronically, Plaintiff was entitled to three additional days beyond the twenty-day deadline in which to file its response to Defendants' Motion to Dismiss. Calculating twenty-three days from Defendants' November 21, 2008 service date, created a response deadline of Sunday December 14, 2008. When the last day of a period falls on a Saturday, Sunday or legal holiday, "the period runs until the end of the next day that is not a Saturday, Sunday or legal holiday." Fed.R. Civ. P. 6(a)(3). Plaintiff filed its response on Monday, December 15, 2008, the next business day. Therefore, the response was timely filed. *Id.; Nolos v. Mukasey*, 2008 WL 5351894 (W.D. Tex. Sept. 25, 2008).

### B. Plaintiff Plead More Than Sufficient Facts to Warrant Jurisdictional Discovery.

Defendants go to great lengths to minimize their significant, deliberate, invasive and purposeful dealings with Texas and make glossy, caustic pronouncements[FN3] that Plaintiff has failed to make a threshold showing of alter ego-notably without citing any authority.[FN4] For example, Alan and Nancy Gagleard felt it relevant to apprise the Court that they have never held Texas driver's licenses or identification cards.[FN5]However, the Gagleards' Declarations fail to apprise the Court of their significant involvement as "controlling persons" of a Texas staff leasing company that processes, services and distributes products to Texas residents.[FN6] This evasiveness alone warrants discovery.

> FN3. For example: (1) "Plaintiff ... barely passes the red-face test." (Def. Reply Mem. at 5 n.7); and (2) "Plaintiff, however, has employed the 'spaghetti testing' method of pleading" (*Id.* at 9). Such comments are simply inflammatory and violate the rules of attorney decorum set forth in *Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284 (N.D. Tex. 1988).

> FN4. As this Court is well aware, Plaintiff need not prove all twelve *Jon-T* factors in order to make a finding that one entity so completely dominates the other that piercing the corporate veil is warranted. *United States v. Jon-T Chemicals*, 768 F.2d 686, 692 (5th Cir. 1985); *Gundle Lining Constr. Corp., v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996). Significantly, without conducting any discovery whatsoever, Plaintiff has already found seven out of the twelve *Jon-T* factors present in this case. While Defendants complain loudly that Plaintiff has failed to address the remaining factors namely, consolidated financial statements and tax returns, one entity's financing the other, the lack of observation of corporate formalities, etc., Plaintiff looks forward to the opportunity to develop such facts through discovery.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009 WL 1936147 (N.D.Tex.)

FN5. *See* ¶13 of the Declarations of Alan and Nancy Gagleard (Def. App. to their Motion to Dismiss at 2 and 7).

FN6. Again, the representations made in ¶17 of Alan and Nancy Gagleard's Declarations, namely that neither has "manufactured, processed, serviced or distributed and products that were used or consumed in Texas," are misleading and evasive. *See id.*

It is well established that a federal district court has the power to require a defendant to respond to discovery relevant to his or her motion to dismiss for lack of personal jurisdiction. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 708-09 (1982). Moreover, "[i]f a plaintiff has presented factual allegations that suggest, 'with reasonable particularity,' the possible existence of the requisite 'contacts between [Defendants] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Toys R Us, Inc. v. Step Two, S.A.,* 318 F.2d 446, 456 (3d Cir. 2003) (quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir. 1992); *see also Skidmore v. Syntex Laboratories,* 529 F.2d 1244, 1248-49 (5th Cir. 1976); *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, 1143-46 (5th Cir. 1973) (en banc), cert. denied, 414 U.S. 1116.

Plaintiff has made the showing " 'with reasonable particularity,' the possible existence of the requisite 'contacts between [the Gagleards] and the forum state [of Texas].'' *See Toys R Us, Inc.,* 318 F.2d at 456. Notably, one of the Defendants, Avio Alternatives, has not challenged jurisdiction. Moreover, Plaintiff has demonstrated, without sending Defendants any discovery, common stock ownership[FN7], common officers and directors [FN8], one common business location[FN9], common use of business property, and a shocking failure to keep business operations and expenses separate[FN10] between the various Defendant entities, sufficient to suggest if not outright support, the assertion that Avio's minimum contacts should be attributed to Alan, Nancy, Gagleard P.C., Power, Power I, and Power II.

FN7. Alan and Nancy Gagleard are the principal shareholders of Avio, Power, Power I, and own more than seventy-five percent of the shares of Power II. Alan Gagleard is the sole shareholder of Gagleard, P.C.

FN8. Alan and Nancy Gagleard are also the sole directors of Avio, Power, Power I and Power II. Alan Gagleard is the sole director of Gagleard, P.C.

FN9. Avio, Power, Power I, Power II, EENucleus, The Texas Star Team LLC, The Power P.E.O. of Florida, Inc., and The Power P.E.O. of Florida I, Inc. all occupy the exact same physical address.

FN10. Alan and Nancy frequently sent Plaintiff emails on behalf of Avio from another Defendant's (Power P.E.O.'s) email address and on at least one occasion Nancy Gagleard issued and signed a payroll check to an Avio/Breckenridge leased employee from another Defendant's (Power P.E.O.'s) checking account. *See* Plaintiff's App. to its Response to Defendants' Motion to Dismiss at 39.

Plaintiff has similarly presented factual allegations, which suggest such continuous and systematic contacts with Texas that would allow this Court to exercise general jurisdiction over Alan and Nancy Gagleard. The unambiguous and undisputed facts show that Alan and Nancy Gagleard had a majority ownership interest in, and operated two companies within the state of Texas. Defendants accuse Plaintiff of employing "tortured logic" in an effort to establish a personal contact between Alan and Nancy Gagleard and their Texas staff leasing company, The Texas Star Team, LLC.[FN11] However, newly obtained evidence from the Texas Department of Licensing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009 WL 1936147 (N.D.Tex.)

and Regulation shows that Alan and Nancy Gagleard used their personal finances--not the finances of their Texas company-to guarantee to pay the debts and financial obligations incurred by the company in order to meet the net worth requirement for issuance of a Texas staff leasing license.[FN12]

    FN11. *See* Def. Reply Memorandum at 3.

    FN12. *See* correspondence from Debbie Meyer of the Texas Department of Licensing and Regulation, dated January 6, 2009 (App. at 10) attached hereto and incorporated herein for all purposes.

In response to an Open Records request to the Texas Department of Licensing and Regulation ("TDLR"), seeking information concerning The Texas Star Team, LLC[FN13], TDLR records confirm that Alan and Nancy Gagleard applied for a Texas staff leasing license in 2005; submitted applications as "controlling persons" for their company and continue to maintain an active staff leasing license.[FN14] Alan and Nancy Gagleard operated these companies under the laws of Texas, entered into business contracts and dealings with other Texas companies, co-employed Texas residents as leased employees, earned income from their Texas businesses, and never once disclosed these facts in their Declarations.[FN15]

    FN13. Pursuant to Section 91.014 of the Texas Occupations Code, certain private and financial and net worth information is confidential and is exempted from public disclosure. While the Gagleards' personal financial information and the specific guarantee forms were not discoverable, Plaintiff was able to learn that the Gagleards used their personal finances and a guarantee to meet the net worth requirements of Section 91.014 of the Texas Labor Code. App. at 10.

    FN14. While Defendants attempt to summarily brush aside the significance of submitting an application for a Texas staff leasing license, noting "almost any person associated with the entity" meets the statutory definition of "controlling person" (Def. Reply Memorandum at 4), documents produced by the Texas Department of Licensing and Regulation show that Alan and Nancy Gagleard are the *only* controlling persons for the Texas Star Team, LLC. *See* Staff Leasing Services License and Staff Leasing Services License Application for The Texas Star Team, LLC (Plaintiff's Surreply App. at 11-26) attached hereto in incorporated for all purposes.

    FN15. The Texas Labor Code imposes significant legal requirements on the controlling persons of a staff leasing company. For example, §91.013 gives the Texas Department of Licensing and Regulation the authority to deny a staff leasing license based on the qualifications of a controlling person. Section 91.012 obligated the Gagleards to prove they had the educational, management and business experience to operate a staff leasing business in Texas and serve as the controlling persons. Moreover, §91.013 required the Gagleards to submit finger prints and undergo criminal background investigations before their company could be approved as a license holder and conduct business in Texas.

### III. CONCLUSION

Plaintiff has gone well beyond mere "red faced" speculation and the "spaghetti testing method of pleading." Plaintiff has shown with reasonable particularity the plausible basis for personal jurisdiction over defendants. Nonetheless, in the event this Court determines the record is inadequate to support personal jurisdiction, Plaintiff should be afforded the opportunity to conduct discovery on the jurisdictional facts and supplement its specific and general jurisdictional allegations.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Respectfully submitted,

REID & DENNIS, P.C.

By: /s/ William E. Reid

WILLIAM E. REID

State Bar No. 16748500

wreid@reiddennis.com

JACQUELINE MONTEJANO

State Bar No. 24027402

jmontejano@reiddennis.com

Providence Towers, Suite 255W

5001 Spring Valley Road

Dallas, Texas 75244-3914

(972) 991-2626 (Telephone)

(972) 991-2678 (Facsimile)

ATTORNEYS FOR PLAINTIFF BRECKENRIDGE ENTERPRISES, INC.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 12



Not Reported in F.Supp.2d, 2001 WL 1335860 (N.D.Tex.)
**(Cite as: 2001 WL 1335860 (N.D.Tex.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas Division.
Dannie G. NEAL, Plaintiff,
v.
LANIER PROFESSIONAL SERVICES and HARRIS CORPORATION, Defendants.

No. 3:00-CV-0053-G.
Oct. 24, 2001.

ORDER
SANDERSON, Magistrate J.
*1 After making an independent review of the pleadings, files and records in this case, and the findings, conclusions and recommendation of the United States Magistrate Judge, I am of the opinion that the findings and conclusions of the Magistrate Judge are correct and they are adopted as the findings and conclusions of the court, with the following modification: the plaintiff's claims against Lanier Professional Services, Inc. should be dismissed, but without prejudice to the arbitration of those claims.

It is therefore ORDERED that, with the modification noted above, the findings, conclusions and recommendation of the United States Magistrate Judge are adopted.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE
Pursuant to the District Court's order of reference filed on September 14, 2001, and the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), came on to be considered Defendant Harris Corporation's motion for summary judgment filed on April 12, 2001, and Defendant Lanier Professional Services, Inc.'s motion to dismiss filed on August 1, 2001, and the magistrate judge finds and recommends as follows:

I. *Defendant Harris Corporation's motion for sum-*

*mary judgment*
In its motion Harris asserts that it is entitled to summary judgment because Plaintiff cannot demonstrate the existence of a genuine issue of fact on one of the necessary elements which he must prove to be entitled to relief on his claims asserted against Harris pursuant to Title VII of the Civil Rights Act and the Fair Labor Standards Act (FLSA). Specifically it claims that Neal cannot show that he was an employee of Harris.

On May 23, 2001, a hearing was held before the undersigned magistrate judge in the capacity of special master.[FN1] Among the issues considered was Harris's summary judgment motion. Plaintiff filed a response to the motion on May 11, 2001, along with a motion for continuance. Plaintiff's response failed to present competent evidence controverting Harris's claim, supported by the affidavit of Frank Spampinato (*See* Defendant's Appendix), that Plaintiff was never employed by Harris. At the hearing Plaintiff argued that Harris Corp. was the *alter ego* of the putative Defendant, Lanier Blair Graphic/Harris Corp.[FN2] and orally moved for additional discovery pursuant to Rule 56(f) to obtain discovery to support his *alter ego* theory. The magistrate judge granted Plaintiff permission to engage in additional discovery in an effort to demonstrate that Harris was an *alter ego* of Lanier Professional Services, or at least to demonstrate a genuine issue of fact relating to the same. *See* Magistrate Judge's Report, Recommendation and Order filed on May 23, 2001, at pages 2-3.

> FN1. On April 25, 2001, the District Court appointed the undersigned as special master. This appointment was subsequently vacated. *See* order filed on September 14, 2001.
>
> FN2. After the magistrate judge's recommendation filed on May 23, 2001, was adopted by the District Court and Lanier Professional Services' motion to set aside de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1335860 (N.D.Tex.)
**(Cite as: 2001 WL 1335860 (N.D.Tex.))**

fault judgment was granted, Plaintiff filed his amended complaint on June 1, 2001, correctly identifying Harris's co-Defendant as Lanier Professional Services, Inc. The amended complaint does not render moot the issue raised in Harris's motion for summary judgment.

Although Plaintiff served discovery on Harris on or about June 1, 2001, a review of the inquiries propounded reflects that the discovery is not limited to matters relating to *alter ego.* Harris in turn served its responses, answers and objections on Plaintiff's counsel no later than July 30, 2001.[FN3] Plaintiff has not filed any further response to Harris's motion for summary judgment.

> FN3. In correspondence to the court from counsel it appears that Harris's responses were initially sent to Plaintiff's counsel's Dallas office, where receipt was refused, and were subsequently sent to Plaintiff's counsel's office in Houston on July 31, 2001.

**\*2** As was noted at the hearing on May 23, 2001, and above Plaintiff's response to Harris's summary judgment evidence is insufficient to raise a colorable claim that he was employed by Harris during the pertinent time period under the requisite indicia of employer-employee relationship, *See e.g. Fields v. Hallsville I .S.D.,* 906 F.2d 1017, 1019 (5th Cir.) cert. denied 498 U.S. 1026, 111 S.Ct. 676 (1990) and *Deal v. State Farm County Mutual Ins. Co. ov Texas,* 5 F.3d 117, 119 (5th Cir.1993) or because Harris was the *alter ego* of Defendant Lanier Professional Services. *See e .g. Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978); *United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 691-92 (5th Cir.1985).[FN4]

> FN4. In the Appendix filed with his opposition to Lanier Professional Services, Inc.'s motion, *infra,* Neal has included a copy of the employment agreement which he executed as an employee of Lanier Profes-

sional Services, Inc., which further points out the frivolousness of his opposition to Harris's motion for summary judgment.

Accordingly Defendant Harris Corp.'s motion for summary judgment should be granted and Plaintiff's claims against Harris should be dismissed with prejudice.

II. *Defendant Lanier Professional Services, Inc.'s motion to dismiss, etc.*

On August 1, 2001, Lanier Professional Services, Inc. filed its Rule 12(b)(6) motion and subject thereto its answer to Plaintiff's amended comply filed on June 1, 2001. In the answer portion of its pleading Lanier admits that Neal was its employee. *See* Lanier's motion at page 8, Part D.5. However, in support of its motion to dismiss or in the alternative, its motion for stay and to compel arbitration Lanier asserts that Plaintiff's claims against it are subject to binding arbitration pursuant to the terms of the employment agreement which Neal signed at the time his employment began. *See* Lanier's Appendix, pages 1-4.

In his opposition to the motion filed on August 24, 2001, Neal does not dispute the fact that he signed the agreement.[FN5] Rather he argues that the arbitration clause is not enforceable because it fails to expressly include disputes based upon federal discrimination claims and that it would be against public policy to require him to arbitrate "other tortuous injuries" alleged in his complaint.[FN6]

> FN5. Per the employment agreement, employment disputes are subject to arbitration. *See* Lanier Appendix at page 3, ¶ 8.

> FN6. It is not entirely clear what Plaintiff's other alleged injuries are since all his damages with the possible exception of Part E.8.c. (*See* amended complaint at page 2) are recoverable in a Title VII case. *See* P.L. 102-166, Section 102. Civil Rights Act of 1991.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The law in this circuit is quite clear that Title VII claims can be subject to mandatory arbitration. *See Rojas v. TK Communications, Inc.,* 87 F.3d 745, 747-49 (5th Cir.1996). *See also Circuit City Stores, Inc. v. Adams,* 121 S.Ct. 1302, 1313 (2001) wherein the Court observed:

> The Court has been quite specific in holding that arbitration agreements can be enforced under the [Federal Arbitration Act] without contravening the policies of congressional enactments giving employees specific discrimination prohibited by federal law.

Any ERISA claim asserted by Neal, *see* n. 6, *supra,* is subject to arbitration as well. Requiring ERISA claims to be submitted to arbitration is wholly consistent with the Supreme Court's language in *Adams, supra.* Any pension or insurance obligations allegedly owed to Plaintiff clearly involve disputes arising out of the compensation to which he is entitled and thus come within the purview of the arbitration paragraph in his employment agreement with Lanier. *See also Gross v. H.F. Ahmanson & Co.,* No. H-98-1232 (S.D.Tex.1998), 1998 U.S. Dist. LEXIS 20911.

*3 When, as here, all of Plaintiff's claims are subject to binding arbitration "the weight of authority clearly supports dismissal." *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) and retaining jurisdiction over the case would serve no useful purpose.

*RECOMMENDATION:*

For the foregoing reasons it is recommended that the District Court grant Harris Corporation's motion for summary judgment and grant Lanier Professional Services, Inc.'s motion to dismiss and that the District Court file its judgment dismissing Plaintiff's claims against Harris Corp. and Plaintiff's claims against Lanier Professional Services, Inc. with prejudice.

A copy of this recommendation will be transmitted to counsel for the parties.

NOTICE

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten days after being served with a copy of this recommendation. Pursuant to *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir.1996) (*en banc* ), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten-day period may bar a *de novo* determination by the district judge of any finding of fact or conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.

N.D.Tex.,2001.
Neal v. Lanier Professional Services
Not Reported in F.Supp.2d, 2001 WL 1335860 (N.D.Tex.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.