# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| *ex rel.* John King & Tammy Drummond § | CIVIL ACTION No. 06-2662 |
| § | TRANSFERRED FROM EASTERN |
| § | DISTRICT OF PENNSYLVANIA |
| and John King & Tammy Drummond, § | |
| § | CIVIL ACTION No. 03-3561 |
| Individually, *et al.* § | |
| Plaintiffs, | |
| v. § | |
| SOLVAY S.A. *et al.*, § | |
| Defendants. | |

## DECLARATION OF LORI KING

I, Lori King, declare as follows:

1. John King and I were married at the time that he filed the lawsuit that is referenced in the caption above.

2. After Solvay fired John his depression was such that it was I who took the initial steps towards reporting off-label marketing and kickbacks to the FDA. I was not employed outside of or home at the time, and it seemed like a way that I could help him at a time when I otherwise felt helpless. I began emailing the FDA at general email addresses such as or similar to druginfo@fda.hhs.gov, in May 2002. At least some of the email addresses I emailed to at the FDA were via online intake forms such that they did not produce a "sent email" within my email account. In any case, unfortunately the computer I used is long since gone, and I do not appear to have any printouts of emails from that timeframe.

All of my communications concerned off-label marketing and kickbacks as to the three drugs at issue, plus Estratest as well.

3. By about June of 2002 I began calling the FDA. It took many calls and substantive voicemail messages before I was routed towards those in the agency who said they were the right people to talk to. Again, all of my communications concerned off-label marketing and kickbacks as to the three drugs at issue, plus Estratest as well.

4. After this went on for several weeks, I believe it was criminal agents with FDA who took an interest. In about August of 2002, John, who had the firsthand information, began a series of lengthy phone conversations with these agents. At this time it was not Michael Cummins with whom we were in touch, though he became involved later. I do not know the names of the agents with whom John spoke during this period. I do remember very clearly that he spoke with them a minimum of 10 to 12 times during this timeframe. I know that because for all of these conversations I was in the room and listening to John talk about what happened. Very often, he held the phone up so that we could both listen to the agent speak. At first, it was John who was offering his account; later, the agents did more of the questioning and asked pointed questions about the events at issue. It was clear that an investigation had been opened.

5. During these conversations, John spoke about Luvox, Aceon, and AndroGel, and Estratest, too. He talked about both off-label promotion and kickbacks. I remember that the agents were particularly interested in Luvox, but that he also discussed AndroGel with them on many occasions. I clearly remember that in discussing AndroGel with the agents, John specifically said Solvay was urging that men get needlessly screened and tested for testosterone levels, and urging that even men with normal levels should be prescribed AndroGel. He talked about how Solvay would have sales representatives say that for men with no previous testosterone tests, we couldn't know what *their* normal levels were, and whether they had precipitously dropped even though they were in the normal range. He also talked about marketing AndroGel to men with HIV/AIDS and to women. I remember these subjects so well because at the time I had been poring over John's documents from the company and was (and am) very disturbed by what I saw and heard. Solvay's promotions seemed very personal to us because John had personally recommended some of these drugs to family members, some of whom seemed to us to then worsen or have other adverse effects.

6. As a result of these conversations, the FDA agents told us they wanted to visit John and me in Mobile, Alabama to interview him further. The trip was planned and flights were booked for late December 2002 or early January 2003. Just before the interview, however, John met with and hired Joel Androphy, who ultimately decided to postpone the FDA interview. I am sure of the date frame because I made Joel's hotel reservation in Mobile and because I remember clearly that Joel's visit was scheduled for just before the FDA's. In fact, Joel's visit happened the Monday or Tuesday of the same week that the FDA planned to come.

7. I have always been an enthusiastic supporter of John's suit against Solvay, and I have continued to follow what I can even since our divorce several years ago. In fact, I have a

Pacer account allowing me to view filings in the case. I had not heard from John about the Court's March 3 Order applying the public disclosure bar to some of John and Tammy's AndroGel claims when I first read the Order on March 6.

8. When I read the Order, I was alarmed because I saw that the Court apparently was unaware of John's early and lengthy conversations with FDA agents that happened before he hired Berg & Androphy. I reached out to John because I was troubled by this, and after discussing John's and my early contact with the FDA at length, Sarah Frazier of Berg & Androphy asked me to verify and sign this declaration.

9. I declare under penalty of perjury that the foregoing is true and correct.

3/12/2015
Dated

Lori King