# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* JOHN KING and | § | |
| TAMMY DRUMMOND, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-2662 |
| | § | |
| SOLVAY S.A., *et al.*, | § | |
| *Defendants*. | § | |

## ORDER

Pending before the court is a motion for partial summary judgment on Relators John King's and Tammy Drummond's (collectively, "Relators") retaliation claims filed by defendant Solvay Pharmaceuticals, Inc. ("Solvay"). Dkt. 391. After considering the motion, response, reply, and applicable law, the court is of the opinion that Solvay's motion should be GRANTED.

## I. BACKGROUND

This opinion relates only to the federal statutory retaliation claims filed by Relators. Relators worked for Solvay as district managers. Dkt. 392, Exs. 1 at 12, 12 at 16–17. Both relators made several complaints to upper level managers about alleged "off-label" promotion related to one or more of the products at issue in this litigation—AndroGel, Aceon, and Luvox. *See generally* Dkt. 392, Exs. 1, 12. King subsequently created a "non-branded presentation" for a physician to use at a roundtable discussion, in violation of company policy. Dkt. 393, Ex. 2C. Solvay, citing the policy violation, terminated King's employment. King contends that Solvay terminated his employment in retaliation for his complaints about its promotional practices. *Id.* Drummond continued to raise issues about alleged off-label promotion and also expressed concern that her job may be in jeopardy after King's termination. Dkt. 422, Ex. 6 at 382-85. It was, as Solvay later terminated Drummond's

employment for violating company policy, asserting that she worked with two doctors on an unapproved letter writing campaign.  Dkt. 393, Ex. 2E.  Drummond contends that her employment was terminated in retaliation for questioning Solvay's promotional practices.  Solvay now moves for summary judgment on both Relators' federal statutory retaliation claims.  Dkt. 393.

## II. Legal Standard

Under the federal False Claims Act ("FCA"), a person cannot present false or fraudulent claims for payment or approval to the federal government.  31 U.S.C. § 3729.  Additionally, if an employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment" because of actions the employee took in furtherance of the FCA, "including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed" under the FCA, the employee "shall be entitled to all relief necessary to make the employee whole."  31 U.S.C.A. § 3730(h) (2003).[1]  "The purpose of the False Claims Act . . . is to discourage fraud against the government, and the whistleblower provision is intended to encourage those with knowledge of fraud to come forward."  *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994).  An employee bringing an FCA retaliation claim must show that (1) he or she engaged in protected activity; (2) his or her employer knew the employee engaged in protected activity; and (3) his or her employer took adverse action because of it.  *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371–72 (5th Cir. 2011) (citing 31 U.S.C. § 3730(h) and *Robertson*, 32 F.3d at 951).

---

[1]  The statute has been amended, but Congress did not make the amendments retroactive. *See* 31 U.S.C.A. § 3730 note (Supp. 2015).

### III. ANALYSIS

**A.     Did Relators Engage in Protected Activity?**

**1.      King's Alleged Protected Activity**

King contends that he expressed concern regarding what he considers to be Solvay's illegal promotional activities on numerous occasions.[2]  Dkt. 422.  He asserts that he voiced concerns regarding whether Dine-N-Dash's were legal while in the presence of the Vice President of Commercial Operations.  *Id.* & Ex. 1 at 271.  Additionally, he contends that on six other instances he inquired or expressed concern about Solvay's alleged illegal promotional practices to either his supervisors or upper management.  Dkt. 422.  King states that he approached two upper-level executives three months before his termination to discuss activities he considered to be illegal and that in doing so he was not simply criticizing the way Solvay was marketing its drugs, and was, in

---

[2]   *See* Dkt. 422, Ex. 2 at 269-71 (stating vaguely that he (King) recalls being part of a discussion about Dine-N-Dashes with upper-level executives and that they knew that "illegal activities" went on); *id.* at 298–99, 316–20 (indicating that he (King) discussed with upper-level executives that King hoped the company would not reward sales representatives who were "doing things that were illegal" and that he "was uncomfortable with the direction that AndroGel marketing was taking" and then stating that one of the executives told King to "let that go"); *id.* at 346–47, 349 (noting that he (King) talked with a regional business director about alleged illegal marketing activities); *id.* at 324–26 (recounting a conversation King had with an upper-level executive in which King states he "expressed concerns to him about ongoing illegal activity, and specifically with respect to activities that were going on in the field that could be construed as kickbacks, such as Dine-N-Dashes and Books-A-Million-type programs, golf shop programs, where golf clubs and balls and so forth were given away, and also lavish dinner-type programs"); *id.* at 330 (discussing a meeting with King's new supervisor in which King states he told the supervisor about the same promotional activities and that they were illegal kickbacks); *id.* at 335-40 (discussing a meeting with the regional director of the Southwest district in which King expressed concern about whether certain programs were illegal or would be considered kickbacks and indicating that the regional manager told King to "let that go"); and *id.* at 345 (testifying that King spoke with a different upper-level executive about the same concerns with promotional activities that he had addressed with his new supervisor and the regional manager and specifically stating that these promotional activities were "illegal and were . . . indeed, kickbacks").

fact, asking about the legality of Solvay's off-label marketing practices so as to raise a distinct possibility that he may bring an FCA case against Solvay for the practices.  *Id.*

Solvay contends that King expressed concern about a marketing strategy, not a concern about false or fraudulent claims being submitted to the government.  Dkt. 393.  Solvay also argues that King's discussions were not aimed at matters that raised a distinct possibility of FCA litigation. Instead, Solvay contends King's complaints were "mere criticism" that did not implicate federal funds or fall into the FCA's scope.  *Id.*  Thus, Solvay argues that King's "internal complaints" simply do not constitute protected activity.  Solvay also points out that King testified that his motivation for complaining about Solvay's marketing of, specifically, AndroGel for depression, was his passion for mental health, not because he was concerned about fraud on the government.  *Id.*  Solvay argues that the fundamental purpose of the FCA anti-retaliation statute—to protect employees acting in furtherance of an FCA suit—is missing from King's story.  *Id.*

### 2.    Drummond's Alleged Protected Activity

Drummond contends she raised concerns about Solvay's alleged illegal activity and how its policy prohibiting off-label promotion was inconsistent with the company's expectations on at least seven different occasions.[3] Dkt. 422.  Drummond contends she raised questions during question and

---

[3]  *See* Dkt. 422, Ex. 4 at 157–160 (stating that she (Drummond) told her direct supervisor in a telephone conversation that she believed the arterial wall compliance messaging for Aceon was off-label and that, at some point, her supervisor advised her that she needed to be "careful about where [she threw] her chips in"); *id.* at 161–66 (stating that the arterial wall compliance issue was later discussed at an Aceon brand team meeting and Aceon's brand manager was present); *id.* at 167–71 (testifying that she (Drummond) raised an issue about specific programs being off-label with every direct supervisor during the time Solvay sold the product); *id.* at 172-73, 176 (discussing communications with "Kate" on the brand team about the appropriateness of promoting AndroGel in the low to normal testosterone situation, especially when only one test was used); *id.* at 198, 202 (indicating that when the regional manager asked Drummond to record a lecture and distribute it to others in the region, Drummond "reminded" the regional manager that it contained off-label

answer sessions in front of the Aceon brand team and that her questions were certainly more than mere criticism. *Id.* She contends that she specifically questioned the legality of the off-label marketing practices, which raises a distinct possibility that she may file an FCA lawsuit. *Id.* Specifically, she argues that she expressed her concerns about the arterial wall compliance message.[4] *Id.*

Solvay argues that Drummond does not provide evidence of even one conversation in which she raised concern about the possibility that Solvay was causing false claims for payment to be submitted to the government. Dkt. 393. It contends that any doubts she expressed about Solvay's marketing messages were not protected activity because she never suggested that Solvay was fraudulently reaping federal funds. *Id.* Moreover, Solvay notes that Drummond's motivation in raising her concerns was a "discomfort" with violating company policy. *Id.*

### 3. The Law Relating to "Protected Activity"

Internal complaints that "concern false or fraudulent claims for payment submitted to the government" are "protected activity" under the FCA. *Patton*, 418 F. App'x at 372. "The employee's

---

information yet the manager still wanted her to record and distribute it); *id.* at 195 (noting that the regional manager dismissed Drummond's concerns about leaving physicians off-label PROGRESS CDs as part of a continuing medical education program); *id.* at 207-13 (stating that she (Drummond) questioned the Vice President of sales about how physicians would perceive the "Nurse Betty" program); *id.* at 238-40 (stating that she (Drummond) voiced concerns to her regional manager about possibly being in jeopardy for promoting off-label after King's termination and that her regional manager told her to "[g]et over it"); Dkt. 422, Ex. 6 at 382-85 (describing instances in which she [Drummond] stated in writing that she and her team were uncomfortable with being asked to sign a document indicating that it was not appropriate to market off-label when in fact they were being asked to promote products that way in the field).

[4] Relators also contend that Drummond told her supervisor that she was concerned after King had been terminated and felt she may need to consult an attorney. *Id.* However, Relators merely cite the fifth amended complaint to support this contention, which is not competent summary judgment evidence.

actions must be aimed at matters demonstrating a 'distinct possibility' of False Claims Act litigation." *United States ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 605 (S.D. Tex. 2012) (Rosenthal, J.) (citing *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303–04 (11th Cir. 2010) (per curiam); *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004); *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002); *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010)).  Under the "distinct possibility" standard, "protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867 (4th Cir. 1999)).  "[T]he focus is on whether the internal complaint 'allege[s] fraud on the government.'" *George*, 864 F. Supp. 2d at 606 (quoting *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 517 (6th Cir. 2000)); *see also United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. H-112973, 2014 WL 4649885, at *16 (S.D. Tex. Sept. 16, 2014) (Rosenthal, J.) (noting that the Fifth Circuit recognizes internal complaints as protected activity under the FCA if they raise concerns about fraud).

In *United States ex rel. Patton v. Shaw Servs., L.L.C.*, John Patton, a carpenter, brought a *qui tam* action against his previous employer, Shaw Services, L.L.C. ("Shaw"), alleging that Shaw violated the FCA by submitting false or fraudulent claims for payment to the federal government and terminated his employment when he complained about it.  418 F. App'x at 367–68.  Shaw moved for summary judgment on the retaliation claim, arguing that Patton could not establish that his supervisors were aware of his complaints and terminated his employment because of them.  *Id.* at

6

368.  Patton filed a declaration in which he stated that he "complained repeatedly" to Shaw supervisors and off-site management about "fraudulent construction mistakes." *Id.* at 372.  These "mistakes" were allegedly improper construction methods.  *Id.*  The district court found, and the Fifth Circuit affirmed, that Patton had not provided sufficient evidence to overcome summary judgment.  *Id.*  Instead, his statements were "conclusory and unsupported by specific facts." *Id.*  The Fifth Circuit additionally (and importantly) noted that "although Patton alleges that he internally reported 'fraud,' it is clear that the substance of his complaints concerned Shaw's allegedly unsafe or improper construction methods, and not that Patton was concerned that Shaw was defrauding the government." *Id.*  The Fifth Circuit held that "[m]ere criticism of Shaw's construction methods, without any suggestions that Patton was attempting to expose illegality or fraud within the meaning of the FCA, does not rise to the level of protected activity." *Id.*  Additionally, the court instructed that an "employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation.'" *Id.* (quoting *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999)).

In *George v. Boston Scientific Corp.*, Judge Rosenthal discussed whether an employee's questions to her employer rose to "protected activity" under the FCA's whistleblower provision.  864 F. Supp. 2d at 606.  The employee had asked her employer whether the federal government would view her employer's marketing of a medical device for off-label use as fraud on the government. *Id.*  The questioning occurred during and immediately subsequent to a meeting about illegal marketing activity and during a meeting about how the device may soon be approved for a then off-label use.  *Id.* at 607.  George did not directly say when questioning the marketing practices that the marketing was unlawful or fraudulent.  *Id.*  George was warned immediately after the questioning

7

"that her job could be at risk" and was reprimanded for the questioning.  *Id.*  She was criticized by her supervisors in the weeks that followed, complained about disparate treatment resulting from her challenging the company's off-label promotion activities, and was eventually terminated.  *Id.* at 601–02.  She filed a *qui tam* complaint alleging, among other things, retaliation. *Id.* at 599.  The defendants moved to dismiss the retaliation claim.  *Id.*

Judge Rosenthal ruled that, taken in context with the types of meetings at which George allegedly asked the questions, George "did more than merely criticize the way in which [her employer] instructed sales representatives to market the . . . device," and that her questions were "'sufficient to support a reasonable conclusion that [her employer] could have feared being reported to the government for fraud or sued in a *qui tam* action.'"  *Id.* (quoting *Sanchez*, 596 F.3d at 1304).  Judge Rosenthal stated, "George's twice-repeated questions about the legality of [her employer's] off-label marketing practices raised a 'distinct possibility' that she, or other employees attending the presentation, might bring False Claims Act litigation against [the employer] for those practices." *Id.*

In *United States ex rel. Ligai v. ETS-Lindgren Inc.*, Judge Rosenthal considered an FCA retaliation claim involving Slav and Tatiana Ligai's termination from ETS-Lindgren Inc. ("ETS").  2014 WL 4649885, at *1.  Slav Ligai was a calibration technician and Tatiana Ligai was a test technician.  *Id.*  Slav Ligai allegedly made internal complaints about ETS and its parent company violating the FCA by submitting claims for payment for improperly conducted calibration tests.  *Id.*  After he and Tatiana Ligai were terminated, Slav Ligai filed an FCA case against ETS and the parent company, asserting, among other claims, that ETS retaliated against him in violation of the FCA whistleblower provision.  *Id.*  Tatiana Ligai was later added as a plaintiff.  *Id.*  ETS and its parent

company moved to dismiss. *Id.* Judge Rosenthal ruled that the Ligais did not adequately allege that Slav Ligai's conduct was undertaken in furtherance of an action under the FCA or that it put the defendants on notice of a potential FCA claim. *Id.* at *16.  She noted that an "employee's allegations that he [or she] complained about his [or her] employer's errors in performing a government contract are insufficient unless the employee specifically referred to fraudulent claims for payment for those services, putting the employer on notice of potential FCA liability."[5] *Id.* (citing *Patton*, 418 F. App'x at 372–73).

### 4.    Analysis: King

King's complaints more closely mirror those in *George* than in *Patton* or *Ligai*.  King's specific discussion on some of the occasions that the activities were "illegal" or "kickbacks" connects the complaints with federal funds sufficiently to raise the "distinct possibility" that he may bring FCA litigation.  The fact that he at some point noted that his motivation was his passion for mental health and that he was primarily concerned with the alleged marketing of AndroGel for depression does not negate this possibility.  If King were indeed solely concerned about the alleged marketing of AndroGel for depression because he was passionate about mental health, certainly bringing an FCA lawsuit would be a way to police any alleged illegal marketing.

Solvay takes issue with the fact that the only evidence offered of King's alleged protected activity is King's deposition testimony about the discussions he claims he had with his superiors. Solvay argues that "'self serving statements, without more, will not defeat a motion for summary judgment, particularly one supported by plentiful contrary evidence.'"  Dkt. 449 at 4 (quoting *Smith*

---

[5]  Judge Rosenthal offers some additional analysis relating to the 2009 amendments to the FCA whistleblower provision, which do not apply to this case.

*v. Sw. Bell Tel. Co.*, 456 F. App'x 489, 492 (5th Cir. 2012) (unpublished) (noting that the plaintiff relied on "uncorroborated allegations" in her own affidavit to challenge the defendant's nondiscriminatory reason for terminating her employment) and citing *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (finding that the defendant's self-serving statement in an affidavit that a third party had paid his debts for him, without any supporting documentation, when he was required to provide an issue of material fact that the debt had been paid, was insufficient to survive summary judgment)).  However, the cases on which Solvay relies discuss conclusory self-serving affidavits.  Here, King testifies about several specific instances in which he discussed specific alleged illegal behavior with particular individuals who were his superiors.  The court finds that, if King's claim were to survive on the other elements, it would best be left to a finder of fact to determine if King's testimony with regard to protected activity is credible.  The testimony is sufficient to raise an issue of material fact as to the protected activity element.

### 5.      Analysis: Drummond

The testimony Relators cite with regard to Drummond concerns communications that were consistently about "off-label promotion," but there is no indication that Drummond was expressing concern about the alleged "off-label" promotion being illegal.  Instead, it appears she was concerned that she or the representatives under her control would be violating Solvay's written policy prohibiting off-label promotion.  While certainly one could make an inference that her voiced concerns about "off-label promotion" were also concerns about illegal behavior that would cause false claims to be filed, the court finds that the types of complaints discussed in Drummond's deposition are merely criticisms about the way Solvay was doing business.  Drummond's complaints are distinguished from those in *George* because, while both Drummond and George complained

about off-label promotion, George's complaints were in conjunction with a meeting about how off-label promotion is illegal.  Since the substance of Drummond's complaints as reflected in the summary judgment record did not raise a distinct possibility that Drummond may file an FCA claim, she has not presented the court with an issue of material fact for trial that she engaged in protected activity.  The court will, however, review the other elements with respect to both Drummond and King, in an abundance of caution.

### B.      Did Solvay Know About the Protected Activity?

Solvay argues that Solvay could not have known about the protected activity because Relators never engaged in protected activity.  Dkt. 393.  Relators contend that Solvay supervisors and executives knew Relators engaged in protected activity because they repeatedly questioned, inquired, and expressed concern regarding Solvay's "illegal behavior."  Dkt. 422.  This prong does not require much analysis.  If the complaints were protected activity, they were directed at Solvay executives, and the alleged comments of the executives relating to "getting over it" or "letting it go" indicate that they were aware that Relators engaged in that activity.  *See supra* notes 2–3.

### C.      Were Relators Terminated Because of the Protected Activity?

Solvay argues that even if Relators engaged in protected activity, there is no evidence that their complaints were causally related to their terminations.  Dkt. 393.  It contends that Relators must be able to show that they were terminated "on account of" or "by reason of" engaging in protected activity, which is a "but-for" causation standard.  *Id.*  Additionally, it argues that even if a mixed-motive standard applies, Relators cannot offer any evidence that Relators were terminated, in part, because of their protected activities.  *Id.*  Solvay contends that King admitted he violated company policy on promotional materials and that there is evidence that Drummond violated company policy.

11

*Id.*

Relators argue that they are required to show that a reasonable trier-of-fact could conclude that Relators were terminated, at least in part, because of their protected activity, which is a mixed-motive standard.  Dkt. 422.  Relators contend that there is certainly a question of fact, given the foregoing, that retaliation was at least a motivating factor in the decision to terminate both Relators. *Id.*  Further, they assert that even if the court requires but-for causation, there is sufficient evidence of causation to create an issue of material fact because (1) the combination of suspicious timing coupled with other significant evidence of pretext can overcome summary judgment; and (2) temporal proximity alone can in some cases establish a prima face case of retaliation.  *Id.*  Relators contend that they were both terminated shortly after they voiced repeated complaints about the alleged unlawful marketing even though they both had highly-commended work performance and had previously been working under unenforced company policies that were used to terminated their employment.  *Id.*

Solvay contends, in reply, that Relators cannot survive summary judgment under the but-for standard because they have not produced "significant evidence" of pretext.  Dkt. 449. Solvay notes that Relators engaged in the activities for which their employment was terminated and knew that the conduct justified termination.  *Id.*  As far as temporal proximity, Solvay argues that the Fifth Circuit has rejected the notion that temporal proximity alone can prove but-for causation in a retaliation case.  *Id.*  Finally Solvay contends that even if the court were to apply a mixed-motive theory, Relators would not prevail because Solvay has offered sufficient evidence that it had valid reasons for terminating Relators' employment and Relators have no evidence that this reason is pretext.  *Id.*

### 1.        The Law Relating to Causation

In *Rogers v. Bromac Title Services, L.L.C.*, the Fifth Circuit considered whether an employer improperly terminated the plaintiff's employment in violation of the Jury System Improvement Act ("JSIA").  755 F.3d 347, 349 (5th Cir. 2014).  The plaintiff argued that the district court should not have applied the but-for causation standard and required her to prove that her jury service was the *only* reason for her termination.  *Id.* at 350.  The Fifth Circuit held that the district court was correct to apply the but-for causation standard to the case because the language of the Age Discrimination in Employment Act ("ADEA") and the JSIA are similar, and the Supreme Court held that but-for causation applied to retaliation claims based on age discrimination in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343 (2009).  *Id.* at 351.

The JSIA states:

> No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee *by reason of* such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

28 U.S.C. § 1875(a) (emphasis added).  The portion of the ADEA considered by the Supreme Court in *Gross* states:

> It shall be unlawful for an employer–
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age . . . .

29 U.S.C. § 623(a)(1) (emphasis added).  The statute at issue in this case, as noted in the legal standard above, states:

> Any employee who is discharged . . . by his or her employer *because of* lawful acts done by the employee on behalf of the employer or others in furtherance of an action under this section . . . shall be entitled to all relief necessary to make the employee whole.

31 U.S.C.A. § 3730(h)(1) (2003) (emphasis added)**.**  The ADEA, considered by *Gross*, and the FCA, considered here, both say "because of."  The Fifth Circuit has interpreted the JSIA, which uses the term "by reason of" rather than "because of," as being close enough to the ADEA to merit the same causation standard.  Certainly, then, a statute using the exact same causation phrase should use the same standard.  Given this authority, but-for causation rather than mixed-motive should apply.  *See also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2534 (2013) (indicating that a "but-for" standard applies in Title VII retaliation cases, which the Court noted is consistent with its reading of the word "because" in *Gross*).

Relators cite *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469 (7th Cir. 2004), *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002), *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731, 736 (D.C. Cir. 1998), and *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034 (N.D. Ill. 1998) in support of their argument that a mixed-motive standard should apply.  *Fanslow*, *Brandon*, and *Luckey* all relate back to *Yesudian.  See Fanslow*, 384 F.3d at 485 (citing and applying *Yesudian* an requiring that the employee "demonstrate that his discharge was motivated, at least in part, by the protected conduct"); *Brandon*, 277 F.3d at 944 (same); *Luckey*, 2 F. Supp. 2d at 1054–55 (citing and applying *Yusudian*).  In *Yesudian*, the D.C. Circuit required that an FCA whistleblower show that "the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity."  153 F.3d at 736.  The D.C. Circuit based this requirement on a 1986 Senate Report relating to the False Claims Reform Act, which added whistleblower protection.  *Id.*  The Senate indicated that "[u]nder other

Federal whistleblower statutes, the 'because' standard has developed into a two-pronged approach. One, the whistleblower must show the employer had knowledge the employee engaged in 'protected activity' and, two, the retaliation was motivated, at least in part, by the employee's engaging in protected activity." S. Rep. No. 99-345 (1986), at 35, reprinted in 1986 U.S.C.C.A.N. 5266, 5300.

All of these cases, including the cases interpreting the other federal statutes discussed in the Senate Report, were decided before the Supreme Court stated in *Gross* that the "words 'because of' mean 'by reason of: on account of'" and held that, since the ADEA makes it unlawful for an employer to discriminate "because of" age, an ADEA plaintiff "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176. Relators have provided the court with no authority indicating that the Fifth Circuit or the Supreme Court would interpret "because of" differently in the FCA whistleblower provision. "'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of the language accurately expresses the legislative purpose.'" *Gross*, 557 U.S. at 176 (quoting *Engine Mfrs. Assn. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 S. Ct. 1756 (2004)).

Given that it is bound by the Supreme Court and the Fifth Circuit, the court agrees with Solvay that a but-for standard of causation applies. *Accord United States ex rel. Schweizer v. Oce N. Am.*, 956 F. Supp. 2d 1, 13 (D.D.C. 2013) ("The combined lesson of *Nassar* and *Gross* is clear: where Congress has given plaintiffs the right to sue employers for adverse actions taken against them by their employers 'because of' X, plaintiffs may succeed only by showing that X was a 'but-for' cause of the adverse action, not merely one of several 'motivating factors.'").

### 3.    Were Relators Terminated Because of a Protected Activity?

The court must determine whether engaging in a protected activity is the but-for cause of

Solvay's decision to terminate Relators' employment.  Solvay's purported reason for terminating King's employment is that, after an investigation, Solvay determined that King had adulterated a promotional slide kit in violation of company policy.  Dkt. 393.  Solvay provides the investigatory summary, dated April 16, 2002, in which Human Resources Consultant Mark Banks noted that "King altered a marketing presentation package for delivery by a doctor to a group of other physicians.  He sent the presentation (via email) to his representatives and 2 District Managers from another company . . . ." Dkt. 393, Ex. 2D.  Solvay also provides Banks's more detailed investigation notes.  Dkt. 393, Ex. 2C.  The notes indicate that on April 18 at 2:15 p.m., Banks and three other individuals met and decided that King had to be terminated because his actions with regard to the presentation jeopardized an agreement Solvay had with another pharmaceutical company.  *Id.*  The notes also indicate that King admitted to the investigator that he provided a slide kit containing part of an approved presentation to a physician and "made a mistake and included [an] unapproved slide in the presentation."  *Id.*  Solvay also provides a copy of an April 18, 2002 email from King to Harold Shlevin, President and CEO of Solvay Pharmaceuticals, Inc., in which King explains to Shlevin that he "recently made an honest mistake in creating a non-branded presentation for a Urologist for some local roundtable programs with PC physicians. . . . I accidentally inserted a slide of ALERT data . . . ." *Id.*

Solvay's purported reason for terminating Drummond's employment is that, after an investigation, Solvay determined that Drummond worked with two doctors on an unapproved letter writing campaigns to promote Aceon and AndroGel and sent letters to her sales force with instructions to solicit doctors to mail them out to patients and managed care providers, in violation of company policy.  Dkt. 393.  Solvay also provides investigative notes relating to Drummond.  The

notes start with a call from Drummond to the investigator in which Drummond discussed the letter campaign and that it made her feel uncomfortable because it was a breach of confidentiality. Dkt. 393, Ex. 2E.  Drummond had sent an email to her sales representatives in which she told her team to use the letter with "doctors in an effort to initiate a mail out in their office[s]."  Dkt. 393, Ex. 2G.  She sent an additional email stating that she was attaching two letters "we have worked on with Dr. [Doe]," and stating that she would like at least ten Aceon supporters to send the letter out.  Dkt. 393, Ex. 2H.  Shortly thereafter, Drummond's supervisor advised the representatives in a conference call not to use the letter.  Dkt. 393, Ex. 2E.  Drummond was not on the call.  After the call, which Drummond apparently heard about, Drummond left voicemails with various representatives, and Solvay provides transcripts of these voicemails.  *See* Dkt. 393.  In one voicemail, Drummond states, "If anything, this is more of an issue about my being a little too innovative, maybe, and stepping into the grey zone a bit outside of the box, I guess."  Dkt. 393, Ex. 2I.  The investigative notes indicate that Drummond was suspended with pay while she was being investigated for using unapproved marketing materials.  *Id.*  Solvay points out that Drummond admitted in her deposition that she indeed encouraged her sales representatives to ask doctors to write their own letters to request formulary changes.  Dkt. 393 (citing Ex. 12 at 86 (Drummond Dep.)).

Relators contend that there is a genuine issue of material fact as to whether they were terminated for retaliatory reasons.  Dkt. 422.  They contend that the timing of the terminations is suspect and that temporal proximity alone can be sufficient to establish a prima facie case of retaliation.[6]  *Id.*  Relators provide evidence indicating that both of them were terminated shortly after

---

[6] Relators also point out that "this Court has found that 'the alleged temporal proximity between the complaints and termination is sufficient to meet the plausibility standard in pleading causation.'"  Dkt. 422 (citing Dkt. 167 at 6).  The plausibility standard, however, is not at issue at

the last occurrence in which they voiced concerns about Solvay's alleged unlawful marketing practices. King testified that he spoke with managers about his concerns in January 2002 and was terminated approximately three months later, on April 18, 2002. Dkt. 422, Ex. 1 at 13; Ex. 2 at 298–99, 316–20. Drummond testified that she spoke with her supervisor after King was terminated but before she went on maternity leave on or about July 24, 2002, and was immediately suspended when she returned from maternity leave. Dkt. 422, Ex. 5 at 232-33, 238–39. Her conversations with her supervisor were about how she and her team were uneasy and anxious about the promotional best practices used in their district because King had "been involved in something that was considered off label, or something that had been created by him directly." *Id.* at 238–39. Drummond specifically expressed concerns about buttons her supervisor had approved, the managed care work they were doing, and letters that had been sent to the whole region. *Id.* at 239. Relators assert that causation due to the timing is buttressed because Relators were terminated despite having highly-commended work performance. Dkt. 422.

Relators rely on three cases to support their argument that the temporal proximity coupled with Relators' exemplary past performance is sufficient to satisfy their burden of producing evidence of an issue of material fact that they were terminated because they engaged in protected activity: *Strong v. University Healthcare System, LLC*, 482 F.3d 802, 808 (5th Cir. 2007), *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999); and *United States ex rel. Dyson v. Amerigroup Texas, Inc.*, No. H-03-4223, 2005 WL 2467689 (S.D. Tex. Oct. 6, 2005). Dkt. 422. In *Strong*, the Fifth Circuit considered a retaliation claim under Title VII in which the only evidence

---

the summary judgment stage. Relators must show that there is an issue of material fact relating to causation.

of causation was temporal proximity.  482 F.3d at 808.  The Fifth Circuit expressly rejected "the notion that temporal proximity standing alone can be sufficient proof of but for causation[, as] [s]uch a rule would unnecessarily tie the hands of employers."  *Id.*  Since the only evidence in *Strong* was temporal proximity, and the plaintiff had no evidence that the reasons the defendant gave for terminating his employment were pretextual, his retaliation claims failed.  *Id.*

In *Shackelford*, the Fifth Circuit was considering a Title VII case alleging racial discrimination and retaliation for engaging in protected activity.  190 F.3d 398.  The defendant argued that the reason it fired the plaintiff was bad performance and poor interpersonal skills.  *Id.* at 409.  The plaintiff presented evidence of a "tight temporal proximity between her protected activity and her termination," she disputed various aspects of the alleged "bad performance" her employer asserted caused it to fire her, and she asserted that various other employees had warned her not to get involved in the protected activity if she wanted to keep her job.  *Id.*  The Fifth Circuit held that the "evidence on the record, when viewed in its totality and in the light most favorable to [the plaintiff], is sufficient to create a genuine issue of material fact as to whether [the employer] fired [the plaintiff] in retaliation for activities protected by Title VII."  *Id.*  It noted that a reasonable jury could believe the plaintiff's account and that her account, while alone not sufficient to survive summary judgment, was sufficient when it was coupled with the suspicious timing of her termination.  *Id.*  It summarized that "the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment."  *Id.*

In *Dyson*, an FCA retaliation case decided *before Gross* and *Rogers,* the court required only evidence that a reasonable trier of fact could conclude that "the plaintiff was terminated, at least in part, because of her protected activity," citing *Brandon*, *Yesudian* and *Luckey*.  2005 WL 24676889,

at *3. The defendant claimed that it fired the plaintiff because she took work home with her and lost it. The plaintiff put forward evidence of a short temporal proximity between her termination and activity protected under the FCA, that she had positive performance reviews, and that other employees who had taken work home and lost it had not been fired. *Id.* The court found, relying on *Shackelford*, that the temporal proximity coupled with this other evidence was sufficient to overcome summary judgment. *Id.*

These three cases, taken together and in light of the court's finding that but-for causation applies, indicate that Relators could survive summary judgment if their evidence of temporal proximity were coupled with significant evidence of pretext. The evidence of pretext provided by Relators consists of performance appraisals indicating that both employees had been rated highly, commendations received by Drummond, and an email indicating that King was a valued employee.[7] Dkt. 154, Ex. 10; Dkt. 422, Exs. 3, 4 at 32, 9. When the court considers the reason for both terminations—violating company policy relating to promotion—the positive performance reviews, and exemplary past performance are not substantial evidence of pretext in light of the discrete violations that led to the terminations. Relators have provided no evidence that Solvay was aware of violations of the policy at issue prior to the positive reviews and commendations but only acted on the violations after the Relators engaged in protected activity.

The temporal proximity between the protected activity and terminations coupled with the fact that Relators had previously received positive performance reviews, commendations, and emails,

---

[7] Relators also state that they "both worked under consistently underenforced company policies." Dkt. 422. As evidence, they cite various testimony by Drummond—not King—about promotional activities that she engaged in that were "directives" or that she was "pressured" into. Dkt. 422 at 24 n.8. There is, however, no argument or evidence linking these activities to specific policy violations.

is insufficient evidence for a reasonable juror to conclude that Relators would not have been fired but for engaging in protected activity.  Accordingly, Relators have not met their burden, and Solvay's motion for summary judgment on the federal FCA claim is GRANTED.

## IV. Conclusion

Solvay's motion for summary judgment on Relators' federal FCA claim is GRANTED. Relators' federal FCA claim is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on July 14, 2015.

_____
Gray H. Miller
United States District Judge